IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | (Joint Admin. Requested) |
| | ) | |
| CRAVE BRANDS, LLC, | ) | Case No. 21-04729 |
| | ) | |
| MEATHEAD RESTAURANTS, LLC, | ) | Case No. 21-04731 |
| | ) | |
| Debtors. | ) | Hon. Timothy A. Barnes |
| | ) | |
| | ) | |

## <u>NOTICE OF MOTION</u>

To:      See attached service list.

PLEASE TAKE NOTICE that on **Tuesday, April 13, 2021 at 4:00 p.m.,** I will appear before the Honorable Judge Timothy A. Barnes, or any judge sitting in that judge's place, and present **Debtors' Motion to Use Cash Collateral and to Provide Adequate Protection**, a copy of which is attached.

This motion will be presented and heard electronically using Zoom for Government. No personal appearance in court is necessary or permitted. To appear and be heard on the motion, you must do the following:

**To appear by video**, use this link: https://www.zoomgov.com/. Then enter the meeting ID and password.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666.  Then enter the meeting ID and password. Those appearing before telephone will require extra clearance before being allowed into the hearing.

Meeting ID and password.  **The meeting ID for this hearing is 161-236-0271 and the passcode is 04132100.**   The meeting ID and password can also be found on the judge's page on the court's web site.

Respectfully submitted,

CRAVE BRANDS, LLC and
MEATHEAD RESTAURANTS, LLC


By:  /s/ David A. Warfield
        One of their attorneys

Lauren Newman, Esq.  (IL Bar No. 6188355)
Thompson Coburn LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
Telephone: (312) 580-2328
Fax: (312) 580-2201
lnewman@thompsoncoburn.com

David A. Warfield
Thompson Coburn LLP
One U.S. Bank Plaza, Suite 2700
St. Louis, Missouri 63101
Telephone: (314) 552-6079
Fax: (314) 552-7000
dwarfield@thompsoncoburn.com

Proposed Counsel for Debtors

## CERTIFICATE OF SERVICE


The undersigned a non-attorney, being first duly sworn on oath, deposes and says that she served a copy of this **Notice of Motion** and **Debtors' Motion to Use Cash Collateral and to Provide Adequate Protection,** a copy of which is served upon you**,** via FEDERAL EXPRESS or USPS Overnight Delivery, on April 12, 2021.


/s/ David Warfield

SERVICE LIST

**STREET ADDRESSES**

Detection Systems
1111 Church Rd
Aurora, IL 60505

Alpha Baking Company
36230 Treasury Center
Chicago, IL 60694

Alsco
2641 S. Leavitt St.
Chicago, IL 60608

C150-II 709 S. Main LLC
c/o Campus Advantage
709 S. Main St.
Normal, IL 61761

City of Champaign Sales Tax
Finance Department-Annette
102 N. Neil
Champaign, IL 61820

Dreamspace Munster, LLC
c/o Lee & Associates, LLC
10123 Alliance Rd., Suite 300
Cincinnati, OH 45242

DTAT Enterprises Inc.
Iroquis Federal
108 Arbours Dr.
Savoy, IL 61874

Eichenhauer Services Inc.
2465 N. 22nd St
Decatur, IL 62526

Fifth Third Bank
222 S. Riverside Plaza
29th Floor
Chicago, IL 60606

FW IL-RIverview Plaza, LLC
Roscoe Square Shopping Center
3043 Solutions Center
Chicago, IL 60677

MEPT Stony Creek, LLC
c/o Hamilton Partners, Ins
300 Park Blvd., Suite 201
Itasca, IL 60143-2636

Well Done
Hospitality Group, LLC
430 W. Erie St., Suite 403
Chicago, IL 60654

Willow Festival Regency LLC
c/o Regency Centers-Willow Festival
1568 Solutions Center
Chicago, IL 60677-1005

William J. Factor, Esq.
counsel for LQD Financial Corp.
150 W. Madison Street, Suite 1500
Chicago, IL 60602

Gretchen Silver, Trial Attorney
Office of the United States Trustee
219 S. Dearborn Street, Room 873
Chicago, IL 60604

Matthew Brash
Newpoint Advisors Corporation
1320 Tower Road
Schaumburg, IL 60173

Bob Handler
Commercial Recovery Associates, LLC
205 W. Wacker Drive
Suite 918
Chicago, IL 60606

LQD Financial Corp.
370 North Carpenter Street
Chicago, IL 60607

Servcorp West Lake LLC

444 West Lake Street Floor 17
Chicago, IL 60606

Small Business Administration
14925 Kingsport Road
Fort Worth, TX 76155

## P.O. BOX ADDRESSES (OVERNIGHT USPS)

Illinois Department of Revenue
Springfield, IL 62726
City of Bloomington Water
P.O. Box 801214
Kansas City, MO 64180-1214

Element Heating and Cooling
P.O Box 72
Plainfield, IL 60544

Indiana Department of Revenue
P.O. Box 7229
Indianapolis, IN 46207

NuCo2 LLC
P.O. Box 417902
Boston, MA 02241-7902

Roberts Sysco Inc.
P.O. Box 620
Lincoln, IL 62656

Staples Business Advantage
P.O. Box 660409
Dallas, TX 75266-0409

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| CRAVE BRANDS, LLC, | ) | Case No. 21-04729 |
| | ) | |
| MEATHEAD RESTAURANTS, LLC | ) | Case No. 21-04731 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |
| | ) | |

**DEBTORS' MOTION TO USE CASH COLLATERAL AND TO
PROVIDE ADEQUATE PROTECTION**

Comes now Crave Brands, LLC ("Crave") and Meathead Restaurants, LLC ("Meathead") (Crave and Meathead are collectively the "Debtors"), by undersigned counsel, and file the Debtors' Motion to Use Cash Collateral and to Provide Adequate Protection (the "Motion"). In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Steve Karfaridis in Support of First Day Pleadings (the "First Day Declaration") filed with the Court contemporaneously with this Motion.  In further support of the Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE AND DEBTOR BACKGROUND**

1.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 40.3.1(a) of the Local Rules of the United States District Court for the Northern District of Illinois.

2.     This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(M).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested in the Motion are sections 105(a), 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois ("Local Rules").

4.     On April 9, 2021 (the "Petition Date"), each of the Debtors filed with this Court voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code.[1]

## ABOUT THE DEBTORS

5.     Meathead operates twelve company-owned fast casual restaurants in Illinois and Indiana.  In addition, there is one franchised restaurant.  A non-debtor affiliate, Meathead Franchising, LLC, is the franchisor. The ownership structure of the Meathead related entities (eis as follows:

| **Steve Karfardis**<br>Co-maker on LQD obligations |
| --- |

| **KW Restaurant Holdings, LLC,** a single member LLC<br>Co-maker on LQD obligations<br>Member interest owned by Steve Karfardis |
| --- |

| **Crave Brands, LLC**<br>Co-maker on LQD obligations<br>Member interests owned by KW Restaurant Holdings LLC (67%), Meathead Investments, LLC (25%),and others (7%)  (All amounts rounded)<br>Filed bankruptcy on 4/9/21 at 3:47 p.m. |
| --- |

| **Meathead Restaurants, LLC,** a single member LL<br><br>Co-maker on LQD obligations<br>Member interest owned by Crave Brands, LLC<br>Owns sole member interest in Meathead Franchising LLC<br>Filed bankruptcy on 4/9/21 at 3:55 p.m. |
| --- |

[1] LQD Financing has asserted that the Debtors' bankruptcy filings were not properly authorized.  The Debtors dispute LQD Financing's argument.  However, nothing in this Motion is intended to prejudice LQD Financing from asserting its arguments regarding the purported lack of authority.

## LQD LOAN

6.      Meathead maintains it main operating account at Fifth Third Bank (the "Fifth Third Operating Account").

7.      On February 22, 2019,  the Debtors, as borrowers, certain other non-debtors[2], and LQD Business Finance Loan Company,[3] as lender (the "Lender"), executed that certain Loan Agreement (as thereafter amended, the "Loan Agreement") pursuant to which the Lender agreed to loan funds and extend financial accommodations to the Debtors and certain non-debtor borrowers (the borrowers under the Loan Agreement shall collectively be referred to as the "Borrowers").

8.      Copies of the Loan Agreement and the subsequent amendments and forbearance agreement are attached hereto and incorporated herein as follows:

| Document Name | Date | Exhibit |
|---|---|---|
| Loan Agreement | February 22, 2019 | A |
| Amendment | March 25, 2020 | B |
| Amendment | July 2, 2020 | C |
| Amended and Restated Forbearance and Reaffirmation Agreement | December 18, 2020 | D |

9.      The indebtedness described in the Loan Agreement matured on March 31, 2021. The Debtors were not in payment default at maturity.  Moreover, the Debtors were not in violation of any financial covenants at the time of maturity.

10.      As of the Petition Date, the balance due to the Lender is $6,650,000.00 in principal plus accrued interest at the rate of 17% per annum (the "LQD Indebtedness").

---

[2] The non-debtor borrowers are Steve Karfaridis, KW Restaurant Holdings Group, LLC, and Meathead Franchising, LLC.

[3] Upon information and belief, LQD Business Finance Loan Company thereafter assigned its interests to an affiliate, LQD Financial Corp.  Unless indicated to the contrary, all references to the "Lender" in this Motion shall be deemed to refer to LQD Financial Corp.

11.    To secure the Obligations (as defined in the Loan Agreement), each of the Borrowers granted to the Lender a security interest in the "Collateral" (as defined in the Loan Agreement).  To further secure the Obligations under the Loan Agreement, certain of the Borrowers pledged to the Lender the "Pledged Stock" (as defined in the Loan Agreement").[4]

12.    Certain of the Collateral constitutes "cash collateral" within the meaning of Section 363(a) of the Bankruptcy Code including, all cash and cash equivalents and the proceeds of the sale of the Meatheads' inventory (collectively, the "Cash Collateral").[5]

13.    The Lender filed UCC-1 financing statements with the Delaware Secretary of State's Office against the Debtors.

14.    In these cases, LQD's "Cash Collateral" consists of (a) the funds in the Fifth Third Operating Account on the Petition Date, (b) the proceeds of the sale of all inventory on hand as of the Petition Date, and (c) the expected ERC payment (as described below).

15.    No other creditor holds or asserts an interest in the Cash Collateral.

16.    The Debtors is in the process of developing a budget of expected cash receipts and expenditures for the 13 weeks beginning on or about the Petition Date (the "Cash Budget").  A copy of the Cash Budget will be filed separately.

**COVID RELATED PROGRAMS**

17.    In 2020, Meathead received a total of $982,112 in a Paycheck Protection Program loan from Fifth Third Bank ("PPP-1 Loan").  Meathead used the PPP-1 Loan proceeds to pay authorized expenses throughout 2020.  Meathead has applied for forgiveness of the PPP-1 Loan and expects a favorable response in the coming weeks.

