IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 (Subchapter V) (Joint Admin. Requested) |
| CRAVE BRANDS, LLC, | ) ) | Case No. 21-04729 |
| MEATHEAD RESTAURANTS, LLC, | ) ) | Case No. 21-04731 |
| Debtors. | ) ) ) | Hon. Timothy A. Barnes |

**DECLARATION OF STEVE KARFARIDIS**

I, Steve Karfaridis, declare as follows:

1.      I am over the age of 21 years of age.  This declaration is made upon my personal knowledge, I am familiar with the facts stated herein, and if called upon to do so, I am competent to and would testify as to the facts in open Court.

2.      I am the manager of Crave Brands, LLC ("Crave") and Meathead Restaurants, LLC ("Meathead", and with Crave, the "Debtors") as of April 9, 2021.  Lender (defined below) has asserted that the Debtors' bankruptcy filings were not properly authorized, and Lender has purported to replace me as manager of the Debtors.  The Debtors dispute Lender's position.

3.      On April 9, 2021, Crave filed for relief under Chapter 11 (subchapter V) of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois in case designated as Case No. 21-04729.

4.      On April 9, 2021, Meathead filed for relief under Chapter 11 (subchapter V) of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois in case designated as Case No. 21-04731.

**About the Debtors**

10111094.2

5.      Meathead operates twelve company-owned fast casual restaurants in Illinois and Indiana.   In addition, there is one licensed restaurant.   A non-debtor affiliate, Meathead Management, LLC, is the licensor. The ownership structure of the Meathead related entities is as follows:

| |
|---|
| **Steve Karfardis**<br>Co-maker on LQD obligations |

| |
|---|
| **KW Restaurant Holdings, LLC,** a single member LLC<br>Co-maker on LQD obligations<br>Member interest owned by Steve Karfaridis |

| |
|---|
| **Crave Brands, LLC**<br>Co-maker on LQD obligations<br>Member interests owned by KW Restaurant Holdings, LLC (68%), Meathead Investments, LLC (25%), and others (7%)  (All amounts rounded) |

| |
|---|
| **Meathead Restaurants, LLC,** a single member LLC<br>Co-maker on LQD obligations<br>Member interest owned by Crave Brands, LLC<br>Owns sole member interest in Meathead Franchising, LLC |

**LQD Loan**

6.      On February 22, 2019,  the Debtors, and Steve Karfaridis, KW Restaurant Holdings Group, LLC, and Meathead Franchising, LLC, as borrowers, and LQD Business Finance Loan Company,[1] as lender (the "Lender"), executed that certain Loan Agreement (as thereafter amended, the "Loan Agreement") pursuant to which the Lender agreed to loan funds and extend

---

[1] Upon information and belief, LQD Business Finance Loan Company thereafter assigned its interests to an affiliate, LQD Financial Corp.

financial accommodations to the Debtors and certain non-debtor borrowers (the borrowers under the Loan Agreement shall collectively be referred to as the "Borrowers").

7.     Copies of the Loan Agreement and the subsequent amendments and forbearance agreement are attached to the Debtors' Motion to Use Cash Collateral and to Provide Adequate Protection as **Exhibits A through D**.

8.     The indebtedness described in the Loan Agreement matured on March 31, 2021. The Debtors were not in payment default at maturity or at any other time. Moreover, the Debtors were not in violation of any financial covenants at the time of maturity.

9.     As of the Petition Date, the balance due to the Lender is $6,650,000.00 in principal plus accrued interest at the rate of 17% per annum (the "LQD Indebtedness").

10.     To secure the Obligations (as defined in the Loan Agreement), each of the Borrowers granted to the Lender a security interest in the "Collateral" (as defined in the Loan Agreement). To further secure the Obligations under the Loan Agreement, certain of the Borrowers pledged to the Lender the "Pledged Stock" (as defined in the Loan Agreement").

11.     The Lender filed UCC-1 financing statements with the Delaware Secretary of State's Office against Crave Brands, LLC and Meatheads Restaurants, LLC (*sic*).

12.     In these cases, Lender's "Cash Collateral" consists of (a) the funds in the Fifth Third Operating Account on the Petition Date, (b) the proceeds of the sale of all inventory on hand as of the Petition Date, and (c) the expected ERC payment (as described below).

13.     No other creditor holds or asserts an interest in the Cash Collateral.

14.     The Debtors are developing a budget of expected cash receipts and expenditures for the 13 weeks beginning on or about the Petition Date (the "Cash Budget").