18.    In 2021, Meathead received a total of $1,438,844.00 in Paycheck Protection Program Second Draw loans from Fifth Third Bank ("PPP-2 Loan").  Meathead deposited the PPP-2 Loan in an account at Chase Bank (the "Chase Account").  The Lender does not hold a lien or security interest in the Chase Account or the funds located therein.  In order to preserve the

---

[4] While the Loan Agreement uses the term "Pledged Stock", in fact the assets pledged were member interests in limited liability companies. The Motion nevertheless uses the term "Pledged Stock" for the sake of consistency.
[5] Crave does not own any inventory or operating assets and therefore has no cash collateral.

future forgivability of the PPP-2 Loan, Meathead must abide by PPP-2 limitations on permissible uses for the funds.[6]

19.     On or about March 4, 2021, Meathead submitted the appropriate paperwork for payment of an Employee Retention Credit ("ERC").  The ERC is authorized by Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), as thereafter amended. Upon information and belief, Meathead will receive a ERC payment of slightly under $700,000 on or about June 1, 2021.

20.     In 2020, Crave also received a COVID-19 Economic Injury Disaster Loan from the U.S. Small Business Administration (the "EIDL Loan") in the amount of $149,500.  This is an unsecured loan with a 20 year term that bears interest at 1 percent per annum.  Upon information and belief, at the present time, the law does not permit the EIDL Loan to be forgiven.

## NEED FOR USE OF CASH COLLATERAL

21.     The Debtors request entry of an Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and the Local Rules and haves an immediate need to obtain use of Cash Collateral (in the amount and in the manner set forth in the Cash Budget  in order to, among other things, preserve and maintain the value of its assets and business and maximize the return to all creditors. An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Cash Budget, for working capital purposes, payment of employees, other general corporate purposes of the Debtor, and the satisfaction of costs and expenses of administering these cases. The Debtors' ability to operate through the use of the Cash Collateral is vital to the Debtors and their effort to maximize the value of its assets. Absent entry of an order authorizing the use of Cash Collateral, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.

## APPLICABLE LAW

22.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to use property of

---

[6] Neither of the PPP loans are included for purposes of determining eligibility for relief under Subchapter V of Chapter 11. In re Parking Management, Inc., 620 B.R. 544 (Bankr. D. Md. 2020)

the estate in the ordinary course of business. To use cash collateral, however, one of two conditions must be satisfied: (1) each entity with an interest in the cash collateral consents to its use, or (2) the court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c)(2). In the latter instance, the court is instructed to prohibit or condition the use of cash collateral as is necessary to provide adequate protection for the interests of the secured party. 11 U.S.C. § 363(e).

23.    Generally, adequate protection can be provided through periodic cash payments, replacement liens, and such other relief (other than administrative expense claims) that will result in the secured creditor receiving the indubitable equivalent of its interest in the cash collateral being used. 11 U.S.C. § 361.

## ADEQUATE PROTECTION

24.    The Debtors propose to provide adequate protection to Lender by (a) granting to the Lender replacement liens on the Collateral to the same extent, validity and priority of the Lender's pre-petition liens on the Collateral to secure any diminution in value of Lender's interest in the Cash Collateral as of the Petition Date[7]; (b) to the fullest extent permitted by law and the rules implementing the Paycheck Protection Program, making all payments pertaining to the ordinary course of business operations from the Chase Account and not from the Fifth Third Account; and  (c) granting such other accommodations to the Lender as are customary in cash collateral orders in similar cases. To the fullest extent permitted by the CARES Act, the Debtors intend to pay immediately the ERC to Lender as soon as possible as after receipt for application to the principal amount of the LQD Indebtedness

---

[7] For the avoidance of any doubt, the Debtors do not propose to provide a replacement lien on the Chase Account because the Lender did not have a prepetition lien on the Chase Account or the funds located therein.

## REQUEST FOR RELIEF

25.     The Debtors request that the Court enter and interim and final order authorize Debtors to use Cash Collateral (in addition to the funds in the Chase Account as permitted by the Paycheck Protection Program) as necessary for the ongoing business operations of the Debtors consistent with the Cash Budget (with a variance not to exceed 10% per budget item).

26.     The Debtors also request that the Court grant adequate protection to Lender by providing a replacement lien on the Collateral to the same extent, validity and priority of the Lender's pre-petition liens on the Collateral to secure any diminution in value of Lender's interest in the Cash Collateral as of the Petition Date and direct the Debtors to pay the ERC proceeds to Lender after receipt to the fullest extent permitted by the CARES Act.

## NOTICE

27.     The Debtors have served notice of this Motion on (a) William J. Factor, Esq., counsel for LQD Financial Corp., 105 W. Madison Street, Suite 1500, Chicago, IL 60602, (b) Gretchen Silver, Trial Attorney, Office of the United States Trustee, 219 S. Dearborn Street, Room 873, Chicago, IL 60604, (c) Matthew Brash, Newpoint Advisors Corporation, 1320 Tower Road, Schaumburg, IL 60173, (d) Bob Handler, Commercial Recovery Associates, LLC, 205 W. Wacker Drive, Suite 918, Chicago, IL 60606, and (e) those creditors appearing on the List of 20 Largest Unsecured Creditors filed in the Debtors' cases, and (f) LQD Financial Corp., 370 Carpenter St., Chicago, IL 60607 (collectively, the "Notice Parties").

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) approving the terms of the proposed cash collateral order submitted simultaneously with the Motion, (b) scheduling a hearing to approve the Motion on a final basis, and (c) granting such other and further relief as is just and equitable under the circumstances.

Respectfully submitted,

CRAVE BRANDS, LLC and
MEATHEAD RESTAURANTS, LLC


By:  /s/ David A. Warfield
        One of their attorneys

Lauren Newman, Esq.  (IL Bar No. 6188355)
Thompson Coburn LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
Telephone: (312) 580-2328
Fax: (312) 580-2201
lnewman@thompsoncoburn.com

David A. Warfield
Thompson Coburn LLP
One U.S. Bank Plaza, Suite 2700
St. Louis, Missouri 63101
Telephone: (314) 552-6079
Fax: (314) 552-7000
dwarfield@thompsoncoburn.com

Proposed Counsel for Debtors



## LQD BUSINESS FINANCE LOAN AGREEMENT

This Loan Agreement, (this "Agreement"), dated as of February 22, 2019, (the "Effective Date"), is made by and between (i) LQD Business Finance, LLC, (the "Lender"), and (ii) the below named Borrowers, (together the "Borrowers" and each, a "Borrower") jointly and severally.  The Borrowers and the Lender are collectively referred to herein as the "Parties," and each, a "Party."

| Borrower Name | Borrower Type | Borrower Address | Borrower TIN | Borrower - State ID or Entity Type | Borrower - Issuing State | Borrower - State ID Number |
|---|---|---|---|---|---|---|
| Crave Brands, LLC | LLC | 101 California Street, Suite 2710, San Francisco, CA 94111 | 833331026 | Limited Liability Company | DE | 202151670 |
| KW Restaurant Holdings, LLC | LLC | 1278 Glenneyre Street Suite 128, Laguna Beach, California 92651 | 83-1618548 | Limited Liability Company | DE | 6942734 |
| Meatheads Franchising, LLC | LLC | 101 California Street, Suite 2710, San Francisco, CA 94111 | 37-1847484 | Limited Liability Company | IL | 05988616 |
| Meatheads Restaurants, LLC | LLC | 101 California Street, Suite 2710, San Francisco, CA 95356 | 83-2865094 | Limited Liability Company | DE | 202121200 |
| Steve Karfaridis | Individual | 1278 Glenneyre Street, Suite 128, Laguna Beach, CA 92651 | 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 | Drivers License | CA | C2093949 |

1.    **DEFINITIONS.**  When used herein, the following terms shall have the following meanings:

| | |
|---|---|
| Borrowers | The above listed Borrowers jointly and severally |
| Principal Amount | $6,500,000.00 |
| Contract Funding Date | February 22, 2019 |
| Maturity Date | September 27, 2019 |
| First Payment Date | March 5, 2019 |
| Interest Rate | 18% |
| Daily Default Penalty | $902.78 |
| Number of Payments | 26 |
| Payment Amount | $22,500.00 |

| Payment Frequency | Weekly |
| Payment Day | Tuesday of each week |
| Prepayment Fee | 10% |
| Origination Costs | $195,000.00 |
| Administrative Costs | $65,000.00 |

**2.      LOAN:**  The Borrowers have requested that the Lender make available to the Borrowers the loan described herein in the Principal Amount, (the "Loan"), and the Lender is willing to make the Loan to the Borrowers under the terms and conditions contained in this Agreement. The Lender may, with or without cause, cancel this Agreement at any time prior to the funding of the Loan.  The Contract Funding Date may be added to Section 1 of this Agreement subsequent to the execution of this Agreement, and Borrowers hereby agree and authorize Lender to add the Contract Funding Date. This Agreement shall commence on the Effective Date and terminate upon the payment in full by Borrowers to Lender of all the Obligations due under this Agreement, (the "Term"). The Maturity Date shall be extended by up to 6 months, in Lender's sole discretion, provided that no Event of Default has occurred.

**3.      EXISTING DEBT.**  Proceeds from the Loan shall be used to pay-off in full the indebtedness listed on Schedule A as Payoff Indebtedness, (the "Payoff Indebtedness"). Any remaining proceeds shall be distributed to the Borrowers. The Borrowers hereby represent and warrant that the Payoff Indebtedness is the entire indebtedness of the Borrowers and that no other indebtedness exists except (i) ordinary course liabilities such as accounts payable, and (ii) Approved Additional Indebtedness listed on Schedule A of this Agreement, (the "Approved Indebtedness").

**4.      REPAYMENT.** On or before the Maturity Date, the Borrowers shall pay to the Lender the Principal Amount in full, plus any Interest, fees, penalties, costs or other amounts owing under this Agreement, (together, the "Obligations").

**5.      INTEREST.** For the period commencing on the Contract Funding Date until the Loan is paid in full, the Borrowers shall pay Interest on the unpaid Principal Amount at a rate per annum equal to the Interest Rate, or the maximum amount allowed by applicable law, whichever is less, (the "Interest").

**6.      MANNER OF REPAYMENT.**  Borrowers shall pay interest on the Loan by making the Number of Payments, with each payment equaling the Payment Amount, and on the Payment Frequency specified in Section 1 of this Agreement, (each, an "Installment Payment," and collectively, the "Installment Payments").  Each Installment Payment shall be made electronically on the Payment Day by automated clearing house withdrawals from the Bank Account referenced in Section 10, or on other such bank account as shall be utilized by the Borrowers, (the "ACH Withdrawals"). The Borrowers hereby irrevocably authorize the Lender to make the ACH Withdrawals.  Acceptance by the Lender of any payment differing from the designated Installment Payments does not relieve the Borrowers of any payment obligation or other obligation under this Agreement.

In addition to the Installment Payments, the Borrowers shall repay the Principal Amount to the Lender on or before the Maturity Date, (the "Principal Payment"). Unless the Borrowers prepay the Principal Amount, the Principal Payment shall be made electronically on the Maturity Date by automated clearing house withdrawal from the Bank Account referenced in Section 10, or on other such bank account as shall be utilized by the Borrowers, (the "ACH Principal Withdrawal"). The Borrowers hereby irrevocably authorize the Lender to make the ACH Principal Withdrawal.