**COVID Related Programs**

15.     In 2020, Meathead received a total of $982,112 in a Paycheck Protection Program loan from Fifth Third Bank ("PPP-1 Loan").  Meathead used the PPP-1 Loan proceeds to pay authorized expenses throughout 2020.  Meathead has applied for forgiveness of the PPP-1 Loan and expects a favorable response in the coming weeks.

16.     In 2021, Meathead received a total of $1,438,844.00 in Paycheck Protection Program Second Draw loans from Fifth Third Bank ("PPP-2 Loan").  Meathead deposited the PPP-2 Loan in an account at Chase Bank (the "Chase Bank Account").  The Lender does not hold a lien or security interest in the Chase Bank Account or the funds located therein.  In order to preserve the future forgivability of the PPP-2 Loan, Meathead must abide by PPP-2 limitations on permissible uses for the funds.

17.     On or about March 4, 2021, Meathead submitted the appropriate paperwork for payment of an Employee Retention Credit ("ERC").  The ERC is authorized by Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), as thereafter amended. Upon information and belief, Meathead will receive a ERC payment of slightly under $700,000 on or about June 1, 2021.

18.     In 2020, Crave also received a COVID-19 Economic Injury Disaster Loan from the U.S. Small Business Administration (the "EIDL Loan") in the amount of $149,900.  This is an unsecured loan with a 20 year term that bears interest at 1 percent per annum.  Monthly interest is currently deferred under the program.  Upon information and belief, at the present time, the law does not permit the EIDL Loan to be forgiven.

19.     An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Cash Budget, for working capital purposes, payment of employees, other

general corporate purposes of the Debtor, and the satisfaction of costs and expenses of administering these cases. The Debtors' ability to operate through the use of the Cash Collateral is vital to the Debtors and their effort to maximize the value of its assets. Absent entry of an order authorizing the use of Cash Collateral, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.

### Payment of Employee Compensation

20.    As of the Petition Date, Debtors have 75 full time and 86 part time employees (the "Employees").

21.    As of the Petition Date, Debtors owed its Employees for employee compensation, employee benefits, employee reimbursements, withholding and payroll taxes, accrued vacation time, and related employee claims, including but not limited to the disbursement of tips collected with bi-weekly payroll, and to pay to maintain various employee health plans, including, for example, medical, vision, and dental insurance offered to full time employees for employer portion and from payroll withholding for any portion paid by employees, all of which was earned by the Employees within 180 days of the Petition Date (collectively, "Employee Compensation").

22.    Debtors last by-weekly payroll expense totalled $162,330.66.

23.    An itemized breakdown of these obligations on that payroll is attached as **Exhibit A** to the Debtors' Motion for an Order Authorizing Debtors to Pay Pre-Petition Wages and Employee Benefits.

24.    None of the employees will receive Employee Compensation for the pre-petition period above $13,650.

25.    There are three insiders that are also entitled to Employee Compensation. I have an annual salary of $90,000. Michael Webb has an annual salary of $90,000. The compensation

for me and Mr. Webb was deferred for a period based on an agreement with the Debtors' secured creditor, but within the last month, Debtors' secured creditor agreed to allow Meathead to pay a portion of our compensation. In addition, my spouse, Jenn Williamson, the Director of Guest Relations, Social Media, Catering/School Lunch sales program (positions she held at Meathead prior to our marriage), is also employed by Meathead and is entitled to Employee Compensation. I understand that none of these insiders will be paid for pre-petition Employee Compensation greater than $13,650.

26.     In order to operate their businesses and to manage their property it is necessary for the Debtors to maintain employee stability, morale, and loyalty, and in order to sustain the work ethic and effort of the

27.     As a food service business, the Debtors' Employees are essential to the success of its business and providing the services its customers require to continue in business. Employees have to serve customers, prepare food, and maintain and manage the Restaurants.

28.     If the Debtors are not authorized to pay and honor the Employee Compensation as requested herein, the Business and efforts to maximize the value of the Estate and creditor recovery could be immediately and severely disrupted.

**Payment of Taxes**

29.     As of the Petition Date, Debtors owed taxes or fees state and local authorities (collectively, with (i), and (ii), the "Taxes") payable to various governmental taxing and licensing authorities (the "Taxing Authorities").