**7.      PREPAYMENT.** The Borrowers may prepay the Loan in whole or in part at any time after the 6 month anniversary of the Contract Funding Date. In the event the Borrowers prepay the Loan under this Section 7, the

Borrowers shall also pay an amount equal to (a) the Prepayment Discount *times* (b) the amount of the prepayment. The Prepayment Fee shall be reduced to 0% after the 12-month anniversary of the Contract Funding Date.

**8.      ORIGINATION AND ADMINISTRATIVE COSTS.**  Simultaneously with the funding of the Loan, the Borrowers shall pay the Origination Costs and the Administrative Costs.  The Origination Costs and the Administrative Costs shall be considered fully earned by, and owing to, the Lender upon the execution of this Agreement.  The Origination Costs and the Administrative Costs shall, at the Lender's sole option, be (i) deducted from the Principal Amount funded, or (ii) paid by the Borrowers through an ACH Withdrawal.

**9.      GRANT OF SECURITY INTEREST.**  Each Borrower hereby grants to the Lender a first priority lien on and security interest in all right, title, and interest of such Borrower in (i) all of such Borrower's assets of every kind and nature, personal property of every kind and nature, and real property of every kind and nature, including without limitation, all Real Property, Personal Property, Cash, Cash Equivalents, Money, Deposit Accounts, Accounts, Accounts Receivable, General Intangibles, Payment Intangibles, Copyrights, Patents, Trademarks, Records, Goods, Inventory, Equipment, Fixtures, Instruments, Securities Accounts, Financial Assets, Investment Property, Certificates of Deposit, Contracts, Documents, Documents of Title, Commercial Tort Claims, Tort Claims, Contract Claims, Health-Care Insurance Receivables, Chattel Paper, Supporting Obligations, Letter-of-Credit Rights, ownership interests in any entity or business, Securities, and Marketable Securities, (ii) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing, and (iii) all payments on or under and all products and proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all cash and non-cash Proceeds, and other property consisting of, arising from or relating to all or any part of any of the foregoing, in the case of each of the foregoing, whether now owned or existing or hereafter created, acquired, or arising (all of the foregoing, collectively, the "Collateral"). The Borrowers acknowledge and agree that the lien and security interest granted hereunder is and shall be a continuing first priority lien on and security interest in all of the Collateral. Each Borrower hereby irrevocably appoints the Lender, the Lender's nominee, and any other person whom the Lender may designate, as such Borrower's Attorney-In-Fact, with full power and authority to sign, on behalf of such Borrower, such further instruments, financing statements, agreements or undertakings, and such certificates of title, financing and continuation statements. and other instruments as the Lender may deem necessary or desirable to perfect, protect and preserve the security interests hereby granted. Such financing statements may describe the Collateral in the same manner as described herein or may contain a general description such as "all real and personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter created, acquired or arising" or any similar type of description. If not otherwise defined herein, (a) capitalized terms used in this Section that are defined or used in the Uniform Commercial Code of any applicable jurisdiction shall have the same meaning herein as is ascribed to such term thereunder, and (b) if not so defined, then any such capitalized term shall have its common meaning. Notwithstanding the foregoing, as used in this Section or elsewhere in this Agreement, "Person" means any individual, company, corporation, limited liability company, partnership, trust or other entity of any type. Notwithstanding the foregoing, the security interest herein granted shall not attach to any Individual Borrower's (i) primary personal residence or personal property. Notwithstanding anything to the contrary, Lender shall have no security interest on any interests of KW Restaurant Holdings, LLC or Steve Karfaridis in Wahoo's Fish Tacos.

Without limiting the foregoing, the following parties hereby pledge all stock owned by such party in Crave Brands, LLC, (the "Pledged Stock"), and shall execute Stock Pledge Agreements in a form acceptable to Lender pledging the Pledged Stock: KW Restaurant Holdings LLC,  Woodside Advisors.

**10.      BANK ACCOUNT.**  The Borrowers shall deposit all funds, revenues, and proceeds from their business operations and the sale of any assets, and the business operations and sale of any assets of any of their successors, affiliates, or subsidiaries (the "Business Funds"), into the bank accounts listed on Schedule D of this Agreement, (together, the "Bank Account"). Schedule D is hereby incorporated into this Section 10 by reference. The Borrowers shall not (i) deposit any Business Funds into any account other than the Bank Account, or (ii) close the Bank Account without the Lender's prior written consent.  Failure to deposit any Business Funds into the Bank Account, or closing the Bank Account shall constitute an Event of Default under this Agreement. The Borrowers shall grant the Lender access to the Bank Account by providing, at the Lender's sole option, one of the following: (i) adding the Lender as a signor on the Bank Account, (ii) providing the Lender with a username and password for the Borrowers' online banking

portal, or (iii) using the Lender's Bank Account Syncing application. In all cases, the Borrowers shall provide the Lender with monthly Bank Account statements for each Bank Account until the Loan is paid in full.

**11.    EVENTS OF DEFAULT.** In addition to any event of default provided for in this Agreement**,** each of the following shall constitute an "Event of Default" under this Agreement:

(a)   the Borrowers' failure to make any payment when due under the terms of this Agreement;

(b)   any Borrower or guarantor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or the filing of any voluntary or involuntary petition in bankruptcy by or regarding any Borrower or the initiation of any proceeding under any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law against any Borrower, or an assignment made by any Borrower for the benefit of creditors; or the appointment of a receiver, custodian, trustee, or similar party to take possession of any Borrower's assets or property;

(c)   the death or dissolution of any Borrower or guarantor;

(d)   any change in control or ownership of any Borrower;

(e)   the failure of any Borrower to deposit any funds, revenues, and proceeds into the Bank Account designated in Section 10;

(f)   the failure of any Borrower or guarantor to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the related documents or to comply with or perform any term, obligation, covenant or condition in any other agreement between the Lender and the Borrowers and/or guarantor;

(g)   any warranty, representation, covenant or statement made or furnished to the Lender by any Borrower or on any Borrower's behalf under this Agreement, or any document delivered by any Borrower to the Lender is incorrect in any respect, either at the time the statement was made or becomes false or misleading at any time thereafter;

(h)   if an adverse change occurs in any Borrower's financial condition, or if Lender believes in good faith and in Lender's sole discretion, that the prospect of payment or performance under this Agreement is impaired;

(i)   default in the payment when due, or in the performance or observance of, any material obligation of, or condition agreed to by, any Borrower with respect to any material purchase or lease of goods or services where such default, singly or in the aggregate with all other such defaults, might reasonably be expected to have a Material Adverse Effect. Material Adverse Effect means (a) a material adverse change in, or a material adverse effect upon, the financial condition, operations, assets, business, properties or prospects of any Borrower, (b) a material impairment of the ability of any Borrower to perform any of the obligations under this Agreement or any documents related to this Agreement, or (c) a material adverse effect upon any substantial portion of the Collateral or upon the legality, validity, binding effect or enforceability against any Borrower of this Agreement or any documents related to this Agreement.

(j)   final judgments or awards shall be rendered against any Borrower or guarantor and shall not have been paid, discharged or vacated or had executions thereof stayed pending appeal within 30 days after entry or filing of such judgments or awards;

(k)   any lien in favor of the Lender shall at any time fail to constitute a valid and perfected lien on all of the Collateral purported to be encumbered thereby;

(l)   the occurrence of any fact, event or circumstance that could reasonably be expected to result in a Material Adverse Effect, if such default shall have continued unremedied for a period of ten (10) days after written notice from the Lender;

(m)  the occurrence of any event having a Material Adverse Effect; or

(n) if the Lender, in good faith, and in the Lender's sole discretion, believes itself insecure as a result of its credit risk materially increasing or financial performance of Borrowers operations materially declining since the Effective Date.

**12.    REMEDIES ON DEFAULT.** If any Event of Default occurs, (i) all amounts owed under this Agreement will be accelerated and become immediately due and payable without any action by the Lender or the Borrowers, or any other person, and without notice to the Borrowers, and (ii) the Borrowers shall pay the Daily Default Penalty. The Lender, in addition to any rights and remedies available to the Lender under this Agreement, may, in its sole discretion, pursue any legal or equitable remedies available to it under applicable law or in equity, including without limitation, taking any of the following actions:

(a) Personally, or by agents or attorneys (in compliance with applicable law) take immediate possession of the Collateral. To that end, the Lender may pursue the Collateral where it may be found, and enter the Borrowers' premises, with or without notice, demand, process of law, or legal procedure if this can be done without breach of the peace. If the premises on which any part of the Collateral is located are not under the Borrowers' direct control, the Borrowers will exercise their best efforts to ensure that the Lender is promptly provided right of access to those premises. To the extent that the Borrowers' consent would otherwise be required before a right of access could be granted, the Borrowers hereby irrevocably grants such consent;

(b) Require the Borrowers to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties (it being acknowledged that the Borrowers' premises are reasonably convenient to the Borrowers);

(c) Sell, lease, or dispose of the Collateral, or any part of it, in any manner permitted by applicable law or by contract;

(d) Take possession of and apply any cash held in any deposit account or other account of any Borrower;

(e) Assign the ownership interests of any Borrower in any other Borrower, (the Assignable Interests), to the Lender without notice to any Borrower. Each Borrower hereby acknowledges and agrees that any Assignable Interests are Collateral, and that the Lender shall have an irrevocable right to assign such Assignable Interests if an Event of Default has occurred and is continuing, provided that such Assignable Interests shall automatically revert to such Borrower upon payment in full of all amounts owing to Lender under this Agreement.

(f) Enter a Confession of Judgment in the appropriate court against the Borrowers, jointly and severally, in the amount due to the Lender at that time, (the "Confession of Judgment"). The Borrowers hereby expressly and irrevocably agree to the entry of a Confession of Judgment without additional notice. Each Borrower hereby acknowledges and agrees that the transactions contemplated in this Agreement are commercial transactions, the proceeds of which were used in the Borrowers' business, and are not consumer transactions. If any portion of the Confession of Judgment is found to be unlawful, then only the unlawful portions of the Confession of Judgment shall be stricken and the remaining portions shall remain valid and in effect.

(g) Each Borrower hereby appoints the Lender, the Lender's nominee, and any other person whom the Lender may designate, as such Borrower's attorney-in-fact, with full power and authority to (i) enter the Confession of Judgment at any time without notice to such Borrower, (ii) sign such Borrower's name on verifications of Collateral, (iii) send requests for verification of Collateral to such Borrower's customers, account debtors and other obligors, (iv) endorse such Borrower's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Lender's possession or on any assignments, stock powers, or other instruments of transfer relating to the Collateral or any part thereof, (v) sign such Borrower's name on claims to enforce collection of any Collateral, on notices to and drafts against the Borrowers' accounts and other obligors, on schedules and assignments of Collateral, on notices of

assignment and on public records, (vi) do all things necessary to carry out this Agreement or any provision contained in this Agreement, (vii) file one or more financing statements disclosing its security interest in any or all of the Collateral without such Borrower's signature appearing thereon, (viii) execute any such financing statements, or amendments and supplements to financing statements, on behalf of such Borrower without notice thereof to such Borrower.   Each Borrower hereby ratifies and approves all acts of any such attorney-in-fact and agrees that neither the Lender nor any such attorney-in-fact will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, including for such person's gross negligence or willful misconduct. The foregoing powers of attorney, being coupled with an interest, are irrevocable until all sums due under this Agreement have been fully paid and satisfied.