30.     In particular, Debtors collect, withhold and incur Taxes, that include sales and use, business and regulatory fees, and other taxes and fees. The Debtors are required to remit the sales and use taxes collected in connection with the sale of goods at its stores to the applicable Taxing

Authorities (as that term is defined in the Motion) on a periodic basis in arrears. As the Taxes are paid in arrears, the Debtors hold the funds for the Taxes for a period of time before remitting them to the appropriate Taxing Authorities. Consequently, some of the Taxing Authorities were not paid for all prepetition Taxes prior to the Petition Date.

31.     Debtors have collected sales tax from its customers and are holding sales taxes that will need to be paid to the state when due.

32.     A list of the sales taxes currently owed by jurisdiction is attached to the Debtors' Motion for an Order Authorizing Debtors to Pay Certain Prepetition Taxes as **Exhibit A**.

33.     Many governmental authorities where the Debtors operate require that the Debtors obtain a business license and pay corresponding occupational fees and/or fees associated with the filing of an annual report with such jurisdictions.

34.     In addition to the regular payment of sales tax, Debtors were paying certain accrued sales taxes on a deferred basis in equal weekly installments of $4,971.01.

35.     Paying the prepetition Taxes is essential to the Debtors' ongoing business operations. If the Debtors fail to pay Taxes, the Debtors' would incur, and would be obligated to pay, increased interest and significant penalties if it does not timely satisfy its ongoing tax obligations for the prepetition period or thereafter.

36.     The Debtors also believe that some of the Taxing Authorities may cause the Debtors to be audited if the Taxes are not paid, which would divert attention from the reorganization process.

37.     Many Taxing Authorities and State agencies impose personal liability on the officers and directors of collecting entities, such as the Debtors, for Taxes collected by those entities that are not paid to the appropriate Taxing Authority. Thus, to the extent that any

prepetition Taxes are unpaid, the Debtors' officers, managers, and members may be subject to audits and/or lawsuits on account of nonpayment during the pendency of these chapter 11 cases. Such proceedings obviously would constitute a significant distraction for these individuals at a time when they should be focused on the Debtors' efforts in the Chapter 11 case.

**Gift Cards and Customer Loyalty Program**

38.     As of March 21, 2021, Meathead had issued pre-petition gift cards (the "Gift Cards") with an outstanding value of $115,773.

39.     Meathead also has a customer loyalty program administered through a third-party vendor, TapMango, which among other things provides rewards to customers for their past and continued patronage of the Debtors' business locations and certain free menu items for their birthday, as well as additional marketing touches for our customers (with the Gift Cards, the "Customer Programs").

40.     Customers with outstanding Gift Cards have the expectation that they will be able to use those cards in the Debtors' stores.

41.     The Debtors' brand and the customer's loyalty would no doubt be damaged if Debtors do not honor the Gift Cards far and that damage to the value of the enterprise would far outweigh the value of the outstanding Gift Cards.

42.     Customers that participate in our loyalty program have the expectation that they will be able to continue to receive the rewards from the program.

43.     Customer loyalty is hard won in the food service space, in which numerous, national, regional, and local restaurants compete for the same customers in their communities.  Part of Debtors' brand is built around this customer loyalty and the quality of customer service, part of

which is based on these Customer Programs.  These Customer Programs are essential to the

ongoing business of the Debtors and the value of maintaining these programs will more than offset

costs associated therewith.

**Debtors' Bank Accounts**

44.     Debtors have two pre-petition bank accounts (the "Prepetition Bank Accounts").

45.     The first one, the Fifth Third Operating Account, is maintained at Fifth Third Bank,

and used for all of Debtor's general operating expense disbursements.  As of the Petition Date, the

balance of the Fifth Third Operating Account was $84,634.24.

46.     The second one, the Chase Bank Account, is located with JPMorgan Chase Bank

and is used as permissible for the proceeds of the Paycheck Protection Program loans.  The second

draw loan from the PPP is currently on deposit in the Chase Bank Account.  As of the Petition

Date, the balance of the Chase Bank Account was $1,444,402.03, of which $1,438,844.00 was

PPP loan proceeds.

47.     Closing these Prepetition Bank Accounts and opening new bank accounts would be

disruptive to the business operations of Debtors.

48.     Debtors also use business forms (including, but not limited to, letterhead, purchase

orders, invoices, and checks) existing immediately prior to the Petition Date.

49.     The expense and delay of replacing all business forms would be wasteful and

inefficient.

50.     If Debtors need to order new business forms during the course of these bankruptcy

cases, it will place a legend on the forms indicating "Debtor-in-Possession" or "DIP".

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true

and correct.

_Steve Karfaridis_                                        Executed on: _April 12, 2021_