(h)   Each Borrower acknowledges and agrees that, in the event of a breach or threatened breach of the Borrower's obligations hereunder, the Lender would not have adequate relief in money damages and shall be entitled to an injunction (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against each Borrower, including, without limitation, (i) maintaining any cash management and collection procedure described herein, (ii) restraining the Borrowers from selling, transferring, disposing, pledging, or in any way impairing the Collateral, (iii) causing the Borrowers to deliver to Lender any and all contracts, book keeping and accounting records, invoices, purchase orders, customer files and customer lists, vendor files and vendor lists, and any other documents or records, whether in paper or digital form, that relate to the Borrowers' business or the Collateral that are in the possession of any Borrower or a third-party who is under the control of any Borrower. However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement.  Each Borrower waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief.

(i)   Exercise all rights and remedies of a secured party under applicable law.

All rights of the Lender expressed herein shall be in addition to and not in limitation of those provided by applicable law.  No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**13.   Representations, Warranties, and Covenants.** To induce the Lender to enter into this Agreement and to induce the Lender to make the Loan, each Borrower hereby covenants and agrees with, and represents and warrants to, the Lender that:

(a)   The information specified in Section 1 with respect to such Borrower is true and correct.

(b)   Each Borrower's full legal name is correctly set forth in this Agreement.  Except for KW Restaurant Holdings, LLC and Steve Karfaridis, no Borrower has transacted business at any time during the immediately preceding five-year period under any other legal names or trade names.  The Borrowers shall not change their legal names or transact business under any other trade names without first giving 30 days' prior written notice of intent to do so to the Lender.

(c)   Each Borrower is validly existing and in good standing under the laws of its jurisdiction of organization; and each Borrower is duly qualified to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required.

(d)   Each Borrower is duly authorized to execute and deliver this Agreement, borrow monies hereunder, and perform its obligations hereunder.  The execution, delivery and performance by each Borrower of this Agreement, and the borrowings by each Borrower hereunder, does not and will not (a) require any consent or approval of any government agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict with (i) any provision of law, (ii) the charter, by-laws or other organizational documents of any Borrower, or (iii) any agreement, indenture, instrument or other

document, or any judgment, order or decree, which is binding upon any Borrower or any of their respective properties, or (c) require, or result in the creation or imposition of a Lien on any asset of any Borrower (other than Liens in favor of the Lender created hereunder).

(e) This Agreement is the legal, valid and binding obligation of each Borrower, enforceable against such Borrower in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

(f) There has been no Material Adverse Effect upon the financial condition, operations, assets, business, properties or prospects of the Borrowers as a whole in the twelve months preceding the date of this Agreement. The Borrowers do not anticipate any Material Adverse Effect to occur in the twelve months after the date of this Agreement.

(g) THE BORROWERS SHALL NOT (I) OPEN OR USE ANY BANK ACCOUNTS THAT ARE NOT DISCLOSED TO THE LENDER, (II) CHANGE THE NAME, PASSWORD OR OTHER ACCESS INFORMATION RELATING TO ACCOUNTS FROM WHICH ACH WITHDRAWALS OR ELECTRONIC CHECK PAYMENTS ARE TO BE MADE WITH RESPECT TO THE BANK ACCOUNT SPECIFIED IN SECTION 10 WITHOUT GIVING LENDER AT LEAST TEN (10) BUSINESS DAYS PRIOR WRITTEN NOTICE OF SUCH CHANGE AND PROVIDING THE UPDATED INFORMATION, OR (III) BLOCK AN ACH WITHDRAWAL AS AGREED TO IN THIS DOCUMENT. BORROWERS ACKNOWLEDGE THAT LENDER HAS ACTED IN RELIANCE ON THIS SECTION 13(g), AND THAT THE MAINTENANCE BY ANY BORROWER OF ANY BANK ACCOUNT WHICH IS NOT DISCLOSED TO THE LENDER SHALL CONSTITUTE FRAUD.

(h) WITH EXCEPTION OF ORDINARY COURSE TRADE DEBT, THE BORROWERS SHALL NOT INCUR ANY ADDITIONAL INDEBTEDNESS WITHOUT THE PRIOR WRITTEN CONSENT OF THE LENDER, INCLUDING WITHOUT LIMITATION ANY MERCHANT CASH ADVANCES, BANK LOANS, FACTORING LINES, LINES OF CREDIT, OR EQUIPMENT FINANCING. BORROWERS ACKNOWLEDGE AND AGREE THAT A BREACH OF THIS SECTION 13(h) WOULD MATERIALLY HARM AND IMPAIR LENDER AND REQUIRE THE ENTRY OF EQUITABLE RELIEF, INCLUDING WITHOUT LIMITATION THE ENTERING OF A TEMPORARY RESTRAINING ORDER TO PRESERVE THE COLLATERAL AND LENDER'S INTERESTS.

(i) The Borrowers shall not (i) sell, dispose, convey or otherwise transfer its business or all or any substantial portion of its assets, in each case, without the express prior written consent of the Lender, (ii) sell, dispose, convey or otherwise transfer any of its future receivables, (iii) commit fraud, which shall include the failure to disclose to Lender that any security interest or lien exists upon the accounts receivables of the business prior to receiving funds from the Lender

(j) The Borrowers shall disclose to the Lender the existence of any security interest or lien upon its accounts receivables and shall not grant any security interest or lien upon its accounts receivable or other assets in the future without written consent from the Lender;

(k) During the Term, the Borrowers shall provide annual financial statements not later than 90 days after the close of the Borrowers' fiscal year, and shall provide annual tax returns to the Lender by not later than May 1 of each year during the Term. Lender shall have the right to request and receive specific financial statements from any Borrower at any time. Each Borrower's financial statements and information, copies of which have been furnished to the Lender, and future financial statements and information (including, without limitation, business or financial data, reports, appraisals and projections) which will be furnished hereafter at the request of the Lender, fairly and accurately represent the financial condition of such Borrower at such dates, and since those dates there has been no material adverse change in financial or otherwise, such condition, operation or ownership of such Borrower. Each Borrower has a continuing, affirmative obligation to advise the Lender of any adverse change in its financial condition, operation or ownership. Any Borrower's failure to do so is deemed to be a material breach of this Agreement. Each Borrower acknowledges that the information (financial and other) provided by the Borrowers has been materially relied upon by the Lender in connection with its decision to make the Loan.

(l) Each Borrower is (i) in compliance with and shall comply with all laws, orders, writs, injunctions and

decrees applicable to it or to its properties (except in such instances in which such law, order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted) and (ii) has valid permits, authorizations and licenses to own, operate and lease its properties and to and to conduct the business in which it is presently engaged.  Promptly upon becoming aware of any of the following, the Borrowers shall provide written notice describing the same and the steps being taking by the Borrower affected thereby with respect thereto: (x) any litigation, arbitration or governmental investigation or proceeding not previously disclosed by the Borrowers to the Lender which has been instituted or, to the knowledge of any Borrower, is threatened against any Borrower, (y) any cancellation or material change in any insurance maintained by any Borrower, or (z) any other event which might reasonably be expected to have a Material Adverse Effect.

(m)  Each Borrower has full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper action.

(n)  Each Borrower shall maintain customary business liability, workman's compensation, business interruption, and other insurance business interruption insurance in amounts  and against risks as are satisfactory to the Lender and shall provide the Lender proof of such  insurance  upon  request, and shall  cause each issuer of an insurance policy to provide the Lender with an endorsement (i) showing the Lender as loss payee with respect to each policy and naming the Lender as an additional insured with respect to each policy, (ii) providing that 30 days' notice will be given to the Lender prior to any cancellation of, material reduction or change in coverage provided by or other material modification to such policy, and (iii) acceptable in all other respects to the Lender.  At any time during the term of this Agreement, Lender shall have the right to require Borrowers to purchase insurance that Lender, in its sole discretion, deems appropriate. Unless the Borrowers provide the Lender with evidence of the insurance coverage required by this Agreement, the Lender may purchase insurance at the Borrowers' expense to protect the Lender's interest in the Collateral.  The coverage that the Lender purchases may not pay any claim that is made against any Borrower in connection with the Collateral.  The Borrowers may later cancel any insurance purchased by the Lender, but only after providing the Lender with evidence that the Borrowers have obtained insurance as required by the Lender. If the Lender purchases insurance for the Collateral, the Borrowers will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancelation or expiration of the insurance.  The costs of the insurance may be added to the Principal Amount of the Loan.  The costs of the insurance may be more than the cost of the insurance the Borrowers may be able to obtain on their own.

(o)  The Borrowers have disclosed to the Lender every name under which they do business and will not conduct business under any name other than as disclosed to the Lender or change any of their places of business, unless prior written consent has been received from the Lender.

(p)  The Borrowers shall continue to conduct their business consistent with past practice.

(q)  The Borrowers have no present intention of closing their business or ceasing to operate their business, either permanently  or temporarily, and are not aware of any future change to any Borrower that could negatively affect the business which Borrowers have not disclosed to the Lender.

(r)  As of the date hereof, each Borrower is solvent, and is not contemplating bankruptcy or insolvency proceeding and such Borrower is not contemplating closing the business within six (6) months of the date of this Agreement.

(s)  No litigation, arbitration proceeding, or governmental investigation is pending or, to any Borrower's knowledge, threatened against any Borrower, its shareholders, officers or directors, except as set forth in Schedule B.

(t)  Each Borrower shall maintain and preserve, and shall cause each other Borrower to maintain and preserve, (i) its existence and good standing in the jurisdiction of its organization and (b) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary.

Each Borrower agrees not to (y) permit the charter, by-laws or other organizational documents of any Borrower to be amended or modified in any way which could reasonably be expected to have a Material Adversely Effect on the interests of the Lender, and (z) change, or allow any other Borrower to change, its state of formation or its organizational form.

(u)   All information heretofore or contemporaneously herewith furnished in writing by any Borrower to the Lender for purposes of or in connection with this Agreement and the Loan hereby is, and all written information hereafter furnished by or on behalf of any Borrower to the Lender pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made.

(v)   Each Borrower is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  No Borrower (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement would be prohibited under U.S. law.

(w)   Each Borrower is in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

(x)   Each Borrower will not, and will not permit any other Borrower to, create or permit to exist any lien on the Collateral, except for (i) liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings, (ii) liens arising in the ordinary course of business (such as liens of carriers, warehousemen, mechanics and materialmen and other similar liens imposed by law), (iii) liens arising in connection with capital leases (and attaching only to the property being leases), (iv) liens that constitute purchase money security interests on any property securing debt incurred for the purpose of financing all or any part of the cost of acquiring such property, provided that any such lien attaches to such property within 20 days of the acquisition thereof (and attaches solely to the property so acquired), and (v) liens arising under this Agreement.

(y)   The proceeds of the Loan will be used only for Restaurant acquisition and funding for strategic initiatives to enhance operations, and shall not be used for any personal expenses or for debt payments to creditors other than LQD. Notwithstanding the foregoing, the proceeds may be used for any purpose provided for in this agreement and to pay trade creditors in the ordinary course of business.

(z)   The Representations, Warranties, Covenants, and Conditions Precedent listed in Schedule C of this Agreement, which are hereby fully incorporated and integrated into this Agreement.

**14.    FURTHER ASSURANCES.**  Each Borrower agrees that until the expiration or termination of this Agreement and thereafter until all obligations to the Lender are paid in full, it shall, will, and will cause each other Borrower to,

at its own cost and expense, promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as the Lender may from time to time request in order to carry out the intent and purposes of this Agreement and the transactions contemplated hereby, including all such actions to establish, create, preserve, protect and perfect a first priority Lien in favor of the Lender on the Collateral (including Collateral acquired after the date hereof).

**15.     WAIVER OF PRESENTMENT; DEMAND.** The Borrowers hereby waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of protest and nonpayment, notice of costs, expenses or losses and interest on those, notice of interest on interest and late charges, and diligence in taking any action to collect any sums owing under this Agreement, including (to the extent permitted by law) waiving the pleading of any statute of limitations as a defense to any demand against the undersigned. Acceptance by the Lender or any other holder of this Agreement of any payment differing from the designated payments listed above does not relieve the undersigned of the obligation to honor the requirements of this Agreement.

**16.     JOINT AND SEVERAL LIABILITY.** Each Borrower acknowledges and agrees that he, she, or it is jointly and severally liable with all other Borrowers. Each Borrower acknowledges and agrees that his, her, or its joint and several liability on this Agreement is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Lender, and without limiting the generality of the foregoing, each Borrower's joint and several liability on this Agreement shall not be impaired by any acceptance by the Lender of any security (if any) for or guarantors upon this Agreement or by any failure, neglect or omission on the Lender's part to resort to any one or all of the Borrowers for payment of this Agreement or to realize upon or protect any Collateral security therefore (if any).  Each Borrower's joint and several liability on this Agreement shall not in any manner be impaired or affected by who receives or uses the proceeds of the Loan or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans made to, other Borrower.  Such joint and several liability of each Borrower shall also not be impaired or affected by (and the Lender, without notice to anyone, is hereby authorized to make from time to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any Collateral security (if any) for this Agreement or of any guaranty thereof (if any).  In order to enforce payment of this Agreement, foreclose or otherwise realize on any Collateral security therefor (if any), and to exercise the rights granted to the Lender hereunder and thereunder and under applicable law, the Lender shall be under no obligation at any time to first resort to any Collateral security, property, liens or any other rights or remedies whatsoever (if any), and the Lender shall have the right to enforce this Agreement irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing.  Each Borrower hereby expressly waives and surrenders any defense to its joint and several liability on this Agreement based upon any of the foregoing.

**17.     GOVERNING LAW AND VENUE.** The laws of the state of Illinois govern this Agreement, without giving effect to its conflicts of law principles. The Parties hereby irrevocably consent to the personal jurisdiction of and the setting of venue in the state and federal courts in Cook County, Illinois.

**18.     COLLECTION COSTS AND ATTORNEYS' FEES.** The Borrowers jointly and severally agree to pay to the Lender all costs and expenses incurred or paid by such Lender, including attorneys' fees and court costs, in connection with the collection of all amounts due and owing under this Agreement and the enforcement of rights to any Collateral security therefore (including, without limitation, all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving any Borrowers or any guarantor of this Agreement).

**19.     INDEMNIFICATION.** The Borrowers shall defend, indemnify, and hold Lender and its officers, directors, shareholders, employees, agents and representatives harmless for any losses, claims, damages, awards, penalties, or injuries, including, but not limited to, reasonable attorney's fees, incurred by Lender as a result of, arising out of, or relating to (a) Borrowers' breach of the terms, representations, warranties and covenants herein, (b) Borrowers' violation of applicable laws, and (c) the claim of a third party which arises from any action of the Borrowers, or which is in any way related to the Collateral or Lender's security interest, or which arises out of or is related to any indebtedness incurred by any Borrower. This indemnity shall survive any termination of this Agreement.

**20.     ASSIGNMENT AND DELEGATION.** The Borrowers may not assign any of their rights under this Agreement nor delegate any performance under this Agreement. If a purported assignment or purported delegation is made in violation of this Section 20, it is void. Lender may assign this Agreement or Lender's rights and interests hereunder.

**21.**     **SEVERABILITY.** If any one or more of the provisions contained in this Agreement is, for any reason, held to be invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability will not affect any other provisions of this Agreement, but this Agreement will be construed as if those invalid, illegal, or unenforceable provisions had never been contained in it, unless the deletion of those provisions would result in such a material change so as to cause completion of the transactions contemplated by this Agreement to be unreasonable.

**22.**     **NOTICES.** Notice shall be given in writing by one of the following types of delivery, each of which is a writing for purposes of this Agreement: personal delivery, mail (registered or certified mail, postage prepaid, return-receipt requested), nationally recognized overnight courier (fees prepaid), facsimile, or email. A party shall address notices under this Section 22 to a party at the addresses listed on Schedule F of this Agreement.

**23.**     **WAIVER.** No waiver of a breach, failure of any condition, or any right or remedy contained in or granted by the provisions of this Agreement will be effective unless it is in writing and signed by the party waiving the breach, failure, right, or remedy.  No waiver of any breach, failure, right, or remedy will be deemed a waiver of any other breach, failure, right, or remedy, whether or not similar, and no waiver will constitute a continuing waiver, unless the writing so specifies.

**24.**     **HEADINGS.** The descriptive headings of the sections and subsections of this Agreement are for convenience only, and do not affect this Agreement's construction or interpretation.

**25.**     **COUNTERPARTS.**  This Agreement may be executed in counterparts (including via fax or .pdf), each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

**26.**     **INTERPRETATION.**  Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any one or more of the members of the relevant class. The terms "hereunder," "herewith," "hereby," "herein" and "hereof" refer to this Agreement in its entirety, including any attachments, and not to any individual provision or Section of this Agreement.  Neuter or masculine pronouns used herein shall be deemed to refer to the masculine and the feminine as the context so indicates.  All references herein to "including" shall mean "including without limitation."

**27.**     **ENTIRE AGREEMENT.**  This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersede all prior agreements, covenants, arrangements, communications, representations or warranties made, whether oral or written, by the Parties or by any officer, employee or representative of any Party.

**28.**     **PARTIES' USE OF LEGAL COUNSEL.**  Each Party acknowledges that it or he has been advised by, or has had the opportunity to be advised by, its or his own legal counsel in connection with this Agreement.  All Parties have participated in the drafting of this Agreement and agree that no ambiguity herein should be construed against the draftsman.  Each Party has entered into this Agreement freely and voluntarily, without coercion, duress, distress or under influence by any other Person.

**29.**     **WAIVER OF RIGHT TO JURY TRIAL.** EACH PARTY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THE PARTIES IN CONNECTION WITH THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT ANY DISPUTES WHATSOEVER BETWEEN THE PARTIES SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

**30.**     **AFFIRMATION OF THE PARTIES.** THE PARTIES AFFIRM THAT THEY HAVE ENTERED INTO THIS AGREEMENT FREELY, VOLUNTARILY, AND WITHOUT RELIANCE ON ANY PROMISES, REPRESENTATIONS, OR OTHER STATEMENTS NOT CONTAINED IN THIS AGREEMENT AND HAVE READ AND UNDERSTOOD THIS AGREEMENT.  EACH BORROWER HEREBY EXPRESSLY AFFIRMS THAT (I) SUCH BORROWER HAS HAD THIS AGREEMENT REVIEWED BY AN ATTORNEY OR HAS HAD THE OPPORTUNITY TO HAVE THIS AGREEMENT REVIEWED BY AN ATTORNEY, (II) SUCH BORROWER HAS HAD AMPLE TIME TO REVIEW THIS AGREEMENT AND HAS IN FACT REVIEWED AND FULLY UNDERSTANDS THIS

AGREEMENT, AND (III) SUCH BORROWER UNDERSTANDS THE TERMS OF THIS AGREEMENT AND IS ENTERING INTO
THIS AGREEMENT FREELY AND WITHOUT COERCION OR DURESS.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**BORROWERS:**

**Individual Borrower:** Steve Karfaridis

**Signature:**

**By:** Steve Karfaridis, Individually

**Company Borrower:** Meatheads Restaurants, LLC

**Signature:**

**By:** Steve Karfaridis, Manager

**Company Borrower:** Crave Brands, LLC

**Signature:**

**By:** Steve Karfaridis, Manager

**Company Borrower:** Meatheads Franchising, LLC

**Signature:**

**By:** Steve Karfaridis, Manager

**Company Borrower:** KW Restaurant Holdings, LLC

**Signature:**

**By:** Steve Karfaridis, Manager

**LENDER:**

**LQD Business Finance, LLC**

**Signed:**

George Souri, not individually, but only as President of LQD Business Finance, LLC

## SCHEDULE A

### EXISTING INDEBTEDNESS

### Payoff Indebtedness

Funding of the Loan is contingent on the receipt of payoff letters from the above listed lenders.

### Approved Additional Indebtedness

1. Gordan Flesh Company, Inc. ("GFC") – As part of the transaction, Seller intends to assign and Borrower intends to assume, 5 "non-cancelable" operating leases (with end of lease equipment purchase options for $1.00) from GFC for POS/back-end computer equipment in 5 restaurants as follows:

Lease #460146 – Willowbrook – Monthly payment $263.89 (2 payments remaining as of 2/25/19)
Lease #460147 – Northbrook – Monthly payment $263.89 (2 payments remaining as of 2/25/19)
Lease #460152 – Naperville – Monthly payment $360.84 (2 payments remaining as of 2/25/19)
Lease #466180 – Champaign – Monthly payment $374.03 (24 payments remaining as of 2/25/19)
Lease #468557 – Roscoe Village – Monthly payment $219.59 (31 payments remaining as of 2/25/19)

2. Coca-Cola North America ("Coca-Cola") – As part of the transaction, Seller intends to assign and Borrower intends to assume a Beverage Marketing Agreement ("BMA") which provides for, among other things, leasing of Legacy and Freestyle fountain beverage dispensing equipment of Coca Cola products. Coca-Cola provides dispensing equipment at no upfront cost to Borrower and amortizes the equipment cost over 100 months. No monthly payment is made directly by the Borrower, Coca-Cola deducts the monthly fee from marketing funds it is obligated to pay Borrower under the BMA.

3. NUCo – As part of the transaction, Seller intends to assign and Borrower intends to assume, rental agreements for 12 CO2 containers for beverage dispensing in the restaurants. The monthly lease payment is $72.00 per location.

4. Automatic Icemakers – As part of the transaction, Seller intends to assign and Borrower intends to assume, one rental agreement for 2 ice machines located in the Willowbrook restaurant. The monthly payment is $165.00.

5. Culligan Water – As part of the transaction, Seller intends to assign and Borrower intends to assume, rental agreements for 2 water softeners in the Frankfort and Barrington restaurants. The monthly lease payment is $30.00 per location.

**SCHEDULE B**


**PENDING OR THREATENED LITIGATION OR GOVERNMENTAL INVESTIGATION OR TAX ISSUES.**

## SCHEDULE C

ADDITIONAL REPRESENTATIONS, WARRANTIES, COVENANTS, and CONDITIONS PRECEDENT

On a Month-end basis, or at Borrowers election, every 28 days, Borrowers shall deliver to Lender consolidating financial statements, in a form and manner acceptable to Lender, to include an income statement, balance, sheet, and a statement of cash flows which shall be accurate as of the date of delivery. The consolidating financials shall include store-level financials and consolidating financials.

By not later than April 30, 2020 Within 121 days after the close of each fiscal year of Borrowers, Reviewed year-end consolidated and consolidating financial statements of Borrower and its Subsidiaries, containing a balance sheet, income statement, statement of cash flows and a Review Report by an independent certified public accounting firm selected by Borrower and satisfactory to Lender.

At the end of any Determination Period during the term, Debt Service Coverage shall not be less than 1.40x. "Debt Service Coverage" shall be calculated by solving for "x" in the following formula: x equals (a) consolidating EBITDA, divided by (b) total Debt Service.

At the end of any Determination Period during the term, monthly consolidated revenues shall not be less than $950k in two consecutive periods.

A "Determination Period" shall be a four-week reporting period of the Borrowers' 13-period operating cycle. A "Determination Quarter" shall be comprised of any consecutive period of three consecutive Determination Periods.

As of the 6-month anniversary of the Contract Funding Date, Borrowers shall have a monthly weighted average EBITDA on a store level basis of not less than 14%, which shall be calculated by dividing the sum of the EBITDA of each store by the sum of the revenue of each store. As of the 12-month anniversary of the contract funding date, Borrowers shall have a monthly weighted average EBITDA on a store level basis of not less than 16%, which shall be calculated by dividing the sum of the EBITDA of each store by the sum of the revenue of each store. This covenant will test operating margin for the month of the testing date, not a cumulative year-to-date margin.

On or before March 1, 2019, Borrowers shall enter into a Deposit Account Control Agreement for each Bank Account, as defined in Section 10 of this Agreement, in a form acceptable to Lender.

**SCHEDULE D**

BANK ACCOUNTS

| Bank Name | ABA Number | Account Name | Account Number |
|---|---|---|---|
| Fifth Third Bank | | Meathead Restaurants, LLC | |

**SCHEDULE E**

ADDITIONAL ELIGIBILITY CRITERIA

**SCHEDULE F**

NOTIFICATION INFORMATION

If to the Lender:

LQD Financial Corp.
329 West 18th Street, Suite 601
Chicago, IL  60616
Tel: 855-402-2077
Fax: 855-491-0797
Email: notices@lqdfinance.com

If to Borrowers:

| Borrower Name | Borrower Address | Borrower Tel | Borrower Email |
|---|---|---|---|
| Crave Brands, LLC | 101 California Street, Suite 2710, San Francisco, CA 94111 | (949) 338-1506 | greekologie@yahoo.com |
| KW Restaurant Holdings, LLC | 1278 Glenneyre Street, Suite 128, Laguna Beach, California 92651 | (949) 338-1506 | greekologie@yahoo.com |
| Meatheads Franchising, LLC | 101 California Street, Suite 2710, San Francisco, CA 94111 | (949) 338-1506 | greekologie@yahoo.com |
| Meatheads Restaurants, LLC | 101 California Street, Suite 2710, San Francisco, CA 94111 | (949) 338-1506 | greekologie@yahoo.com |
| Steve Karfaridis | 1278 Glenneyre Street, Suite 128, Laguna Beach, California 92651 | (949) 338-1506 | greekologie@yahoo.com |

**EXECUTION VERSION**

## AMENDED AND RESTATED FORBEARANCE AND REAFFIRMATION AGREEMENT

**THIS AMENDED AND RESTATED FORBEARANCE AND REAFFIRMATION AGREEMENT** (the "Agreement"), dated December 18, 2020, is entered into by and between **LQD FINANCIAL CORP.** with its principal place of business at 370 North Carpenter St., Chicago, Illinois 60607 (the "Lender"), and **CRAVE BRANDS, LLC, KW RESTAURANT HOLDINGS, LLC, MEATHEAD FRANCHISING, LLC, MEATHEAD RESTAURANTS, LLC and STEVE KARFARIDIS** (collectively, "Borrowers" and, along with Lender, the "Parties").

## I. RECITALS

R.1 WHEREAS, on or about February 22, 2019, LQD Business Finance LLC ("LQD Business") provided Borrowers with an initial business loan in the principal amount of $6,500,000, which was then increased to $6,650,000 (the "Business Loan") pursuant to the March Amendment (as defined below), which Business Loan is secured by a duly perfected first-priority lien upon and security interest in the Collateral; and

R.2 WHEREAS, the Business Loan is evidenced by that certain LQD Business Finance Loan Agreement dated February 22, 2019 (the "Original Loan Agreement"), as amended by that certain LQD Business Finance Loan Amendment dated September 27, 2019 (the "September Amendment"), as amended by that certain LQD Business Finance Loan Amendment dated March 25, 2020 (the "March Amendment") and as further amended by that certain LQD Business Finance Loan Agreement dated July 2, 2020 (the "July Amendment" and, along with the Original Loan Agreement, the September Amendment, the March Amendment, as well as any other documents evidencing, securing or relating to the Business Loan, as modified from time to time, including this Agreement and the Pledge Agreements are the "Loan Documents") (capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Documents); and

R.3 WHEREAS, LQD Business and Lender are related entities and are entitled to freely assign between themselves any rights either of them have, have had or will have under the Loan Documents, including any rights against any of the Borrowers, and each is entitled to and has the right to enforce the rights and remedies in the Loan Documents as the Lender thereunder; and

i.    WHEREAS, LQD Business assigned and transferred to Lender all of LQD Business' property, rights, claims, and entitlements related to the Borrowers, including the Loan Documents and any property, rights, claims, and entitlements arising thereunder, such that the term "Lender" in the Original Loan Agreement includes LQD Financial Corp. and it is the owner and holder of such property, rights, claims and entitlements and has the ability and right to use, enjoy and enforce such rights, property, claims and entitlements; and

{00181158 4}

R.4 WHEREAS, certain Existing Events of Default (as defined below) have occurred under the Loan Documents; and

R.5 WHEREAS, Lender and LQD Business and each of the Borrowers entered into that certain Forbearance and Reaffirmation Agreement dated June 26, 2020 (the "Existing Forbearance Agreement") pursuant to which, among other things, Lender and LQD Business agreed to forbear from taking certain actions against Borrowers, but only on the terms and conditions set forth therein; and

R.6 WHEREAS, Borrowers have advised Lender that they have implemented or will shortly be implementing certain cost-cutting measures to address the root causes of the Existing Events of Default and that such measures include, but may not be limited to, the following items (items (a) through (f) below are collectively the "Cost-Cutting Measures"):

(a) unless Meathead Restaurants, LLC's ("Meathead") free cash flow (as determined by cash generated from operations less cash to support operations and for capital improvements) is positive for the preceding two Determination Periods, Steve Karfaridis and Michael Webb (the "Principals") shall not receive payments for current wages or salary ("Salary") and such amounts shall be accrued, except that Salary may be paid and not accrued only to the extent required to achieve forgiveness of amounts obtained through the Payroll Protection Program;

(b) headcount reductions consisting of Brian Landstrom, Chelsea Pappas and Keegan Soule;

(c) the cessation of services and charges from DogNPony Marketing Company;

(d) unless Meathead's free cash flow (as determined by cash generated from operations less cash to support operations and for capital improvements) is positive for the preceding two Determination Periods, Meathead shall not reimburse any automobile expenses;

(e) the cessation of all "Mobile App Fees" to the extent that these constitute Level Up licensing fees; and

(f) the cessation of reimbursement for travel expenses incurred after May 22, 2020, that are related to Steve Karfaridis' commute from California.

R.7 WHEREAS, Lender has the present right to enforce all of its rights and remedies against the Borrowers pursuant to the Loan Documents either now or upon the expiration of the forbearance period in the Existing Forbearance Agreement; and

R.8 WHEREAS, Borrowers and Lender wish to amend and restate the Existing Forbearance Agreement, but only on the terms and conditions set forth herein and only on a limited basis, as set forth below; and

NOW, THEREFORE, in consideration of the mutual covenants and terms set forth herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties hereto agree as follows:

## II. **AGREEMENT**

1.     **Recitals**. The recitals set forth above are an integral part of this Agreement and, therefore, are incorporated by reference into this Agreement as if fully set forth herein.

2.     **Effective Date of Agreement**. This Agreement shall not take effect and it shall not impose any obligations or duties upon Lender, including, without limitation, any obligation to forbear, until the satisfaction of the following conditions precedent (the date on which such conditions have been satisfied in the sole discretion of Lender shall be the "Effective Date"):

a.     Each Borrower has executed this Agreement and delivered its signature to Lender; and

b.     Lender has executed this Agreement and delivered its signature to Borrowers; and

c.     KW Restaurant Holdings LLC has caused the Amended and Restated Operating Agreement of KW Restaurant Holdings LLC (the "KW LLC Agreement" and, along with the Crave LLC Agreement, the "LLC Agreements") appended hereto as Exhibit B to be executed by the Member of KW Restaurant Holdings LLC and such Amended and Restated Operating Agreement is in full force and effect and has been delivered to Lender; and

d.     Steve Karfaridis has executed and delivered to Lender that certain LLC Pledge Agreement, a copy of which is appended hereto as Exhibit C (the "Karfaridis Pledge"), whereby he has pledged all of the Membership Interests in KW Restaurant Holdings LLC to Lender and has delivered the Certificates signed in blank to Lender; and

e.     KW Restaurant Holdings LLC has executed and delivered to Lender that certain LLC Pledge Agreement, a copy of which is appended hereto as Exhibit D (the "KW Pledge" and, along with the Karfaridis Pledge, the "Pledge Agreements") whereby it has pledged its 61% Membership Interests in Crave Brands LLC to Lender and has delivered the Certificates signed in blank to Lender.

3.     **Forbearance Period and Termination**.

a.     **Forbearance Period**.  Lender agrees to forbear from exercising its rights under Paragraph 12 of the Original Loan Agreement commencing on the Effective Date and ending on the Forbearance Termination Date, and each of the Borrowers agrees that Lender shall have no obligation to forbear after the Forbearance Termination Date

and can exercise all rights and remedies after the Forbearance Termination Date, and each of them shall not assert or contend otherwise in any manner, context or form.

b. **Forbearance Termination Date**. The "Forbearance Termination Date" is the earlier of: (i) March 31, 2021, subject to any extensions thereof provided by Lender, in the exercise of its sole discretion and only as set forth in a writing executed by Lender and delivered to each of the Borrowers and (ii) the date on which a Forbearance Default occurs (as defined below).

c. **Forbearance Default**. A Forbearance Default shall occur immediately and without any notice upon the happening, whether or not Lender learns thereof, of any one or more of the following:

i. Any Borrower breaches, or defaults in the performance of, any of the provisions or obligations of this Agreement or any of the Loan Documents or an Event of Default occurs under the Loan Documents or this Agreement, other than the Existing Events of Default;

ii. Any Borrower fails to implement or fails to continue to implement any of the Cost Cutting Measures or any actions are taken that are inconsistent with any of the Cost Cutting Measures;

iii. Any of the representations, covenants or warranties contained in this Agreement or the Loan Documents is untrue, breached or with the passage of time will become untrue or breached, except for the Existing Events of Default;

iv. The Amended and Restated Operating Agreement of Crave Brands LLC (the "Crave LLC Agreement") appended hereto as Exhibit A has not been executed by each of the Members of Crave Brands LLC and is not in full force and effect on or before January 31, 2021, except that the obligation set forth in this subparagraph (iv) shall not give rise to a Forbearance Default to the extent Borrowers demonstrate to Lender, in the exercise of Lender's reasonable satisfaction, that on or before January 31, 2021, Borrowers have exercised commercially reasonable efforts to comply with the requirements of this subparagraph (iv) but notwithstanding such efforts the Crave LLC Agreement is not in full force and effect; and

v. Any person interferes with or does not fully cooperate with the Lender's exercise of any of its rights under this Agreement, the Loan Documents, the Pledge Agreements or the LLC Agreements.

d. **Cross-defaults**. Each Borrower jointly and severally hereby acknowledges and agrees that there will be an Event of Default under this Agreement and the Loan Documents and a termination of the Forbearance Period (a) if there is a breach by any Borrower of any term, provision, covenant, or condition herein set forth or herein required, (b) if, other than the Existing Events of Default, there is a breach by any of the Borrowers of any term, provision, covenant, or condition set forth in the Loan Documents, irrespective of whether such default was in effect or occurred as of the Effective Date, (c) if any Borrower or any other signatory thereto breaches any of the

{00181158 4}                                4

terms or conditions imposed upon them by any of the LLC Agreements, and (d) if any Borrower or any other thereto signatory breaches any of the terms or conditions imposed upon them by any of the Pledge Agreements.

e.   **Termination of Forbearance Period**.  Upon the occurrence of the Forbearance Termination Date, Lender's agreement to forbear from exercising any of its rights or remedies against any of the Borrowers shall immediately cease and terminate without any further action or notice and Lender shall have the unfettered ability and right to exercise or enforce any and all of its rights and remedies against any of the Borrowers under the Loan Documents, this Agreement, the LLC Agreements, the Pledge Agreements or applicable law.  Each Borrower acknowledges and agrees that Lender's failure to enforce any or all of the remedies or rights under this Agreement, the Loan Documents, the LLC Agreements, the Pledge Agreements or under law or at equity after the Forbearance Termination Date is neither intended to, nor will give rise to, a further extension of the Forbearance Period or the waiver of any rights or remedies.

f.   **Forbearance Claims**.  Upon the occurrence of the Forbearance Termination Date, each Borrower acknowledges and agrees it shall not have any claims, whether for damages or otherwise, against Lender with respect to any such termination or end of the Forbearance Period, acceleration of the amounts owed to Lender in accordance with the terms of this Agreement or the Lender's exercise of its rights under the Loan Documents, applicable law, or this Agreement.

g.   **Benefits of Forbearance.**  Each Borrower acknowledges and agrees that the benefits to it as a result of this Agreement are substantial and of great value and that such benefits are new and are sufficient and reasonably equivalent consideration for each and every one of their respective obligations and agreements under this Agreement.

4.   **Borrowers' Acknowledgements**, **Covenants and Agreement**:

a.   **Existing Events of Default**.  Each of the Borrowers irrevocably acknowledges and agrees that the following defaults or Events of Default occurred under the Loan Documents and that only such defaults or Events of Default are the "Existing Events of Default" hereunder:

i.   The monthly weighted average EBITDA on a store level basis has been less than the required 16%;

ii.   The Debt Service Coverage ratio has been less than the required 1.4x;

iii.   The monthly consolidated revenues were less than $950,000 for the periods ending March 22, 2020 and April 19, 2020;

iv.   Borrowers have failed to pay sales tax liabilities as and when due.

{00181158 4}                                     5

b. **Amount Due**. Each of the Borrowers jointly and severally agree and acknowledge that (a) as of October 31, 2020, the Obligations are outstanding in the principal amount of $6,650,000.00 (the "Indebtedness") and (b) Lender has performed all obligations and duties owed to each Borrower as of the date hereof, and (c) no Borrower has any defense, offset or counterclaim with respect to any amounts owed to Lender or with respect to the performance or observance by Lender of any representation, covenant or other agreement contained in the Loan Documents, the Existing Forbearance Agreement, the LLC Agreements or the Pledge Agreements.

c. **Reaffirmation, Reinstatement and Covenants**. Each of the Borrowers jointly, severally and irrevocably (i) consents to this Agreement; (ii) ratifies, reaffirms and acknowledges full liability for all of the Obligations, including the amount of the Indebtedness, the respective payments and performance obligations, contingent or otherwise, under the Loan Documents and any subordination agreements and intercreditor agreements relating to the Indebtedness or the Obligations; (iii) ratifies and reaffirms and acknowledges full liability and enforceability for all security interests, mortgages, and liens granted for the benefit of Lender and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the Obligations and the full amount of the Indebtedness, (iv) acknowledges and agrees that except as set forth herein, each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, (v) reaffirms, remakes as true as of the date hereof and ratifies each of the Representations, Warranties and Covenants in the Loan Documents, (vi) acknowledges and agrees that it has no setoffs, defenses, crossclaims, demands, counterclaims or rights that can be asserted to or, if asserted would, impair or otherwise limit or reduce Lender's rights under the Loan Documents or to seek affirmative relief or damages against Lender, (vii) acknowledges and agrees that in entering into this Agreement it is not relying upon any statement, representation or action of Lender or its agents, (viii) acknowledges and agrees that Lender has a duly perfected first priority security interest in and lien upon all of the Collateral; (ix) agrees, covenants and acknowledges that, except as expressly set forth herein, the execution of this Agreement shall not operate as a waiver or modification of any right, power or remedy of Lender, constitute a waiver of any defaults or other provision of any of the Loan Documents or serve to effect a novation of any Obligations owed to Lender or any Loan Document; (x) acknowledges that any obligations of Lender under this Agreement are in the nature of a conditional forbearance only, and that Lender has made no agreement or commitment to provide additional forbearance, to modify further or to extend the Loan Documents beyond the Forbearance Period and that the Existing Events of Default are not cured as a result of this Agreement; and (xi) acknowledges and agrees that any assignment of rights under the Loan Documents or this Agreement between LQD Business Finance LLC and LQD Finance Corp., including any assignment of the Obligations or Indebtedness or rights in any of the Collateral, constitutes a valid and enforceable assignment and any reference in any of the Loan Documents to LQD Business shall also be a reference to LQD Financial Corp.

d. Amendment of Loan Documents. Subject to the terms and conditions of this Agreement, the Loan Documents are amended solely as follows:

      i.      The definition of Collateral excludes any household furniture or other goods used for a Borrower's personal, family or household purposes; and

      ii.      Schedule C of the Original Loan Agreement is replaced with the Schedule C appended hereto, which shall be one of the Loan Documents;

      iii.      The definition of Maturity Date in Section 1 of the Original Loan Agreement is replaced with the following: March 31, 2021.

5.      **Remedies**.

      a.      Receivership.  In addition to any other rights and remedies available to Lender under the Loan Documents or applicable law upon the occurrence of a Forbearance Default hereunder, each Borrower agrees, acknowledges, consents and stipulates that the occurrence of Forbearance Default constitutes and provides the requisite cause under any applicable law, including the laws of Illinois, justifying the immediate appointment of a receiver to, among other things, manage the business and affairs of each Borrower.  Each Borrower further stipulates and agrees that upon the occurrence of a Forbearance Default, it waives and is estopped from asserting any defenses to the immediate appointment of a receiver.

      b.      Loan Documents,  Upon the occurrence of the Forbearance Termination Date, Lender shall have all of the rights and remedies available under the Loan Documents and this Agreement, in addition to any others provided under this Agreement or applicable law.

      c.      Clawback.  Notwithstanding anything to the contrary in this Agreement, the Loan Documents or applicable law, if any payment made to, or other amount of value received by, Lender on account of the Obligations or Indebtedness is avoided, rescinded, set aside, or must otherwise be returned by Lender, or a demand for any of the foregoing is made, whether in a case under the Bankruptcy Code, or a similar proceeding under any otherwise applicable law, the Indebtedness or Obligations intended to be repaid or satisfied thereby shall be reinstated (the "Reinstated Amount"), along with any liens or mortgages securing such Reinstated Amount, without any further action by any Party and shall be enforceable against each of the Borrowers and the Collateral.

      d.      Borrowers acknowledge that as a consequence of the Existing Defaults and the terms of the Loan Documents and this Agreement, Lender is entitled to enforce its remedies with regard to the Collateral under Article 9 of the UCC or otherwise without notice to any of the Borrowers, such notice having been waived and relinquished.  Borrowers consent to Lender's acceptance of the Collateral in full or partial satisfaction of the Indebtedness, as determined by Lender pursuant to a writing Lender delivers to Borrowers, with the amount of the Indebtedness satisfied to be determined by Lender at the time of acceptance.

6.      **Waiver, Release and Discharge and Indemnification**.

a. Each of the Borrowers, on its own behalf and on behalf of its respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, heirs, successors and assigns (collectively, the "Borrowing Group") hereby releases and forever discharges Lender, and its officers, directors, subsidiary, affiliated and related companies, agents, consultants, attorneys, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Lender Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, this Agreement, the transactions contemplated in this Agreement, and/or any financial accommodations extended or denied by Lender to Borrowers, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Lender Group, directly or indirectly, through the date hereof. Each Borrower acknowledges and agrees that Lender is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Lender entering into this Agreement and the transactions contemplated herein. Each Borrower represents and warrants to Lender and the Lender Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the claims against the Lender Group to be released herein.

b. Each Borrower hereby agree to indemnify and hold each entity in the Lender Group harmless with respect to any and all liabilities, claims, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by each entity in the Lender Group, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulations or common law principles arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Documents, this Agreement or any other document executed in connection herewith. The foregoing indemnity shall survive the payment in full of the obligations owed to Lender and the termination of this Agreement and the Loan Documents.

7. **Additional Covenants by Borrowers.** In addition to any of the other Covenants in any of the Loan Documents, each of the Borrowers jointly and severally covenant and agree:

a. Consultants. During the Forbearance Period and thereafter, each Borrower will cooperate fully with representatives of any consultant, financial advisor or similar entity or person (a "Consultant") engaged by Lender or any Borrower to assess and address matters germane to any Borrower's performance under the Loan Documents, including, without limitation, any Borrowers business operations. Without

{00181158 4}                                    8

limiting the generality of the foregoing, Borrowers acknowledge and agree that any Consultant retained by Lender (a "Lender Consultant") or Borrowers will be authorized to do the following during the Forbearance Period and at any time thereafter: (i) assist in the preparation, evaluation and revisions of any Borrower's business plans, cash flow forecasts (including a 13-week cash flow forecast) and financial projections, test any Borrower's critical assumptions, identify opportunities for improvement in the planning process and, as appropriate, assist management in the implementation and control of such programs; (ii) assist in projecting and managing each of the Borrower's cash position and trade credit on an ongoing basis and in preparing such projections, reports, budgets, and analyses as may be reasonably required by any Borrower's lenders or investors; and (iii) develop processes and procedures to ensure that the Lender's information needs are met in a timely manner, including borrowing base certificates and all financial reporting requirements.  Borrowers further agree that they shall pay the fees and expenses of any Lender Consultant.

      b.    In the event of the filing of any petition for bankruptcy relief filed by or against any of the Borrowers (a "Bankruptcy Filing"), such Borrower consents to the entry of an order granting Lender relief from the automatic stay of Section 362 of the Bankruptcy Code and shall not assert or request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce, or inhibit the ability of Lender to enforce any rights it has under the Loan Documents or any other rights Lender has against any Borrower or against any property owned by any Borrower.  Without limiting the generality of the foregoing, each Borrower acknowledges and agrees, and is estopped from contesting, that cause for relief from the automatic stay shall exist if any of the Borrowers are subject to a Bankruptcy Filing.

      c.    Each of the Borrowers covenants and agrees that notwithstanding anything to the contrary under any otherwise applicable law (a) any information, know-how, data or trade secrets, including any that is confidential (collectively, "Information"), that is  disclosed to Lender or any Lender Consultant by any of the Borrowers or otherwise obtained by Lender or any Lender Consultant may be used or disclosed by Lender or any Lender Consultant in furtherance of any efforts undertaken by Lender or any Lender Consultant to facilitate a transaction involving any of the Borrowers (a "Transaction") or to preserve and protect Lender's rights in the Collateral or enhance Lender's chances of recovering payment of the Obligations or Indebtedness, irrespective of any default thereof, (b) a Transaction may include, without limitation, additional loans made to any of the Borrowers, additional equity invested in any of the Borrowers or a sale of any of the Borrowers or their assets, (c) no action taken by Lender or any Lender Consultant in connection with this Agreement, the Loan Documents or the enforcement, preservation or protection of Lender's rights, including, without limitation, any action taken related to a Transaction, shall give rise to, create or establish a fiduciary relationship or fiduciary duty between any of the Borrowers and Lender or any Lender Consultant, it being agreed that at all times the relationship between Lender and each of the Borrowers shall be a debtor/creditor relationship, and (d) any action taken by Lender pursuant to this Agreement or the Loan Documents, including, without limitation, any related to a Transaction, shall be in furtherance of Lender's rights as a secured creditor.

8.     **Additional Provisions:**

     a.     **Successors and Assigns/No Third-Party Beneficiaries**. This Agreement is binding upon and shall inure to the benefit only of each of the signatories hereto and their respective successors and assigns. No Person other than the signatories hereto, and those in the Lender Group referenced in paragraph 6, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Lender Group set forth in paragraph 6) are hereby expressly disclaimed.

     b.     **Further Assurances.**  Each Borrower shall promptly execute and/or deliver any other agreements or documents and take such other actions Lender deems necessary, in the exercise of its sole discretion, to achieve the objectives of this Agreement.

     c.     **Advice of Counsel**.  The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution and enters into this Agreement freely and of their own volition and without any duress or coercion.  The wording of this Agreement shall not be construed in favor of or against any Party.

     d.     **Time is of the Essence.**  Time is of the essence with respect to each Borrower's performance of its respective obligations under this Agreement.

     e.     **Relationship**. Each Borrower agrees that the relationship between Lender and each Borrower is that of creditor and debtor and not that of partners or joint venturers and that no action taken by Lender pursuant to the terms hereof shall give rise to a joint venture or partnership relationship.  This Agreement does not constitute a partnership agreement, or any other association between Lender and any Borrower. Each Borrower acknowledges that Lender has acted at all times only as a creditor to each Borrower within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Lender attempted to exercise any control over each Borrower or its business or affairs. Each of the Borrowers acknowledges and agrees that at no time shall Lender owe any fiduciary or other enhanced duty to any of the Borrowers and each Borrower disavows the existence of creation of a fiduciary or enhanced duty, particularly when Lender is exercising any of the rights granted pursuant to this Agreement or the Loan Documents.

     f.     **Merger; Modification**.  This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters.  This Agreement shall not be modified or amended or extended except in written form signed by each of the Parties hereto. In entering into this Agreement and agreeing to be bound by the terms hereof, each Borrower is not relying upon any statements outside of this Agreement.

     g.     **Counterparts**.  This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one

agreement.  Except as set forth herein, any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile or email a signature page of this Agreement signed by such party and such signature shall be treated in all respects as having the same effect as an original signature.

h.     **No Custom; Section Headings**.  This Agreement shall not establish a custom or course of dealing.  The section headings and captions herein are for convenience of reference only and shall not be deemed to limit, impair or affect the interpretation and construction of the terms hereof.

i.      **Notices.**

i.      To each Borrower. All notices or other information sent by Lender to each Borrower in connection with this Agreement and the Loan Documents must be in written form and may be sent, in Lender's Sole Discretion, by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, (d) confirmed telecopy or other facsimile transmission, or (e) email, addressed, as applicable, as follows:

**Borrowers.**

**Crave Brands, LLC,**
**Meathead Franchising. LLC &**
**Meathead Restaurants, LLC**

101 California Street.
Suite 2710
San Francisco, CA 94111

**KW Restaurant Holdings, LLC &**
**Steve Karfaridis**

1278 Glenneyre Street
Suite 128
Laguna Beach, CA 92651

ii.      To Lender.  All notices or other information sent by each Borrower to Lender in connection with this Agreement and the Loan Documents, must be in writing and must be sent by prepaid overnight courier, addressed as follows:

**If to Lender:**

LQD Financial Corp.
370 Carpenter St.
Chicago, IL 60607

**With a copy to:**

{00181158 4}                                    11

William J. Factor
FactorLaw
105 W. Madison Street, Suite 1500
Chicago, IL 60602

     j.    **Change of Address**. The parties may designate another addressee or change its address for notices and other communications hereunder by a notice given to the other parties in the manner provided in this paragraph. A notice or other communication sent in compliance with the provisions of this paragraph shall be deemed good and sufficient service regardless of whether the parties actually receive such notice, except that notice to Lender shall be deemed given only upon receipt by Lender.

     9.    **GOVERNING LAW/VENUE**. THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLIED, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE. ANY AND ALL DISPUTES BETWEEN ANY OF THE BORROWERS AND LENDER SHALL BE RESOLVED PURSUANT TO ILLNOIS LAW, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLICABLE, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE. EACH BORROWER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY UNITED STATES MAIL, FIRST CLASS POSTAGE, OR ANY OTHER MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW. EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING BETWEEN THE PARTIES SHALL BE COOK COUNTY, ILLINOIS OR, IN LENDER'S SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW AND LENDER MAY BRING AN ACTION IN ANOTHER VENUE TO THE EXTENT DOING SO IS NECESSARY, IN LENDER'S SOLE DISCRETION, TO ENFORCE LENDER'S RIGHTS AGAINST ANY OF THE BORROWERS, ANY OF THEIR PROPERTY OR ANY OF THE COLLATERAL.

     10.    **WAIVER OF JURY TRIAL.** EACH BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH BORROWER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS

AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**LQD Business Finance LLC**

By:_____

Its:_____

**LQD Finance Corp.**

By:_____

Its:_____

**Crave Brands, LLC**

By:_____

Its:_____

**Meathead Franchising. LLC**

By:_____

Its:_____

**Meathead Restaurants, LLC**

By:_____

Its:_____

**Steve Karfaridis**

By:_____

**KW Restaurant Holdings, LLC**

By:_____

Its:_____

SCHEDULE C

**ADDITIONAL REPRESENTATIONS, WARRANTIES, COVENANTS, and CONDITIONS PRECEDENT**

On a Month-end basis, or at Borrowers' election, every 28 days, Borrowers shall deliver to Lender consolidating financial statements, in a form and manner acceptable to Lender, to include an income statement, balance, sheet, and a statement of cash flows which shall be accurate as of the date of delivery. The consolidating financials shall include store-level financials and consolidating financials.

By not later than April 30, 2020 and then within 121 days after the close of each fiscal year for Borrowers, reviewed year-end consolidated and consolidating financial statements of each Borrower and any of its subsidiaries, containing a balance sheet, income statement, statement of cash flows and a Review Report by an independent certified public accounting firm selected by Borrowers and satisfactory to Lender.

At the end of any Determination Period, Debt Service Coverage shall not be less than 1.40x. "Debt Service Coverage" shall be calculated by solving for "x" in the following formula: x equals (a) consolidating EBITDA, divided by (b) total Debt Service.

Monthly consolidated revenues shall not be less than (i) $850,000 in Determination Period 12 of 2020; (ii) $850,000 in Determination Period 13 of 2020; (iii) $850,000 in Determination Period 1 of 2021; (iv) $900,000 in Determination Period 2 of 2021; and (v) $900,000 in Determination Period 3 of 2021 and thereafter.

Meatheads Restaurants, LLC shall not permit cash held at Fifth Third Bank to be less than $100,000 for more than any 5 consecutive Bank business day period.

A "Determination Period" shall be a four-week reporting period of the Borrowers' 13-period operating cycle. A "Determination Quarter" shall be comprised of any consecutive period of three consecutive Determination Periods.

On a consolidated basis, Borrowers shall have a monthly weighted average EBITDA on a location level basis ("Monthly Weighted EBITDA") of not less than (i) 14% for Determination Period 12 of 2020; (ii) 14% for Determination Period 13 of 2020; (iii) 14% for Determination Period 1 of 2021; (iv) 15% for Determination Period 2 of 2021; and (v) 15% for Determination Period 3 of 2021 and thereafter.  The Monthly Weighted EBITDA shall be calculated by dividing the sum of the EBITDA of each location by the sum of the revenue of each location.

On or before March 1, 2019, Borrowers shall enter into a Deposit Account Control Agreement for each Bank Account, as defined in Section 10 of this Agreement, in a form acceptable to Lender.