# Exhibit 1

**EXECUTION VERSION**

## AMENDED AND RESTATED FORBEARANCE AND REAFFIRMATION AGREEMENT

**THIS AMENDED AND RESTATED FORBEARANCE AND REAFFIRMATION AGREEMENT** (the "Agreement"), dated December 18, 2020, is entered into by and between **LQD FINANCIAL CORP.** with its principal place of business at 370 North Carpenter St., Chicago, Illinois 60607 (the "Lender"), and **CRAVE BRANDS, LLC, KW RESTAURANT HOLDINGS, LLC, MEATHEAD FRANCHISING, LLC, MEATHEAD RESTAURANTS, LLC and STEVE KARFARIDIS** (collectively, "Borrowers" and, along with Lender, the "Parties").

## I. RECITALS

R.1 WHEREAS, on or about February 22, 2019, LQD Business Finance LLC ("LQD Business") provided Borrowers with an initial business loan in the principal amount of $6,500,000, which was then increased to $6,650,000 (the "Business Loan") pursuant to the March Amendment (as defined below), which Business Loan is secured by a duly perfected first-priority lien upon and security interest in the Collateral; and

R.2 WHEREAS, the Business Loan is evidenced by that certain LQD Business Finance Loan Agreement dated February 22, 2019 (the "Original Loan Agreement"), as amended by that certain LQD Business Finance Loan Amendment dated September 27, 2019 (the "September Amendment"), as amended by that certain LQD Business Finance Loan Amendment dated March 25, 2020 (the "March Amendment") and as further amended by that certain LQD Business Finance Loan Agreement dated July 2, 2020 (the "July Amendment" and, along with the Original Loan Agreement, the September Amendment, the March Amendment, as well as any other documents evidencing, securing or relating to the Business Loan, as modified from time to time, including this Agreement and the Pledge Agreements are the "Loan Documents") (capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Documents); and

R.3 WHEREAS, LQD Business and Lender are related entities and are entitled to freely assign between themselves any rights either of them have, have had or will have under the Loan Documents, including any rights against any of the Borrowers, and each is entitled to and has the right to enforce the rights and remedies in the Loan Documents as the Lender thereunder; and

i.    WHEREAS, LQD Business assigned and transferred to Lender all of LQD Business' property, rights, claims, and entitlements related to the Borrowers, including the Loan Documents and any property, rights, claims, and entitlements arising thereunder, such that the term "Lender" in the Original Loan Agreement includes LQD Financial Corp. and it is the owner and holder of such property, rights, claims and entitlements and has the ability and right to use, enjoy and enforce such rights, property, claims and entitlements; and

{00181158 4}

R.4 WHEREAS, certain Existing Events of Default (as defined below) have occurred under the Loan Documents; and

R.5 WHEREAS, Lender and LQD Business and each of the Borrowers entered into that certain Forbearance and Reaffirmation Agreement dated June 26, 2020 (the "Existing Forbearance Agreement") pursuant to which, among other things, Lender and LQD Business agreed to forbear from taking certain actions against Borrowers, but only on the terms and conditions set forth therein; and

R.6 WHEREAS, Borrowers have advised Lender that they have implemented or will shortly be implementing certain cost-cutting measures to address the root causes of the Existing Events of Default and that such measures include, but may not be limited to, the following items (items (a) through (f) below are collectively the "Cost-Cutting Measures"):

(a) unless Meathead Restaurants, LLC's ("Meathead") free cash flow (as determined by cash generated from operations less cash to support operations and for capital improvements) is positive for the preceding two Determination Periods, Steve Karfaridis and Michael Webb (the "Principals") shall not receive payments for current wages or salary ("Salary") and such amounts shall be accrued, except that Salary may be paid and not accrued only to the extent required to achieve forgiveness of amounts obtained through the Payroll Protection Program;

(b) headcount reductions consisting of Brian Landstrom, Chelsea Pappas and Keegan Soule;

(c) the cessation of services and charges from DogNPony Marketing Company;

(d) unless Meathead's free cash flow (as determined by cash generated from operations less cash to support operations and for capital improvements) is positive for the preceding two Determination Periods, Meathead shall not reimburse any automobile expenses;

(e) the cessation of all "Mobile App Fees" to the extent that these constitute Level Up licensing fees; and

(f) the cessation of reimbursement for travel expenses incurred after May 22, 2020, that are related to Steve Karfaridis' commute from California.

R.7 WHEREAS, Lender has the present right to enforce all of its rights and remedies against the Borrowers pursuant to the Loan Documents either now or upon the expiration of the forbearance period in the Existing Forbearance Agreement; and

R.8 WHEREAS, Borrowers and Lender wish to amend and restate the Existing Forbearance Agreement, but only on the terms and conditions set forth herein and only on a limited basis, as set forth below; and

NOW, THEREFORE, in consideration of the mutual covenants and terms set forth herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties hereto agree as follows:

## II. AGREEMENT

1.     **Recitals**. The recitals set forth above are an integral part of this Agreement and, therefore, are incorporated by reference into this Agreement as if fully set forth herein.

2.     **Effective Date of Agreement**. This Agreement shall not take effect and it shall not impose any obligations or duties upon Lender, including, without limitation, any obligation to forbear, until the satisfaction of the following conditions precedent (the date on which such conditions have been satisfied in the sole discretion of Lender shall be the "Effective Date"):

   a.     Each Borrower has executed this Agreement and delivered its signature to Lender; and

   b.     Lender has executed this Agreement and delivered its signature to Borrowers; and

   c.     KW Restaurant Holdings LLC has caused the Amended and Restated Operating Agreement of KW Restaurant Holdings LLC (the "KW LLC Agreement" and, along with the Crave LLC Agreement, the "LLC Agreements") appended hereto as Exhibit B to be executed by the Member of KW Restaurant Holdings LLC and such Amended and Restated Operating Agreement is in full force and effect and has been delivered to Lender; and

   d.     Steve Karfaridis has executed and delivered to Lender that certain LLC Pledge Agreement, a copy of which is appended hereto as Exhibit C (the "Karfaridis Pledge"), whereby he has pledged all of the Membership Interests in KW Restaurant Holdings LLC to Lender and has delivered the Certificates signed in blank to Lender; and

   e.     KW Restaurant Holdings LLC has executed and delivered to Lender that certain LLC Pledge Agreement, a copy of which is appended hereto as Exhibit D (the "KW Pledge" and, along with the Karfaridis Pledge, the "Pledge Agreements") whereby it has pledged its 61% Membership Interests in Crave Brands LLC to Lender and has delivered the Certificates signed in blank to Lender.

3.     **Forbearance Period and Termination**.

   a.     **Forbearance Period**. Lender agrees to forbear from exercising its rights under Paragraph 12 of the Original Loan Agreement commencing on the Effective Date and ending on the Forbearance Termination Date, and each of the Borrowers agrees that Lender shall have no obligation to forbear after the Forbearance Termination Date

and can exercise all rights and remedies after the Forbearance Termination Date, and each of them shall not assert or contend otherwise in any manner, context or form.

      b.    **Forbearance Termination Date**. The "Forbearance Termination Date" is the earlier of: (i) March 31, 2021, subject to any extensions thereof provided by Lender, in the exercise of its sole discretion and only as set forth in a writing executed by Lender and delivered to each of the Borrowers and (ii) the date on which a Forbearance Default occurs (as defined below).

      c.    **Forbearance Default**. A Forbearance Default shall occur immediately and without any notice upon the happening, whether or not Lender learns thereof, of any one or more of the following:

      i.    Any Borrower breaches, or defaults in the performance of, any of the provisions or obligations of this Agreement or any of the Loan Documents or an Event of Default occurs under the Loan Documents or this Agreement, other than the Existing Events of Default;

      ii.    Any Borrower fails to implement or fails to continue to implement any of the Cost Cutting Measures or any actions are taken that are inconsistent with any of the Cost Cutting Measures;

      iii.    Any of the representations, covenants or warranties contained in this Agreement or the Loan Documents is untrue, breached or with the passage of time will become untrue or breached, except for the Existing Events of Default;

      iv.    The Amended and Restated Operating Agreement of Crave Brands LLC (the "Crave LLC Agreement") appended hereto as Exhibit A has not been executed by each of the Members of Crave Brands LLC and is not in full force and effect on or before January 31, 2021, except that the obligation set forth in this subparagraph (iv) shall not give rise to a Forbearance Default to the extent Borrowers demonstrate to Lender, in the exercise of Lender's reasonable satisfaction, that on or before January 31, 2021, Borrowers have exercised commercially reasonable efforts to comply with the requirements of this subparagraph (iv) but notwithstanding such efforts the Crave LLC Agreement is not in full force and effect; and

      v.    Any person interferes with or does not fully cooperate with the Lender's exercise of any of its rights under this Agreement, the Loan Documents, the Pledge Agreements or the LLC Agreements.

      d.    **Cross-defaults**. Each Borrower jointly and severally hereby acknowledges and agrees that there will be an Event of Default under this Agreement and the Loan Documents and a termination of the Forbearance Period (a) if there is a breach by any Borrower of any term, provision, covenant, or condition herein set forth or herein required, (b) if, other than the Existing Events of Default, there is a breach by any of the Borrowers of any term, provision, covenant, or condition set forth in the Loan Documents, irrespective of whether such default was in effect or occurred as of the Effective Date, (c) if any Borrower or any other signatory thereto breaches any of the

terms or conditions imposed upon them by any of the LLC Agreements, and (d) if any Borrower or any other thereto signatory breaches any of the terms or conditions imposed upon them by any of the Pledge Agreements.

     e.    **Termination of Forbearance Period**. Upon the occurrence of the Forbearance Termination Date, Lender's agreement to forbear from exercising any of its rights or remedies against any of the Borrowers shall immediately cease and terminate without any further action or notice and Lender shall have the unfettered ability and right to exercise or enforce any and all of its rights and remedies against any of the Borrowers under the Loan Documents, this Agreement, the LLC Agreements, the Pledge Agreements or applicable law. Each Borrower acknowledges and agrees that Lender's failure to enforce any or all of the remedies or rights under this Agreement, the Loan Documents, the LLC Agreements, the Pledge Agreements or under law or at equity after the Forbearance Termination Date is neither intended to, nor will give rise to, a further extension of the Forbearance Period or the waiver of any rights or remedies.

     f.    **Forbearance Claims**. Upon the occurrence of the Forbearance Termination Date, each Borrower acknowledges and agrees it shall not have any claims, whether for damages or otherwise, against Lender with respect to any such termination or end of the Forbearance Period, acceleration of the amounts owed to Lender in accordance with the terms of this Agreement or the Lender's exercise of its rights under the Loan Documents, applicable law, or this Agreement.

     g.    **Benefits of Forbearance.** Each Borrower acknowledges and agrees that the benefits to it as a result of this Agreement are substantial and of great value and that such benefits are new and are sufficient and reasonably equivalent consideration for each and every one of their respective obligations and agreements under this Agreement.

    4.    **Borrowers' Acknowledgements, Covenants and Agreement:**

     a.    **Existing Events of Default**. Each of the Borrowers irrevocably acknowledges and agrees that the following defaults or Events of Default occurred under the Loan Documents and that only such defaults or Events of Default are the "Existing Events of Default" hereunder:

     i.    The monthly weighted average EBITDA on a store level basis has been less than the required 16%;

     ii.    The Debt Service Coverage ratio has been less than the required 1.4x;

     iii.    The monthly consolidated revenues were less than $950,000 for the periods ending March 22, 2020 and April 19, 2020;

     iv.    Borrowers have failed to pay sales tax liabilities as and when due.

{00181158 4}     5

b.    **Amount Due**.  Each of the Borrowers jointly and severally agree and acknowledge that (a) as of October 31, 2020, the Obligations are outstanding in the principal amount of $6,650,000.00 (the "Indebtedness") and (b) Lender has performed all obligations and duties owed to each Borrower as of the date hereof, and (c) no Borrower has any defense, offset or counterclaim with respect to any amounts owed to Lender or with respect to the performance or observance by Lender of any representation, covenant or other agreement contained in the Loan Documents, the Existing Forbearance Agreement, the LLC Agreements or the Pledge Agreements.

c.    **Reaffirmation, Reinstatement and Covenants**.  Each of the Borrowers jointly, severally and irrevocably (i) consents to this Agreement; (ii) ratifies, reaffirms and acknowledges full liability for all of the Obligations, including the amount of the Indebtedness, the respective payments and performance obligations, contingent or otherwise, under the Loan Documents and any subordination agreements and intercreditor agreements relating to the Indebtedness or the Obligations; (iii) ratifies and reaffirms and acknowledges full liability and enforceability for all security interests, mortgages, and liens granted for the benefit of Lender and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the Obligations and the full amount of the Indebtedness, (iv) acknowledges and agrees that except as set forth herein, each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, (v)  reaffirms, remakes as true as of the date hereof and ratifies each of the Representations, Warranties and Covenants in the Loan Documents, (vi) acknowledges and agrees that it has no setoffs, defenses, crossclaims, demands, counterclaims or rights that can be asserted to or, if asserted would, impair or otherwise limit or reduce Lender's rights under the Loan Documents or to seek affirmative relief or damages against Lender, (vii) acknowledges and agrees that in entering into this Agreement it is not relying upon any statement, representation or action of Lender or its agents, (viii) acknowledges and agrees that Lender has a duly perfected first priority security interest in and lien upon all of the Collateral; (ix) agrees, covenants and acknowledges that, except as expressly set forth herein, the execution of this Agreement shall not operate as a waiver or modification of any right, power or remedy of Lender, constitute a waiver of any defaults or other provision of any of the Loan Documents or serve to effect a novation of any Obligations owed to Lender or any Loan Document; (x) acknowledges that any obligations of Lender under this Agreement are in the nature of a conditional forbearance only, and that Lender has made no agreement or commitment to provide additional forbearance, to modify further or to extend the Loan Documents beyond the Forbearance Period and that the Existing Events of Default are not cured as a result of this Agreement; and (xi) acknowledges and agrees that any assignment of rights under the Loan Documents or this Agreement between LQD Business Finance LLC and LQD Finance Corp., including any assignment of the Obligations or Indebtedness or rights in any of the Collateral, constitutes a valid and enforceable assignment and any reference in any of the Loan Documents to LQD Business shall also be a reference to LQD Financial Corp.

d.    Amendment of Loan Documents.  Subject to the terms and conditions of this Agreement, the Loan Documents are amended solely as follows:

i.     The definition of Collateral excludes any household furniture or other goods used for a Borrower's personal, family or household purposes; and

ii.     Schedule C of the Original Loan Agreement is replaced with the Schedule C appended hereto, which shall be one of the Loan Documents;

iii.     The definition of Maturity Date in Section 1 of the Original Loan Agreement is replaced with the following: March 31, 2021.

5.     **Remedies**.

a.     Receivership.  In addition to any other rights and remedies available to Lender under the Loan Documents or applicable law upon the occurrence of a Forbearance Default hereunder, each Borrower agrees, acknowledges, consents and stipulates that the occurrence of Forbearance Default constitutes and provides the requisite cause under any applicable law, including the laws of Illinois, justifying the immediate appointment of a receiver to, among other things, manage the business and affairs of each Borrower.  Each Borrower further stipulates and agrees that upon the occurrence of a Forbearance Default, it waives and is estopped from asserting any defenses to the immediate appointment of a receiver.

b.     Loan Documents,  Upon the occurrence of the Forbearance Termination Date, Lender shall have all of the rights and remedies available under the Loan Documents and this Agreement, in addition to any others provided under this Agreement or applicable law.

c.     Clawback.  Notwithstanding anything to the contrary in this Agreement, the Loan Documents or applicable law, if any payment made to, or other amount of value received by, Lender on account of the Obligations or Indebtedness is avoided, rescinded, set aside, or must otherwise be returned by Lender, or a demand for any of the foregoing is made, whether in a case under the Bankruptcy Code, or a similar proceeding under any otherwise applicable law, the Indebtedness or Obligations intended to be repaid or satisfied thereby shall be reinstated (the "Reinstated Amount"), along with any liens or mortgages securing such Reinstated Amount, without any further action by any Party and shall be enforceable against each of the Borrowers and the Collateral.

d.     Borrowers acknowledge that as a consequence of the Existing Defaults and the terms of the Loan Documents and this Agreement, Lender is entitled to enforce its remedies with regard to the Collateral under Article 9 of the UCC or otherwise without notice to any of the Borrowers, such notice having been waived and relinquished.  Borrowers consent to Lender's acceptance of the Collateral in full or partial satisfaction of the Indebtedness, as determined by Lender pursuant to a writing Lender delivers to Borrowers, with the amount of the Indebtedness satisfied to be determined by Lender at the time of acceptance.

6.     **Waiver, Release and Discharge and Indemnification**.

{00181158 4}                                    7

a.      Each of the Borrowers, on its own behalf and on behalf of its respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, heirs, successors and assigns (collectively, the "Borrowing Group") hereby releases and forever discharges Lender, and its officers, directors, subsidiary, affiliated and related companies, agents, consultants, attorneys, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Lender Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, this Agreement, the transactions contemplated in this Agreement, and/or any financial accommodations extended or denied by Lender to Borrowers, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Lender Group, directly or indirectly, through the date hereof. Each Borrower acknowledges and agrees that Lender is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Lender entering into this Agreement and the transactions contemplated herein. Each Borrower represents and warrants to Lender and the Lender Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the claims against the Lender Group to be released herein.

b.      Each Borrower hereby agree to indemnify and hold each entity in the Lender Group harmless with respect to any and all liabilities, claims, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by each entity in the Lender Group, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulations or common law principles arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Documents, this Agreement or any other document executed in connection herewith. The foregoing indemnity shall survive the payment in full of the obligations owed to Lender and the termination of this Agreement and the Loan Documents.

7.      **Additional Covenants by Borrowers.** In addition to any of the other Covenants in any of the Loan Documents, each of the Borrowers jointly and severally covenant and agree:

a.      Consultants. During the Forbearance Period and thereafter, each Borrower will cooperate fully with representatives of any consultant, financial advisor or similar entity or person (a "Consultant") engaged by Lender or any Borrower to assess and address matters germane to any Borrower's performance under the Loan Documents, including, without limitation, any Borrowers business operations. Without

{00181158 4}                                    8

limiting the generality of the foregoing, Borrowers acknowledge and agree that any Consultant retained by Lender (a "Lender Consultant") or Borrowers will be authorized to do the following during the Forbearance Period and at any time thereafter: (i) assist in the preparation, evaluation and revisions of any Borrower's business plans, cash flow forecasts (including a 13-week cash flow forecast) and financial projections, test any Borrower's critical assumptions, identify opportunities for improvement in the planning process and, as appropriate, assist management in the implementation and control of such programs; (ii) assist in projecting and managing each of the Borrower's cash position and trade credit on an ongoing basis and in preparing such projections, reports, budgets, and analyses as may be reasonably required by any Borrower's lenders or investors; and (iii) develop processes and procedures to ensure that the Lender's information needs are met in a timely manner, including borrowing base certificates and all financial reporting requirements. Borrowers further agree that they shall pay the fees and expenses of any Lender Consultant.

b.      In the event of the filing of any petition for bankruptcy relief filed by or against any of the Borrowers (a "Bankruptcy Filing"), such Borrower consents to the entry of an order granting Lender relief from the automatic stay of Section 362 of the Bankruptcy Code and shall not assert or request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce, or inhibit the ability of Lender to enforce any rights it has under the Loan Documents or any other rights Lender has against any Borrower or against any property owned by any Borrower. Without limiting the generality of the foregoing, each Borrower acknowledges and agrees, and is estopped from contesting, that cause for relief from the automatic stay shall exist if any of the Borrowers are subject to a Bankruptcy Filing.

c.      Each of the Borrowers covenants and agrees that notwithstanding anything to the contrary under any otherwise applicable law (a) any information, know-how, data or trade secrets, including any that is confidential (collectively, "Information"), that is disclosed to Lender or any Lender Consultant by any of the Borrowers or otherwise obtained by Lender or any Lender Consultant may be used or disclosed by Lender or any Lender Consultant in furtherance of any efforts undertaken by Lender or any Lender Consultant to facilitate a transaction involving any of the Borrowers (a "Transaction") or to preserve and protect Lender's rights in the Collateral or enhance Lender's chances of recovering payment of the Obligations or Indebtedness, irrespective of any default thereof, (b) a Transaction may include, without limitation, additional loans made to any of the Borrowers, additional equity invested in any of the Borrowers or a sale of any of the Borrowers or their assets, (c) no action taken by Lender or any Lender Consultant in connection with this Agreement, the Loan Documents or the enforcement, preservation or protection of Lender's rights, including, without limitation, any action taken related to a Transaction, shall give rise to, create or establish a fiduciary relationship or fiduciary duty between any of the Borrowers and Lender or any Lender Consultant, it being agreed that at all times the relationship between Lender and each of the Borrowers shall be a debtor/creditor relationship, and (d) any action taken by Lender pursuant to this Agreement or the Loan Documents, including, without limitation, any related to a Transaction, shall be in furtherance of Lender's rights as a secured creditor.

8.    **Additional Provisions:**

a.    **Successors and Assigns/No Third-Party Beneficiaries.** This Agreement is binding upon and shall inure to the benefit only of each of the signatories hereto and their respective successors and assigns. No Person other than the signatories hereto, and those in the Lender Group referenced in paragraph 6, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Lender Group set forth in paragraph 6) are hereby expressly disclaimed.

b.    **Further Assurances.** Each Borrower shall promptly execute and/or deliver any other agreements or documents and take such other actions Lender deems necessary, in the exercise of its sole discretion, to achieve the objectives of this Agreement.

c.    **Advice of Counsel.** The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution and enters into this Agreement freely and of their own volition and without any duress or coercion. The wording of this Agreement shall not be construed in favor of or against any Party.

d.    **Time is of the Essence.** Time is of the essence with respect to each Borrower's performance of its respective obligations under this Agreement.

e.    **Relationship.** Each Borrower agrees that the relationship between Lender and each Borrower is that of creditor and debtor and not that of partners or joint venturers and that no action taken by Lender pursuant to the terms hereof shall give rise to a joint venture or partnership relationship. This Agreement does not constitute a partnership agreement, or any other association between Lender and any Borrower. Each Borrower acknowledges that Lender has acted at all times only as a creditor to each Borrower within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Lender attempted to exercise any control over each Borrower or its business or affairs. Each of the Borrowers acknowledges and agrees that at no time shall Lender owe any fiduciary or other enhanced duty to any of the Borrowers and each Borrower disavows the existence of creation of a fiduciary or enhanced duty, particularly when Lender is exercising any of the rights granted pursuant to this Agreement or the Loan Documents.

f.    **Merger; Modification.** This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters. This Agreement shall not be modified or amended or extended except in written form signed by each of the Parties hereto. In entering into this Agreement and agreeing to be bound by the terms hereof, each Borrower is not relying upon any statements outside of this Agreement.

g.    **Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one

agreement.  Except as set forth herein, any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile or email a signature page of this Agreement signed by such party and such signature shall be treated in all respects as having the same effect as an original signature.

h.    **No Custom; Section Headings**.  This Agreement shall not establish a custom or course of dealing.  The section headings and captions herein are for convenience of reference only and shall not be deemed to limit, impair or affect the interpretation and construction of the terms hereof.

i.    **Notices.**

i.    To each Borrower. All notices or other information sent by Lender to each Borrower in connection with this Agreement and the Loan Documents must be in written form and may be sent, in Lender's Sole Discretion, by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, (d) confirmed telecopy or other facsimile transmission, or (e) email, addressed, as applicable, as follows:

**Borrowers.**

**Crave Brands, LLC,**
**Meathead Franchising. LLC &**
**Meathead Restaurants, LLC**

101 California Street.
Suite 2710
San Francisco, CA 94111

**KW Restaurant Holdings, LLC &**
**Steve Karfaridis**

1278 Glenneyre Street
Suite 128
Laguna Beach, CA 92651

ii.    To Lender. All notices or other information sent by each Borrower to Lender in connection with this Agreement and the Loan Documents, must be in writing and must be sent by prepaid overnight courier, addressed as follows:

**If to Lender:**

LQD Financial Corp.
370 Carpenter St.
Chicago, IL 60607

**With a copy to:**

William J. Factor
FactorLaw
105 W. Madison Street, Suite 1500
Chicago, IL 60602

j.    **Change of Address**. The parties may designate another addressee or change its address for notices and other communications hereunder by a notice given to the other parties in the manner provided in this paragraph. A notice or other communication sent in compliance with the provisions of this paragraph shall be deemed good and sufficient service regardless of whether the parties actually receive such notice, except that notice to Lender shall be deemed given only upon receipt by Lender.

9.    **GOVERNING LAW/VENUE**. THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLIED, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE. ANY AND ALL DISPUTES BETWEEN ANY OF THE BORROWERS AND LENDER SHALL BE RESOLVED PURSUANT TO ILLNOIS LAW, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLICABLE, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE. EACH BORROWER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY UNITED STATES MAIL, FIRST CLASS POSTAGE, OR ANY OTHER MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW. EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING BETWEEN THE PARTIES SHALL BE COOK COUNTY, ILLINOIS OR, IN LENDER'S SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW AND LENDER MAY BRING AN ACTION IN ANOTHER VENUE TO THE EXTENT DOING SO IS NECESSARY, IN LENDER'S SOLE DISCRETION, TO ENFORCE LENDER'S RIGHTS AGAINST ANY OF THE BORROWERS, ANY OF THEIR PROPERTY OR ANY OF THE COLLATERAL.

10.    **WAIVER OF JURY TRIAL.** EACH BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH BORROWER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS

AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF
THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the
date first set forth above.

**LQD Business Finance LLC**

By: _George Souri_

Its: CEO

**LQD Finance Corp.**

By: _George Souri_

Its: CEO

**Crave Brands, LLC**

By: _____

Its: Manager

**Meathead Franchising LLC**

By: _____

Its: Manager

**Meathead Restaurants, LLC**

By: _____

Its: Manager

**Steve Karfaridis**

By: _____

**KW Restaurant Holdings, LLC**

By: _____

Its: Manager

SCHEDULE C

**ADDITIONAL REPRESENTATIONS, WARRANTIES, COVENANTS, and CONDITIONS PRECEDENT**

On a Month-end basis, or at Borrowers' election, every 28 days, Borrowers shall deliver to Lender consolidating financial statements, in a form and manner acceptable to Lender, to include an income statement, balance, sheet, and a statement of cash flows which shall be accurate as of the date of delivery. The consolidating financials shall include store-level financials and consolidating financials.

By not later than April 30, 2020 and then within 121 days after the close of each fiscal year for Borrowers, reviewed year-end consolidated and consolidating financial statements of each Borrower and any of its subsidiaries, containing a balance sheet, income statement, statement of cash flows and a Review Report by an independent certified public accounting firm selected by Borrowers and satisfactory to Lender.

At the end of any Determination Period, Debt Service Coverage shall not be less than 1.40x. "Debt Service Coverage" shall be calculated by solving for "x" in the following formula: x equals (a) consolidating EBITDA, divided by (b) total Debt Service.

Monthly consolidated revenues shall not be less than (i) $850,000 in Determination Period 12 of 2020; (ii) $850,000 in Determination Period 13 of 2020; (iii) $850,000 in Determination Period 1 of 2021; (iv) $900,000 in Determination Period 2 of 2021; and (v) $900,000 in Determination Period 3 of 2021 and thereafter.

Meatheads Restaurants, LLC shall not permit cash held at Fifth Third Bank to be less than $100,000 for more than any 5 consecutive Bank business day period.

A "Determination Period" shall be a four-week reporting period of the Borrowers' 13-period operating cycle. A "Determination Quarter" shall be comprised of any consecutive period of three consecutive Determination Periods.

On a consolidated basis, Borrowers shall have a monthly weighted average EBITDA on a location level basis ("Monthly Weighted EBITDA") of not less than (i) 14% for Determination Period 12 of 2020; (ii) 14% for Determination Period 13 of 2020; (iii) 14% for Determination Period 1 of 2021; (iv) 15% for Determination Period 2 of 2021; and (v) 15% for Determination Period 3 of 2021 and thereafter. The Monthly Weighted EBITDA shall be calculated by dividing the sum of the EBITDA of each location by the sum of the revenue of each location.

On or before March 1, 2019, Borrowers shall enter into a Deposit Account Control Agreement for each Bank Account, as defined in Section 10 of this Agreement, in a form acceptable to Lender.

{00181158 4}

# Exhibit 2



**FACTORLAW**
THE LAW OFFICE OF WILLIAM J. FACTOR, LTD.

**William J Factor**
Direct Dial: 312-878-6146
Email: wfactor@wfactorlaw.com

April 6, 2021

**FOR SETTLEMENT PURPOSES ONLY**

Darrell Graham
Roeser Tanner & Graham LLC
Two North Riverside Plaza. Ste 1850
Chicago, IL  60606

Lauren Newman
Thompson Coburn LLP
55 East Monroe Street
Chicago, IL 60603

Matt Hafter
Thompson Coburn LLP
55 East Monroe Street
Chicago, IL 60603

Re:    Crave Brands

Dear Darrell, Matt, and Lauren:

Reference is hereby made to the various loan agreements, forbearance agreements, pledge agreements and related documents (the "Loan Documents") executed by and between Crave Brands, LLC ("Crave"), KW Restaurant Holdings, LLC ("KW"), Meathead Franchising, LLC ("Franchising"), Meathead Restaurants, LLC ("Restaurants") and Steve Karfaridis ("Steve," Crave, KW, Franchising, and Restaurants, are the "Borrowers"), including that certain Amended and Restated Forbearance and Reaffirmation Agreement dated December 18, 2020 (the "Forbearance Agreement").

As you know from our call yesterday, an actionable default has occurred under the Loan Documents and Lender and Borrowers have been discussing a viable strategy for addressing the situation.  At this time, Lender is willing to consider a strategy that would preserve value for creditors and that would provide economic benefits to Steve and Michael Webb ("Michael").

The proposed strategy consists of the following general structure, which may be subject to modification (see below for further disclaimer regarding the non-binding nature of this communication):

April 6, 2021
Page 2

1. Incremental release of Steve's personal obligations to Lender:

   a. 50% of Steve's obligation to Lender (approximately $3,325,000) will be released at the closing of the specific transaction (approximately $3,325,000 will remain).

   b. Subject to Steve performing his continuing obligations post-closing, the balance of the personal obligation will be released on the 6-month anniversary of the closing date of the proposed transaction, which might involve a sale of the assets of Crave (and potentially certain other Borrowers) vis-à-vis a foreclosure or other type of sale.

   c. Steve will retain a contingent liability of $3,325,000 for 2-years after the closing. The contingent liability would be triggered only if Steve willingly takes certain actions that harm the operations of the Crave entities post-closing.

2. Steve and Michael will receive payment of 50% of their deferred salary at the closing of the proposed transaction, with the amounts to be determined at closing (it is estimated that $104,616 is owed as of March 21, 2021). The total amount at closing will be split in half and then allocated on a pro rata basis based upon amounts owed to each.

3. Steve to receive a 7% ownership interest in the new limited liability company – i.e., Newco -- formed to acquire the assets of Crave entities.

4. KW, Crave, Steve and Michael will be obligated to cooperate in what potentially would be a private foreclosure sale of assets of Crave (and potentially other Borrowers) to Newco. If Lender elects to pursue its remedies through another transaction or process, Steve and Michael will be required to cooperate.

5. Steve and Michael will execute separation agreements that, among other things:

   a. acknowledges they will not be involved in day to day management of the Borrowers and will fully cooperate in transitioning management and operating functions to new management;

   b. will not disparage Borrowers, Newco, Lender, or others (the non-disparagement will be reciprocal);

   c. protects trade secrets and other intellectual property of Borrowers;

   d. requires reasonable assistance and cooperation in dealing with third-parties, including all PPP-related forgiveness applications and filings.

April 6, 2021
Page 3

6. Business will be operated in the normal course through the closing of any transaction or process with no disruptions.

This letter is being transmitted for settlement purposes only and thus all privileges and bars that relate to settlement correspondence or discussions apply to the contents and existence of this letter. This letter and any proposals set forth herein represent solely expressions of interest and nothing herein gives rise to or establishes any binding or otherwise enforceable rights or obligations on the part of any Borrower or Lender.

Nothing contained in this letter or any delay by Lender in exercising any rights, powers, privileges and remedies under the Loan Documents or applicable law with respect to the Events of Default or any other default or Events of Default now existing or hereafter arising under the Loan Documents shall be construed as a waiver or modification of such rights, powers, privileges, and remedies.

This letter is not, and shall not be deemed to be, a waiver of, or a consent to, any default, noncompliance, default, Event of Default now existing or hereafter arising under the Loan Documents. This letter shall not entitle Borrowers to any other or further notice or demand.

Any discussions or correspondence between or among Lender or Borrowers regarding the administration of the amounts owed to Lender or proposals regarding amendments to, or modifications or restructurings of the Loan Documents or release or modifications of any Borrower's obligations shall not constitute any waiver of any default or Event of Default, or an agreement to forbear from the exercise of Lender's rights and remedies under the Loan Documents, or applicable law, nor shall it be construed as an undertaking by Lender to continue such discussions or to enter into any such amendments, modifications, restructurings or releases. In all respects, Lender reserves all its rights and remedies related to Borrowers.

Lender requests Borrowers' response to the strategy identified above no later than Wednesday at 5:00 pm.

**THE LAW OFFICE OF**
**WILLIAM J. FACTOR, LTD.**

Very truly yours,

William J Factor

WJF:
cc: LQD Financial Corp.

# Exhibit 3

**EXECUTION VERSION**

## LLC PLEDGE AGREEMENT (KW)

THIS MEMBERSHIP INTEREST PLEDGE AGREEMENT (this "Pledge Agreement"), dated as of December 18, 2020, is entered into by and between Steve Karfaridis ("Pledgor") and LQD Financial Corp. ("Secured Party").

## RECITALS

WHEREAS, on or about February 22, 2019, LQD Business Finance LLC ("LQD Business") provided Crave Brands, LLC, KW Restaurant Holdings, LLC, Meathead Franchising, LLC, Meathead Restaurants, LLC and Steve Karfaridis (collectively, the "Borrowers") with an initial business loan in the principal amount of $6,500,000, which was then increased to $6,650,000 (the "Business Loan") pursuant to the March Amendment (as defined below), which Business Loan is secured by a duly perfected first-priority lien upon and security interest in the Collateral; and

WHEREAS, the Business Loan is evidenced by that certain LQD Business Finance Loan Agreement dated February 22, 2019 (the "Original Loan Agreement"), as amended by that certain LQD Business Finance Loan Amendment dated September 27, 2019 (the "September Amendment"), as amended by that certain LQD Business Finance Loan Amendment dated March 25, 2020 (the "March Amendment") and as further amended by that certain LQD Business Finance Loan Agreement dated July 2,, 2020 (the "July Amendment" and, along with the Original Loan Agreement, the September Amendment, the March Amendment, as well as any other documents evidencing or relating to the Business Loan, as modified from time to time, including this Agreement, the "Loan Documents") (capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Documents); and

WHEREAS, LQD Business assigned and transferred all of its rights against Borrowers to Secured Party; and

WHEREAS, Pledgor has executed and is a Borrower under the foregoing Loan Documents which evidence loans made to or for the benefit of each Borrower, including Pledgor, in the aggregate principal amount of $6,650,000 (the "Loan");

WHEREAS, Pledgor is the owner of one-hundred percent (100%) of the membership interest units (referred to herein as "Interests") of KW Restaurant Holdings, LLC, a Delaware limited liability company, as set forth on Schedule A hereto;

WHEREAS, Pledgor has agreed to pledge the Collateral (as defined below), including the Interests, together with any and all rights attendant thereto, as set forth below, to Secured Party, and to enter into this Pledge Agreement in order to secure his obligations to Secured Party arising from the Loan Documents.

{00178933 2}

# SECTION 1
## GRANT OF SECURITY INTEREST AND DELIVERY OF CERTIFICATES

**1.1.** *Incorporation of Recitals.* The foregoing recital paragraphs are incorporated into this Pledge Agreement either as representations, warranties or covenants and each forms a material part of this Pledge Agreement.

**1.2.** *Security Interest.* Pledgor agrees that in addition to any rights which Secured Party would otherwise have against Pledgor, or may in the future acquire, Pledgor hereby PLEDGES, ASSIGNS, TRANSFERS and CONVEYS to Secured Party and GRANTS, BARGAINS AND SELLS to Secured Party a first and perfected security interest in (i) all of Pledgor's right, title and interest in, and to the membership interests in, and as a member of, KW Restaurant Holdings LLC, a limited liability company created under the laws of the State of Delaware (the "Company"), whether now owned or hereinafter acquired, including all economic interests therein and rights thereunder and under the Company's Operating Agreement, all of Pledgor's right, title and interest, if any, to participate in the management and voting of the Company and all control rights, rights as a member and economic rights (collectively, the "Interests"), (ii) all distributions made or available to be made by the Company to Pledgor, whether in the form of cash or other property, real, personal, mixed, and upon complete or partial liquidation or otherwise, (iii) all of Pledgor's right, title and interest in specific property of the Company, if any, (iv) all of Pledgor's right, title and interest in and to: (A) all rights, privileges, authority and power of Pledgor as owner and holder of the items specified in (i), (ii), and (iii) above, including but not limited to, all contract rights related thereto, (B) all options and other agreements for the purchase or acquisition of any interest in the Company, and (C) any document or certificate representing or evidencing Pledgor's rights and interests in the Company, and (vi) to the extent not otherwise included, all Proceeds (defined below) and products of the foregoing (collectively, the "Collateral").

(A) "Proceeds" means proceeds, as such term is defined in the Uniform Commercial Code as the same may from time to time be in effect in the State of Illinois and, in any event, shall include, but not be limited to, (i) any and all payments (in any form whatsoever) made or due and payable to Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral, including the Interests, by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (ii) any and all amounts paid or payable to Pledgor for or in connection with any sale or other disposition of Pledgor's interests in the Company, and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

(B) This Pledge Agreement secures, and the Collateral, including the Interests, is security for, the full and prompt payment and performance when due of all present and future indebtedness and obligations of Debtor under or pursuant to the Loan, the Loan Agreement and the other Loan Documents.

     **1.3.** *Delivery to Secured Party.* Contemporaneously with the execution of this Pledge Agreement, the Pledgor must endorse in blank and deposit with Secured Party, all membership certificates of the Company, representing a 100% interest in the profits of the Company and 100% in the capital of the Company. A copy of the current Certificate representing Pledgor's 100% Interest in the Company is appended hereto as Exhibit B. The Pledgor must, in the future, similarly endorse and deposit with the Secured Party any membership certificates constituting products or proceeds of the Interests and membership certificates representing any additional membership interests in the Company hereafter acquired by the Pledgor in any other manner. Any membership interests constituting Proceeds that are not represented by a certificate or other instrument and reflected solely in book entry form shall be transferred to and maintained in an account with Secured Party, and Secured Party shall be entitled at any time to register such non-certificated interest in the name of Secured Party or its nominee or nominees. (All of the membership certificates Pledgor has or is entitled to obtain in the Company are collectively referred to in this Pledge Agreement as the "Certificates.")

## SECTION 2
## OBLIGATIONS SECURED

The obligations secured by this Pledge Agreement are as follows:

     **2.1.** *The Loan.* Indefeasible payment of all of the principal and interest due under the Loan Documents;

     **2.2.** *Covenants and Conditions.* Full and indefeasible payment and performance or observance by the Pledgor and each of the Borrowers of the covenants and conditions of this Pledge Agreement and the Loan Documents;

     **2.3.** *Other Obligations.* Any other indebtedness, liability, or obligation of the Pledgor or the Borrowers to the Secured Party, however arising, whether now existing or arising in the future, due or not due, absolute or contingent, liquidated or unliquidated, including indebtedness, liabilities, and obligations on which the Pledgor is jointly liable with other parties;

     **2.4.** *Expenses of Secured Party.* Payment of all expenses incurred or paid by the Secured Party for purposes of conserving and protecting the Collateral and the Secured Party's security interest, including, but not limited to, attorney's fees and other legal expenses incurred in connection with retaking, holding, preparing for sale, and selling the Collateral; and

     **2.5.** *Legal Expenses.* Payment of attorney's fees and other expenses incurred by the Secured Party in any legal proceeding, including any proceeding in the United States bankruptcy court, in the trial court or on appeal, brought to enforce or to collect any obligation secured by this Pledge Agreement, or to enforce any of its terms or provisions, including any legal proceeding brought to foreclose or otherwise realize upon the Collateral or the Interests.

## SECTION 3
## PLEDGOR'S COVENANTS, REPRESENTATIONS AND WARRANTIES

The Pledgor covenants, represents and warrants to the Secured Party that:

**3.1.**   *Ownership of the Collateral.* The Pledgor is the sole owner of the Collateral, free and clear of liens or encumbrances, and will defend the same against all claims and demands of all persons.   Pledgor also is the sole manager of the Company. Exhibit A is a true and accurate representation of the ownership and management of the Company.

**3.2.**   *Right to Grant Security Interest.* Pledgor has a good right to grant a security interest in the Collateral as provided in this Pledge Agreement, and this Pledge Agreement will not result in or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach, or violation of any lease, license, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, Pledge Agreement, or other agreement, instrument, or arrangement to which the Pledgor is a party or by which the Pledgor, or the Collateral, are bound.

**3.3.**   *Further Assurances.*   From time to time and as requested by Secured Party, Pledgor agrees:

(A) to furnish Secured Party from time to time at Secured Party's request written statements and schedules further identifying and describing the Interests in such detail as Secured Party may reasonably require;

(B) to advise Secured Party promptly, in sufficient detail, of any substantial change in the Interests, and of the occurrence of any event which would have a material adverse effect on the value of the Interests or on Secured Party's security interest therein.

(C) not to permit the amendment or modification of the Company's Operating Agreement without Secured Party's prior written consent;

(D) to take no action and give no consent, waiver or ratification which would cause Pledgor to breach any of the provisions of this Agreement;

(E) upon the occurrence of an Event of Default or a Default under this Pledge Agreement or the Loan Documents (collectively, a "Default"), not receive or distribute, or permit the Company to distribute, any sums in respect of the Interests or other Proceeds of the Interests or the Loan, it being understood that, if a Default exists, a demand by Secured Party upon the Company for the payment to Secured Party of any such sums due or to become due to Pledgor shall alone be sufficient to warrant to the Company to make said payments directly to Secured Party.

{00178933 2}

(F) to keep the Collateral free from any and all liens, security interests, attachments, encumbrances or claims, except as contemplated by this Agreement.

**3.4.** *No Consents Required.* Pledgor hereby represents and warrants that its execution of this Pledge Agreement does not require the consent of any third party nor is it prohibited by, or in violation of, the Company's Operating Agreement, or any other agreement to which Pledgor or Company is a party or by which either of them may be bound or affected.

**3.5.** *No Consents Required.* Pledgor hereby represents and warrants that its execution of this Pledge Agreement does not require the consent of any third party, or that if such consent is required, that such consent has been obtained, nor is the execution of this Pledge Agreement prohibited by, or in violation of, the Company's Operating Agreement, or any other agreement to which Pledgor or Company is a party or by which either of them may be bound or affected.

**3.6.** *Consent to Transfer.* By executing this Pledge Agreement, (a) Pledgor is exercising its right as a member holding the requisite percentage interest as a member of the Company to consent to the terms of this Pledge Agreement and to effectuate the terms hereof and representing that no further consents are required for Secured Party to exercise the rights granted by the Pledge Agreement and (b) Pledgor is casting an affirmative vote of 100% of the interests of the Company in favor of the terms, conditions, actions and transactions set forth in this Pledge Agreement.

## SECTION 4
## RIGHTS AND RESTRICTIONS RELATING TO COLLATERAL

**4.1.** *Distributions.* Except as otherwise provided in this section relating to rights and restrictions relating to certificates, Secured Party is entitled to receive all distributions of cash or property made by the Company with respect to the Collateral. After receiving a cash distribution, the Secured Party must apply it to the obligations secured by the Loan Documents in the manner Secured Party elects, in the exercise of its discretion. After receiving a distribution of property other than cash, the Secured Party must hold the property as additional security for the obligations secured by this Pledge Agreement.

**4.2.** *Other Rights.* Until there is a Default under this Pledge Agreement or the Loan Documents, Pledgor may exercise all rights of the holder of the Interests but only to the extent they are not inconsistent with the provisions of this Pledge Agreement. Specifically, until there is a Default under this Pledge Agreement or the Loan Documents, the Pledgor is entitled to receive information regarding the business and affairs of the Company, inspect and copy the Company's books and records, exercise all voting rights, and exercise all rights to participate in the business and management of the Company. Pledgor's rights upon a Default are set forth in § 5 and § 6 hereof.

**4.3.** *Prohibition on Transfer.* The Pledgor may not sell, transfer, or otherwise dispose of all or any portion of the Collateral, including the Interests, or any other collateral held as security under this Pledge Agreement and the Pledgor must keep the Collateral and other collateral free and clear of all liens and encumbrances other than the lien created by this Pledge Agreement.

## SECTION 5
## DEFAULT

Time is of the essence of this Pledge Agreement. The occurrence of any of the following events will constitute a default under this Pledge Agreement, without notice:

**5.1.** *Cross-Default.*   One or more Defaults occurs under any of the Loan Documents, with or without notice thereof;

**5.2.** *Payment Defaults.* The Pledgor fails to pay any installment of principal or interest on any obligation secured by this Pledge Agreement when the installment is due;

**5.3.** *Breach of Representations and Warranties.* Any representation or warranty made by the Pledgor in this Pledge Agreement proves to have been untrue in any material respect when it was made or furnished;

**5.4.** *Foreclosure Suit.* A foreclosure action or proceeding is commenced by any third party against the Collateral and the Secured Party reasonably determines that the action or proceeding would jeopardize the security interest created by this Pledge Agreement; or

**5.5.** *Financial Distress.* The Pledgor or the Company is in financial distress as evidenced by any of the following: (a) the Pledgor discontinues business; (b) the Pledgor makes a general assignment for the benefit of creditors; (c) the Pledgor applies for or consents to the appointment of a receiver, a trustee, or liquidator of the Pledgor or of all or a substantial part of the Pledgor's assets; (d) the Pledgor is adjudicated as being bankrupt or insolvent; (e) the Pledgor files a voluntary petition in bankruptcy or files a petition or answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of Pledgors, or admits (by answer, by default, or otherwise) the material allegations of a petition filed against it in any bankruptcy, reorganization, arrangement, insolvency, or other proceeding (whether federal or state) relating to relief of Pledgors; (f) a court of competent jurisdiction enters any judgment, decree, or order that approves a petition seeking reorganization of the Pledgor, appoints a receiver, trustee, or liquidator of the Pledgor or of all or a substantial part of the Pledgor's assets, or takes any other action that, in the reasonable opinion of the Secured Party, would jeopardize the security interest created by this Pledge Agreement; or (g) the Pledgor takes or omits to take any action for the purpose or with the result of effecting or permitting any of the foregoing.

{00178933 2}

## SECTION 6
## RIGHTS OF SECURED PARTY

**6.1.**   *Rights of Secured Party, Other Rights.* Upon the occurrence of a Default hereunder or the Loan Documents, in addition to any other rights it may have or hereafter acquire, including rights under § 6.13, Secured Party may, in its sole discretion, exercise the rights of a secured creditor under the Uniform Commercial Code. After a Default hereunder or the Loan Documents and automatically without notice to Pledgor any other person, Pledgor shall cease to have voting or other rights with respect to the Collateral, including the Interests, and, as further set forth in § 6.13, Secured Party shall thereafter have exclusive rights to vote all or any part of the Interests and to execute consents in respect thereto, to consent to, satisfy or waive notice of any or all meetings, to elect members and to exercise any and all other rights as a member of Company whether under the Company's Operating Agreement or by operation of law.

**6.2.**   *Notice of Sale.*   Any notice of sale, disposition, or other intended action by Secured Party sent by First Class Mail, postage prepaid, and/or overnight courier, to the address of Pledgor as shown on the records of Secured Party at least ten (10) days before the action shall constitute reasonable notice. If Secured Party elects to enforce its remedies through a public sale, Debtor acknowledges and agrees that it is reasonable to hold such a sale in Cook County, Illinois. Secured Party may buy any part or all of the Collateral at any public sale and may make payments therefore by any means, including through partial or full credit bid in an amount Secured Party deems appropriate. In case of any sale or other disposition of any of the Interests aforesaid, after deducting all costs, or expenses of every kind for care, safekeeping, collection, sale, delivery and for reasonable attorney's fees for legal services in connection therewith, Secured Party may apply the residue of the proceeds of the sale or sales or other disposition of the Interests, in full or partial payment of the Loan, as it may deem proper, and return the excess proceeds, if any, to Pledgor.

**6.3.**   *No Waiver.* No delay on the part of Secured Party in exercising any rights hereunder or hereafter acquired with respect to this Pledge Agreement or the rights granted hereby shall operate as a waiver of such rights, nor shall the waiver of any breach hereunder operate as a waiver of any subsequent breach. Secured Party may also, at any time when in its discretion it may be deemed necessary, compromise, settle or extend the time of payment of any of the indebtedness hereby secured.

**6.4.**   *Remedies Exclusive.*   No remedy herein conferred upon or reserved to Secured Party is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Pledge Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any Default, omission or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle Secured Party to exercise any remedy reserved to it in this Pledge Agreement, it shall not be necessary to

{00178933 2}

give any notice, other than such notice as may be herein expressly required. In the event any provision contained in this Pledge Agreement should be breached by Pledgor and thereafter duly waived by Secured Party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. No waiver, amendment, release or modification of this Pledge Agreement shall be established by conduct, custom or course of dealing, but solely by an instrument in writing duly executed by Secured Party.

      **6.5.**   *Sale Process.*  In connection with any sale of the Collateral, the Pledgor agrees that it is commercially reasonable to sell the Collateral at public or private sale as one lot or in several lots. The Secured Party may restrict the purchasers or prospective purchasers of the Collateral in a manner that will avoid the necessity of registering the Certificates under applicable state or federal securities laws. The Secured Party must give the Pledgor no more than 10 days' notice of any proposed sale of the Collateral.  Pledgor recognizes and agrees that absent unforeseen circumstances, Secured Party will be required to sell the Collateral in a transaction which does not constitute a public offering and which qualifies for so-called private placement exemptions under the Securities Act of 1933 and applicable state securities laws. Pledgor agrees that a sale conducted after commercially reasonable public advertising shall constitute a public sale for purposes of the applicable provisions of the Uniform Commercial Code, notwithstanding reasonable restrictions imposed by Secured Party on bidders in order to qualify for applicable exemptions from registration and other requirements of the Securities Act of 1933, applicable state securities laws, and rules and regulations promulgated under any of them. Secured Party shall be under no obligation to delay a sale of the Collateral for the period of time necessary to permit Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, even if the Pledgor would agree to do so.

      **6.6.**   *Other Disposition.* The Secured Party has no obligation to sell the Collateral if, in its reasonable business judgment, none of the offers received reasonably approximates the fair value of the Collateral. If the Secured Party elects not to sell the Collateral, the Secured Party can elect to follow the procedures set forth in the Uniform Commercial Code for retaining the Collateral in satisfaction of the obligations secured by this Pledge Agreement, subject to the Pledgor's rights under those procedures.

      **6.7.**   *Financing Statements.*  Pledgor will execute one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law in form satisfactory to Secured Party and will pay the cost of filing or recording the same, or filing or recording this Pledge Agreement or any other instrument, agreement or document executed and delivered pursuant hereto (including the cost of all Federal, State or local stamp or other taxes) in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Secured Party also has the right to file such financing statements and Pledgor authorizes Secured Party to do so. In addition, the Secured Party may file this Pledge Agreement as a financing statement. Pledgor will also promptly deliver to Secured Party, appropriately endorsed to Secured Party's order, all of the Collateral, including any Certificates, as to which Secured Party's

security interest must be perfected by possession under applicable law. If at any time any of the Collateral is represented or evidenced by certificates, all certificates representing or evidencing the Interests shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party.

**6.8.** *Assignment.* The Secured Party has the right to assign this Pledge Agreement and the interest of the Secured Party in the Collateral, including the Interests, or to grant a security interest in the same.

**6.9.** *Transfer of Collateral.* If there is a Default under this Pledge Agreement or the Loan Documents, the Secured Party may take possession of the Collateral, including the Interests and the Certificates, and cause any of them to be transferred into the name of the Secured Party on the books and records of the Company. To this end, the Secured Party may notify the Company of the Default.

**6.10.** *Preservation of Collateral.*   Secured Party shall not be under any liability or obligation to take any steps whatsoever to preserve the value of any Collateral, including any Interests, pledged hereunder, or to fix any liability upon, or to collect or to enforce payment of any indebtedness hereby secured, whether by giving any notice, presenting, demanding payment, protesting, instituting suit or otherwise.

**6.11.** OBLIGATIONS NOT IMPAIRED. PLEDGOR HEREBY WAIVES DILIGENCE, PRESENTMENT, DEMAND, PROTEST AND NOTICE OF ANY KIND WHATSOEVER IN RESPECT OF THE LOAN OR THE COLLATERAL, AS WELL AS ANY REQUIREMENT THAT SECURED PARTY EXHAUST ANY RIGHT OR REMEDY OR TAKE ANY ACTION IN CONNECTION WITH THE LOAN DOCUMENTS, THIS PLEDGE AGREEMENT OR ANY OTHER DOCUMENTS. DEBTOR FURTHER WAIVES ALL RIGHT TO HAVE ANY SECURITY FOR THE LOAN MARSHALED UPON THE EXERCISE OF ANY REMEDIES PERMITTED HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS. PLEDGOR AGREES THAT SECURED PARTY MAY ACCEPT OR RELEASE OTHER SECURITY FOR THE OBLIGATIONS SECURED HEREBY, RELEASE ANY PARTY LIABLE FOR ANY SUCH OBLIGATIONS, GRANT EXTENSIONS, RENEWALS OR INDULGENCES WITH RESPECT TO SAID OBLIGATIONS, AND MAY APPLY AND OTHER SECURITY THEREFOR HELD BY IT WITHOUT PREJUDICE TO ANY OF ITS RIGHTS HEREUNDER.

**6.12.** INDEMNITY. SECURED PARTY SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE, NOR DOES IT HEREBY UNDERTAKE TO PERFORM OR DISCHARGE, ANY OBLIGATION, DUTY OR LIABILITY WITH RESPECT TO THE COLLATERAL OR THE COMPANY, AND PLEDGOR SHALL AND DOES HEREBY AGREE TO INDEMNIFY SECURED PARTY FOR, AND TO HOLD SECURED PARTY HARMLESS OF AND FROM, ANY AND ALL LIABILITY, LOSS OR DAMAGE (COLLECTIVELY, "LOSSES") WHICH IT MAY OR MIGHT INCUR WITH RESPECT TO OR BY REASON OF ANY OF THE COLLATERAL, INCLUDING THE INTERESTS, OR THIS PLEDGE AGREEMENT AND OF AND FROM ANY AND ALL CLAIMS AND

DEMANDS WHATSOEVER WHICH MAY BE ASSERTED AGAINST IT IN RESPECT OF THIS PLEDGE AGREEMENT OR BY REASON OF ANY ALLEGED OBLIGATIONS OR UNDERTAKING ON ITS PART TO PERFORM OR DISCHARGE ANY OF THE TERMS, COVENANTS OR AGREEMENTS CONTAINED IN THE COMPANY'S OPERATING AGREEMENT, PROVIDED, HOWEVER, THAT PLEDGOR SHALL NOT BE REQUIRED TO INDEMNIFY SECURED PARTY FOR LOSSES DUE TO SECURED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. SHOULD SECURED PARTY INCUR SUCH LIABILITY, LOSS OR DAMAGE, OR IN THE DEFENSE OF ANY CLAIMS OR DEMANDS IN RESPECT THEREOF, THE AMOUNT THEREOF (INCLUDING REASONABLE COSTS, EXPENSES AND ATTORNEYS' FEES) SHALL BE SECURED HEREBY AND PLEDGOR SHALL REIMBURSE SECURED PARTY THEREFOR IMMEDIATELY UPON DEMAND.

**6.13.** *Power of Attorney and Proxy.*

(A) Immediately and automatically upon the occurrence of a Default, and without any notice thereof by Secured Party to any party, Pledgor, being the record owner of 100% of the Interests of the Company does hereby appoint Secured Party, of Chicago, Illinois, as its proxy to attend all meetings of the members of the Company with full power to vote and act for Pledgor in the same manner and extent that Pledgor might as if Pledgor were personally present at said meetings.  As a result of this proxy, Secured Party  shall have full power to substitute another person as Pledgor's proxy and to revoke the appointment of any such substitute proxy. This proxy is coupled with an interest, is given in connection with this Pledge Agreement and is irrevocable until all obligations owed by Pledgor or any Borrower to Secured Party are paid in full.

(B) The Pledgor appoints the Secured Party as the Pledgor's attorney-in-fact for transfer of the Collateral, including any of the Interests and Certificates, into the name of the Secured Party. The Company is not required to inquire as to whether or not the Pledgor is in default and whether the Secured Party is entitled to transfer any of the Collateral, including the Interests and any Certificates, into the name of the Secured Party or to take possession thereof.

**6.14.** *Marshaling.* The Secured Party will not be required to marshal security and may proceed to foreclose or otherwise realize upon the Collateral and any other security for the obligations secured by this Pledge Agreement in the order and the manner the Secured Party determines in the Secured Party's sole discretion.

**6.15.** *No Obligations or Duties.*   Secured Party shall not be under any liability or obligation to take any steps whatsoever to preserve the value of any of the Collateral, including any Interests pledged hereunder, or to fix any liability upon, or to collect or to enforce payment of any indebtedness hereby secured, whether by giving any notice, presenting, demanding payment, protesting, instituting suit or otherwise. Secured Party shall not have or owe any duties to Pledgor, Company or any third party arising from or in connection with the enforcement or exercise of any of rights under this

Pledge Agreement or related to the Interests, including without limitation, any fiduciary or similar duty.

**6.16.** *Not a Joint Venture or Partnership.* This Pledge Agreement and the other Loan Documents are intended to create only a debtor-creditor relationship between Pledgor and Secured Party, and Pledgor acknowledges and agrees that nothing contained herein or therein shall be construed in any way as creating a joint venture, partnership, joint tenancy or tenancy in common between Pledgor and Secured Party. Secured Party shall not, by virtue of this Pledge Agreement, have any liability for the debts, obligations, or liabilities of the Company or to have any obligation to make contributions to the Company.

**6.17.** *Waiver of Subrogation Rights.* Pledgor waives, relinquishes and irrevocably agrees not to assert in any fashion any and all rights of contribution, subrogation, indemnification or reimbursement Pledgor may have against any of the Borrowers related to, or as a result of, any of the actions of Secured Party hereunder, the Loan Documents or applicable law, including, without limitation, Secured Party's sale of any of the Collateral or receipt of any funds on account of the Loans.

## SECTION 7
## MISCELLANEOUS PROVISIONS

**7.1.** *Binding Effect.* The provisions of this Pledge Agreement are binding on and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the parties. This section is, however, not a modification of any restriction on transfer set forth in this Pledge Agreement.

**7.2.** *Notice.* All notices or other information required or permitted to be given by Secured Party to Pledgor in connection with this Pledge Agreement or an applicable Uniform Commercial Code provision must be in written form and may be sent, in Secured Party's sole discretion, by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, (d) confirmed telecopy or other facsimile transmission, or (e) email, addressed, as applicable, as follows:

Pledgor:

Steve Karfaridis
1278 Glenneyre Street
Suite 128
Laguna Beach, CA 92651

With a copy to:

Darrell J. Graham
Roeser Tanner & Graham LLC
Two North Riverside Plaza, Ste 1850

{00178933 2}

Chicago, IL 60606

All notices or other information sent by Pledgor to Secured Party in connection with this Pledge Agreement must be in writing and must be sent by prepaid overnight courier, addressed as follows:

If to Lender:

Attn: George Souri
LQD Financial Corp.
370 North Carpenter St.
Chicago, IL 60607

With a copy to:

William J. Factor
FactorLaw
105 W. Madison Street, Suite 1500
Chicago, IL will60602

The address of a party to which notices or other communications must be mailed may be changed from time-to-time by giving written notice to the other party.

**7.3.** *Litigation Expense.* If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this Pledge Agreement, or for the purpose of collecting any obligation secured by this Pledge Agreement, including any proceeding in the United States Bankruptcy Court, the Secured Party is entitled to recover reasonable attorney's fees in the proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law. In addition, the Secured Party is entitled to recover reasonable attorney's fees and legal expenses incurred by the Secured Party in connection with retaking, holding, preparing for sale, and selling the Collateral.

**7.4.** *No Waiver.* No waiver of any provision of this Pledge Agreement or any obligation secured by this Pledge Agreement may be deemed, or will constitute, a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver will be binding unless executed in writing by the party making the waiver.

**7.5.** *Section Headings.* Section headings are for convenience only and are not material parts of this Pledge Agreement.

**7.6.** *Advice of Counsel.* The wording of this Pledge Agreement was reviewed by legal counsel for each of the parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution and enters into this

Pledge Agreement freely and of their own volition and without any duress or coercion. The wording of this Pledge Agreement shall not be construed in favor of or against any party.

      **7.7.**   *Merger/Modification.*  This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters.  This Pledge Agreement shall not be modified or amended or extended except in written form signed by each of the parties hereto. In entering into this Pledge Agreement and agreeing to be bound by the terms hereof, Pledgor is not relying upon any statements outside of this Pledge Agreement.

      **7.8.**   *Counterparts.*  This Pledge Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one agreement.  Except as set forth herein, any party hereto may execute and deliver a counterpart of this Pledge Agreement by delivering by facsimile or email a signature page of this Pledge Agreement signed by such party and such signature shall be treated in all respects as having the same effect as an original signature.

      **7.9.**   GOVERNING LAW/VENUE.  THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLIED, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE.  PLEDGOR HEREBY IRREVOCABLY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY UNITED STATES MAIL, FIRST CLASS POSTAGE, OR ANY OTHER MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW.  EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING BETWEEN THE PARTIES SHALL BE COOK COUNTY, ILLINOIS OR, IN SECURED PARTY'S SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW AND SECURED PARTY MAY BRING AN ACTION IN ANOTHER VENUE TO THE EXTENT DOING SO IS NECESSARY, IN SECURED PARTY'S SOLE DISCRETION, TO ENFORCE SECURED PARTY'S RIGHTS AGAINST PLEDGOR OR ANY OF THE COLLATERAL.

      **7.10.**  WAIVER OF JURY TRIAL.  PLEDGOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

PLEDGOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.

Steve Karfaridis, Pledgor

LQD Finance Corp.

By: *George Souri*

George Souri, not individually, but solely as President of LQD Financial Corp.

Consented to:

KW Restaurant Holdings LLC

By:

Steve Karfaridis, Its Manager and Sole Member

{00178933 2}

Exhibit A

## NAMES, ADDRESSES, EMAIL INFORMATION OF MEMBERS CAPITAL CONTRIBUTIONS, AND MEMBERSHIP INTERESTS

| Member Name Address/Email | Capital Contribution | Membership Interest | Membership Units |
|---|---|---|---|
| Steve Karfaridis ("Manager") 1278 Glenneyre Street, Suite 128 Laguna Beach, CA 92651 greekologie@yahoo.com | $100.00 | 100.00% | 10,000 |

**EXECUTION VERSION**

**AMENDED PLEDGE AGREEMENT (CRAVE)**

THIS AMENDED MEMBERSHIP INTEREST PLEDGE AGREEMENT (this "Pledge Agreement"), dated as of December 18, 2020, is entered into by and between KW Restaurant Holdings LLC ("Pledgor"), and LQD Financial Corp. ("Secured Party").

## RECITALS

WHEREAS, on or about February 22, 2019, LQD Business Finance LLC ("LQD Business") provided Crave Brands, LLC, KW Restaurant Holdings, LLC, Meathead Franchising, LLC, Meathead Restaurants, LLC and Steve Karfaridis (collectively, the "Borrowers") with an initial business loan in the principal amount of $6,500,000, which was then increased to $6,650,000 (the "Business Loan") pursuant to the March Amendment (as defined below), which Business Loan is secured by a duly perfected first-priority lien upon and security interest in the Collateral; and

WHEREAS, the Business Loan is evidenced by that certain LQD Business Finance Loan Agreement dated February 22, 2019 (the "Original Loan Agreement"), as amended by that certain LQD Business Finance Loan Amendment dated September 27, 2019 (the "September Amendment"), as amended by that certain LQD Business Finance Loan Amendment dated March 25, 2020 (the "March Amendment") and as further amended by that certain LQD Business Finance Loan Agreement dated July 2, 2020 (the "July Amendment" and, along with the Original Loan Agreement, the September Amendment, the March Amendment, as well as any other documents evidencing or relating to the Business Loan, as modified from time to time, including this Agreement, the "Loan Documents") (capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Documents); and

WHEREAS, LQD Business assigned and transferred all of its rights against Borrowers to Secured Party; and

WHEREAS, Pledgor has executed and is a Borrower under the foregoing Loan Documents which evidence loans made to or for the benefit of each Borrower, including Pledgor, in the aggregate principal amount of $6,650,000 (the "Loan");

WHEREAS, Pledgor is the owner of membership interest units (referred to herein as "Interests") of Crave Brands LLC, a Delaware limited liability company, as set forth on Exhibit A hereto; and

WHEREAS, on or about February 22, 2019, Pledgor executed that certain Stock Pledge Agreement pursuant to which Pledgor assigned and pledged its ownership interests in the Company to Lender to secure the Loan, which is hereby amended and restated; and

WHEREAS, Pledgor has agreed to pledge the Collateral (as defined below), including the Interests, together with any and all rights attendant thereto, as set forth below, to Secured

Party, and to enter into this Pledge Agreement in order to secure his obligations to Secured Party arising from the Loan Documents.

## SECTION 1
## GRANT OF SECURITY INTEREST AND DELIVERY OF CERTIFICATES

  **1.1.** *Incorporation of Recitals.* The foregoing recital paragraphs are incorporated into this Pledge Agreement either as representations, warranties or covenants and each forms a material part of this Pledge Agreement.

  **1.2.** *Security Interest.* Pledgor agrees that in addition to any rights which Secured Party would otherwise have against Pledgor, or may in the future acquire, Pledgor hereby PLEDGES, ASSIGNS, TRANSFERS and CONVEYS to Secured Party and GRANTS, BARGAINS AND SELLS to Secured Party a first and perfected security interest in (i) all of Pledgor's right, title and interest in, and to the membership interests in, and as a member of, Crave Brands, LLC, a limited liability company created under the laws of the State of Delaware (the "Company"), whether now owned or hereinafter acquired, including all economic interests therein and rights thereunder and under the Company's Operating Agreement, all of Pledgor's right, title and interest, if any, to participate in the management and voting of the Company and all control rights, rights as a member and economic rights (collectively, the "Interests"), (ii) all distributions made or available to be made by the Company to Pledgor, whether in the form of cash or other property, real, personal, mixed, and upon complete or partial liquidation or otherwise, (iii) all of Pledgor's right, title and interest in specific property of the Company, if any, (iv) all of Pledgor's right, title and interest in and to: (A) all rights, privileges, authority and power of Pledgor as owner and holder of the items specified in (i), (ii), and (iii) above, including but not limited to, all contract rights related thereto, (B) all options and other agreements for the purchase or acquisition of any interest in the Company, and (C) any document or certificate representing or evidencing Pledgor's rights and interests in the Company, and (vi) to the extent not otherwise included, all Proceeds (defined below) and products of the foregoing (collectively, the "Collateral").

  (A) "Proceeds" means proceeds, as such term is defined in the Uniform Commercial Code as the same may from time to time be in effect in the State of Illinois and, in any event, shall include, but not be limited to, (i) any and all payments (in any form whatsoever) made or due and payable to Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral, including the Interests, by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (ii) any and all amounts paid or payable to Pledgor for or in connection with any sale or other disposition of Pledgor's interests in the Company, and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

  (B) This Pledge Agreement secures, and the Collateral, including the Interests, is security for, the full and prompt payment and performance when due of all

{00179075 3}

present and future indebtedness and obligations of Debtor under or pursuant to the Loan, the Loan Agreement and the other Loan Documents.

        **1.3.** *Delivery to Secured Party.* Contemporaneously with the execution of this Pledge Agreement, the Pledgor must endorse in blank and deposit with Secured Party, all membership certificates of the Company held or in the name of Pledgro, representing at least a 61% interest in the Company and at least a 61% interest in the capital and profits of the Company. A copy of the current Certificate representing Pledgor's 61.04% interest in the Company is appended hereto as Exhibit B. The Pledgor must, in the future, similarly endorse and deposit with the Secured Party any membership certificates constituting products or proceeds of the Interests and membership certificates representing any additional membership interests in the Company hereafter acquired by the Pledgor in any other manner. Any membership interests constituting Proceeds that are not represented by a certificate or other instrument and reflected solely in book entry form shall be transferred to and maintained in an account with Secured Party, and Secured Party shall be entitled at any time to register such non-certificated interest in the name of Secured Party or its nominee or nominees. (All of the membership certificates Pledgor has or is entitled to obtain in the Company are collectively referred to in this Pledge Agreement as the "Certificates.")

## SECTION 2
## OBLIGATIONS SECURED

    The obligations secured by this Pledge Agreement are as follows:

        **2.1.** *The Loan.* Indefeasible payment of all of the principal and interest due under the Loan Documents;

        **2.2.** *Covenants and Conditions.* Full and indefeasible payment and performance or observance by the Pledgor and each of the Borrowers of the covenants and conditions of this Pledge Agreement and the Loan Documents;

        **2.3.** *Other Obligations.* Any other indebtedness, liability, or obligation of the Pledgor or the Borrowers to the Secured Party, however arising, whether now existing or arising in the future, due or not due, absolute or contingent, liquidated or unliquidated, including indebtedness, liabilities, and obligations on which the Pledgor is jointly liable with other parties;

        **2.4.** *Expenses of Secured Party.* Payment of all expenses incurred or paid by the Secured Party for purposes of conserving and protecting the Collateral and the Secured Party's security interest, including, but not limited to, attorney's fees and other legal expenses incurred in connection with retaking, holding, preparing for sale, and selling the Collateral; and

**2.5.** *Legal Expenses.* Payment of attorney's fees and other expenses incurred by the Secured Party in any legal proceeding, including any proceeding in the United States bankruptcy court, in the trial court or on appeal, brought to enforce or to collect any obligation secured by this Pledge Agreement, or to enforce any of its terms or provisions, including any legal proceeding brought to foreclose or otherwise realize upon the Collateral or the Interests.

## SECTION 3
## PLEDGOR'S COVENANTS, REPRESENTATIONS AND WARRANTIES

The Pledgor covenants, represents and warrants to the Secured Party that:

**3.1.** *Ownership of the Collateral.* The Pledgor is the sole owner of the Collateral, free and clear of liens or encumbrances, and will defend the same against all claims and demands of all persons.   Pledgor als is the manager of the Company and the owner and holder of nor less than 61.04% of the Company's membership interests.

**3.2.** *Right to Grant Security Interest.* Pledgor has a good right to grant a security interest in the Collateral as provided in this Pledge Agreement, and this Pledge Agreement will not result in or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach, or violation of any lease, license, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, Pledge Agreement, or other agreement, instrument, or arrangement to which the Pledgor is a party or by which the Pledgor, or the Collateral, are bound.

**3.3.** *Further Assurances.*   From time to time and as requested by Secured Party, Pledgor agrees:

(A) to furnish Secured Party from time to time at Secured Party's request written statements and schedules further identifying and describing the Interests in such detail as Secured Party may reasonably require;

(B) to advise Secured Party promptly, in sufficient detail, of any substantial change in the Interests, and of the occurrence of any event which would have a material adverse effect on the value of the Interests or on Secured Party's security interest therein.

(C) not to permit the amendment or modification of the Company's Operating Agreement without Secured Party's prior written consent;

(D) to take no action and give no consent, waiver or ratification which would cause Pledgor to breach any of the provisions of this Agreement;

(E) upon the occurrence of an Event of Default or a Default under this Pledge Agreement or the Loan Documents (collectively, a "Default"), not receive or

distribute, or permit the Company to distribute, any sums in respect of the Interests or other Proceeds of the Interests or the Loan, it being understood that, if a Default exists, a demand by Secured Party upon the Company for the payment to Secured Party of any such sums due or to become due to Pledgor shall alone be sufficient to warrant to the Company to make said payments directly to Secured Party.

(F) to keep the Collateral free from any and all liens, security interests, attachments, encumbrances or claims, except as contemplated by this Agreement.

**3.4.** *No Consents Required.* Pledgor hereby represents and warrants that its execution of this Pledge Agreement does not require the consent of any third party nor is it prohibited by, or in violation of, the Company's Operating Agreement, or any other agreement to which Pledgor or Company is a party or by which either of them may be bound or affected.

**3.5.** *No Consents Required.* Pledgor hereby represents and warrants that its execution of this Pledge Agreement does not require the consent of any third party, or that if such consent is required, that such consent has been obtained, nor is the execution of this Pledge Agreement prohibited by, or in violation of, the Company's Operating Agreement, or any other agreement to which Pledgor or Company is a party or by which either of them may be bound or affected.

**3.6.** *Consent to Transfer.* By executing this Pledge Agreement, (a) Pledgor is exercising its right as a member holding the requisite percentage interest as a member of the Company to consent to the terms of this Pledge Agreement and to effectuate the terms hereof and representing that no further consents are required for Secured Party to exercise the rights granted by the Pledge Agreement and (b) Pledgor is casting an affirmative vote of 100% of the interests of the Company in favor of the terms, conditions, actions and transactions set forth in this Pledge Agreement.

## SECTION 4
## RIGHTS AND RESTRICTIONS RELATING TO COLLATERAL

**4.1.** *Distributions.* Except as otherwise provided in this section relating to rights and restrictions relating to certificates, Secured Party is entitled to receive all distributions of cash or property made by the Company with respect to the Collateral. After receiving a cash distribution, the Secured Party must apply it to the obligations secured by the Loan Documents in the manner Secured Party elects, in the exercise of its discretion. After receiving a distribution of property other than cash, the Secured Party must hold the property as additional security for the obligations secured by this Pledge Agreement.

**4.2.** *Other Rights.* Until there is a Default under this Pledge Agreement or the Loan Documents, Pledgor may exercise all rights of the holder of the Interests but only to the extent they are not inconsistent with the provisions of this Pledge Agreement.

Specifically, until there is a Default under this Pledge Agreement or the Loan Documents, the Pledgor is entitled to receive information regarding the business and affairs of the Company, inspect and copy the Company's books and records, exercise all voting rights, and exercise all rights to participate in the business and management of the Company. Pledgor's rights upon a Default are set forth in § 5 and § 6 hereof.

**4.3.** *Prohibition on Transfer.* The Pledgor may not sell, transfer, or otherwise dispose of all or any portion of the Collateral, including the Interests, or any other collateral held as security under this Pledge Agreement and the Pledgor must keep the Collateral and other collateral free and clear of all liens and encumbrances other than the lien created by this Pledge Agreement.

## SECTION 5
## DEFAULT

Time is of the essence of this Pledge Agreement. The occurrence of any of the following events will constitute a default under this Pledge Agreement, without notice:

**5.1.** *Cross-Default.* One or more Defaults occurs under any of the Loan Documents, with or without notice thereof;

**5.2.** *Payment Defaults.* The Pledgor fails to pay any installment of principal or interest on any obligation secured by this Pledge Agreement when the installment is due;

**5.3.** *Breach of Representations and Warranties.* Any representation or warranty made by the Pledgor in this Pledge Agreement proves to have been untrue in any material respect when it was made or furnished;

**5.4.** *Foreclosure Suit.* A foreclosure action or proceeding is commenced by any third party against the Collateral and the Secured Party reasonably determines that the action or proceeding would jeopardize the security interest created by this Pledge Agreement; or

**5.5.** *Financial Distress.* The Pledgor or the Company is in financial distress as evidenced by any of the following: (a) the Pledgor discontinues business; (b) the Pledgor makes a general assignment for the benefit of creditors; (c) the Pledgor applies for or consents to the appointment of a receiver, a trustee, or liquidator of the Pledgor or of all or a substantial part of the Pledgor's assets; (d) the Pledgor is adjudicated as being bankrupt or insolvent; (e) the Pledgor files a voluntary petition in bankruptcy or files a petition or answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of Pledgors, or admits (by answer, by default, or otherwise) the material allegations of a petition filed against it in any bankruptcy, reorganization, arrangement, insolvency, or other proceeding (whether federal or state) relating to relief of Pledgors; (f) a court of competent jurisdiction

enters any judgment, decree, or order that approves a petition seeking reorganization of the Pledgor, appoints a receiver, trustee, or liquidator of the Pledgor or of all or a substantial part of the Pledgor's assets, or takes any other action that, in the reasonable opinion of the Secured Party, would jeopardize the security interest created by this Pledge Agreement; or (g) the Pledgor takes or omits to take any action for the purpose or with the result of effecting or permitting any of the foregoing.

**SECTION 6**
**RIGHTS OF SECURED PARTY**

**6.1.**   *Rights of Secured Party, Other Rights.* Upon the occurrence of a Default hereunder or the Loan Documents, in addition to any other rights it may have or hereafter acquire, including rights under § 6.13, Secured Party may, in its sole discretion, exercise the rights of a secured creditor under the Uniform Commercial Code. After a Default hereunder or the Loan Documents and automatically without notice to Pledgor any other person, Pledgor shall cease to have voting or other rights with respect to the Collateral, including the Interests, and, as further set forth in § 6.13, Secured Party shall thereafter have exclusive rights to vote all or any part of the Interests and to execute consents in respect thereto, to consent to, satisfy or waive notice of any or all meetings, to elect members and to exercise any and all other rights as a member of Company whether under the Company's Operating Agreement or by operation of law.

**6.2.**   *Notice of Sale.*   Any notice of sale, disposition, or other intended action by Secured Party sent by First Class Mail, postage prepaid, and/or overnight courier, to the address of Pledgor as shown on the records of Secured Party at least ten (10) days before the action shall constitute reasonable notice. If Secured Party elects to enforce its remedies through a public sale, Debtor acknowledges and agrees that it is reasonable to hold such a sale in Cook County, Illinois. Secured Party may buy any part or all of the Collateral at any public sale and may make payments therefore by any means, including through partial or full credit bid in an amount Secured Party deems appropriate. In case of any sale or other disposition of any of the Interests aforesaid, after deducting all costs, or expenses of every kind for care, safekeeping, collection, sale, delivery and for reasonable attorney's fees for legal services in connection therewith, Secured Party may apply the residue of the proceeds of the sale or sales or other disposition of the Interests, in full or partial payment of the Loan, as it may deem proper, and return the excess proceeds, if any, to Pledgor.

**6.3.**   *No Waiver.* No delay on the part of Secured Party in exercising any rights hereunder or hereafter acquired with respect to this Pledge Agreement or the rights granted hereby shall operate as a waiver of such rights, nor shall the waiver of any breach hereunder operate as a waiver of any subsequent breach. Secured Party may also, at any time when in its discretion it may be deemed necessary, compromise, settle or extend the time of payment of any of the indebtedness hereby secured.

**6.4.**   *Remedies Exclusive.*   No remedy herein conferred upon or reserved to Secured Party is intended to be exclusive of any other available remedy or remedies, but

each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Pledge Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any Default, omission or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle Secured Party to exercise any remedy reserved to it in this Pledge Agreement, it shall not be necessary to give any notice, other than such notice as may be herein expressly required. In the event any provision contained in this Pledge Agreement should be breached by Pledgor and thereafter duly waived by Secured Party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. No waiver, amendment, release or modification of this Pledge Agreement shall be established by conduct, custom or course of dealing, but solely by an instrument in writing duly executed by Secured Party.

   **6.5.**  *Sale Process.*  In connection with any sale of the Collateral, the Pledgor agrees that it is commercially reasonable to sell the Collateral at public or private sale as one lot or in several lots. The Secured Party may restrict the purchasers or prospective purchasers of the Collateral in a manner that will avoid the necessity of registering the Certificates under applicable state or federal securities laws. The Secured Party must give the Pledgor no more than 10 days' notice of any proposed sale of the Collateral.  Pledgor recognizes and agrees that absent unforeseen circumstances, Secured Party will be required to sell the Collateral in a transaction which does not constitute a public offering and which qualifies for so-called private placement exemptions under the Securities Act of 1933 and applicable state securities laws. Pledgor agrees that a sale conducted after commercially reasonable public advertising shall constitute a public sale for purposes of the applicable provisions of the Uniform Commercial Code, notwithstanding reasonable restrictions imposed by Secured Party on bidders in order to qualify for applicable exemptions from registration and other requirements of the Securities Act of 1933, applicable state securities laws, and rules and regulations promulgated under any of them. Secured Party shall be under no obligation to delay a sale of the Collateral for the period of time necessary to permit Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, even if the Pledgor would agree to do so.

   **6.6.**  *Other Disposition.* The Secured Party has no obligation to sell the Collateral if, in its reasonable business judgment, none of the offers received reasonably approximates the fair value of the Collateral. If the Secured Party elects not to sell the Collateral, the Secured Party can elect to follow the procedures set forth in the Uniform Commercial Code for retaining the Collateral in satisfaction of the obligations secured by this Pledge Agreement, subject to the Pledgor's rights under those procedures.

   **6.7.**  *Financing Statements.*  Pledgor will execute one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law in form satisfactory to Secured Party and will pay the cost of filing or recording the same, or filing or recording this Pledge Agreement or any other instrument,

agreement or document executed and delivered pursuant hereto (including the cost of all Federal, State or local stamp or other taxes) in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Secured Party also has the right to file such financing statements and Pledgor authorizes Secured Party to do so. In addition, the Secured Party may file this Pledge Agreement as a financing statement. Pledgor will also promptly deliver to Secured Party, appropriately endorsed to Secured Party's order, all of the Collateral, including any Certificates, as to which Secured Party's security interest must be perfected by possession under applicable law. If at any time any of the Collateral is represented or evidenced by certificates, all certificates representing or evidencing the Interests shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party.

**6.8.**    *Assignment.* The Secured Party has the right to assign this Pledge Agreement and the interest of the Secured Party in the Collateral, including the Interests, or to grant a security interest in the same.

**6.9.**    *Transfer of Collateral.* If there is a Default under this Pledge Agreement or the Loan Documents, the Secured Party may take possession of the Collateral, including the Interests and the Certificates, and cause any of them to be transferred into the name of the Secured Party on the books and records of the Company. To this end, the Secured Party may notify the Company of the Default.

**6.10.**    *Preservation of Collateral.*   Secured Party shall not be under any liability or obligation to take any steps whatsoever to preserve the value of any Collateral, including any Interests, pledged hereunder, or to fix any liability upon, or to collect or to enforce payment of any indebtedness hereby secured, whether by giving any notice, presenting, demanding payment, protesting, instituting suit or otherwise.

**6.11.**    OBLIGATIONS NOT IMPAIRED. PLEDGOR HEREBY WAIVES DILIGENCE, PRESENTMENT, DEMAND, PROTEST AND NOTICE OF ANY KIND WHATSOEVER IN RESPECT OF THE LOAN OR THE COLLATERAL, AS WELL AS ANY REQUIREMENT THAT SECURED PARTY EXHAUST ANY RIGHT OR REMEDY OR TAKE ANY ACTION IN CONNECTION WITH THE LOAN DOCUMENTS, THIS PLEDGE AGREEMENT OR ANY OTHER DOCUMENTS. DEBTOR FURTHER WAIVES ALL RIGHT TO HAVE ANY SECURITY FOR THE LOAN MARSHALED UPON THE EXERCISE OF ANY REMEDIES PERMITTED HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS. PLEDGOR AGREES THAT SECURED PARTY MAY ACCEPT OR RELEASE OTHER SECURITY FOR THE OBLIGATIONS SECURED HEREBY, RELEASE ANY PARTY LIABLE FOR ANY SUCH OBLIGATIONS, GRANT EXTENSIONS, RENEWALS OR INDULGENCES WITH RESPECT TO SAID OBLIGATIONS, AND MAY APPLY AND OTHER SECURITY THEREFOR HELD BY IT WITHOUT PREJUDICE TO ANY OF ITS RIGHTS HEREUNDER.

**6.12.**    INDEMNITY. SECURED PARTY SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE, NOR DOES IT HEREBY UNDERTAKE TO PERFORM OR

{00179075 3}

DISCHARGE, ANY OBLIGATION, DUTY OR LIABILITY WITH RESPECT TO THE COLLATERAL OR THE COMPANY, AND PLEDGOR SHALL AND DOES HEREBY AGREE TO INDEMNIFY SECURED PARTY FOR, AND TO HOLD SECURED PARTY HARMLESS OF AND FROM, ANY AND ALL LIABILITY, LOSS OR DAMAGE (COLLECTIVELY, "LOSSES") WHICH IT MAY OR MIGHT INCUR WITH RESPECT TO OR BY REASON OF ANY OF THE COLLATERAL, INCLUDING THE INTERESTS, OR THIS PLEDGE AGREEMENT AND OF AND FROM ANY AND ALL CLAIMS AND DEMANDS WHATSOEVER WHICH MAY BE ASSERTED AGAINST IT IN RESPECT OF THIS PLEDGE AGREEMENT OR BY REASON OF ANY ALLEGED OBLIGATIONS OR UNDERTAKING ON ITS PART TO PERFORM OR DISCHARGE ANY OF THE TERMS, COVENANTS OR AGREEMENTS CONTAINED IN THE COMPANY'S OPERATING AGREEMENT, PROVIDED, HOWEVER, THAT PLEDGOR SHALL NOT BE REQUIRED TO INDEMNIFY SECURED PARTY FOR LOSSES DUE TO SECURED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. SHOULD SECURED PARTY INCUR SUCH LIABILITY, LOSS OR DAMAGE, OR IN THE DEFENSE OF ANY CLAIMS OR DEMANDS IN RESPECT THEREOF, THE AMOUNT THEREOF (INCLUDING REASONABLE COSTS, EXPENSES AND ATTORNEYS' FEES) SHALL BE SECURED HEREBY AND PLEDGOR SHALL REIMBURSE SECURED PARTY THEREFOR IMMEDIATELY UPON DEMAND.

**6.13.** *Power of Attorney and Proxy.*

(A) Immediately and automatically upon the occurrence of a Default, and without any notice thereof by Secured Party to any party, Pledgor, being the record owner of 61% of the Interests of the Company does hereby appoint Secured Party, of Chicago, Illinois, as its proxy to attend all meetings of the members of the Company with full power to vote and act for Pledgor in the same manner and extent that Pledgor might as if Pledgor were personally present at said meetings. As a result of this proxy, Secured Party shall have full power to substitute another person as Pledgor's proxy and to revoke the appointment of any such substitute proxy. This proxy is coupled with an interest, is given in connection with this Pledge Agreement and is irrevocable until all obligations owed by Pledgor or any Borrower to Secured Party are paid in full.

(B) The Pledgor appoints the Secured Party as the Pledgor's attorney-in-fact for transfer of the Collateral, including any of the Interests and Certificates, into the name of the Secured Party. The Company is not required to inquire as to whether or not the Pledgor is in default and whether the Secured Party is entitled to transfer any of the Collateral, including the Interests and any Certificates, into the name of the Secured Party or to take possession thereof.

**6.14.** *Marshaling.* The Secured Party will not be required to marshal security and may proceed to foreclose or otherwise realize upon the Collateral and any other security for the obligations secured by this Pledge Agreement in the order and the manner the Secured Party determines in the Secured Party's sole discretion.

**6.15.** *No Obligations or Duties.*   Secured Party shall not be under any liability or obligation to take any steps whatsoever to preserve the value of any of the Collateral, including any Interests pledged hereunder, or to fix any liability upon, or to collect or to enforce payment of any indebtedness hereby secured, whether by giving any notice, presenting, demanding payment, protesting, instituting suit or otherwise. Secured Party shall not have or owe any duties to Pledgor, Company or any third party arising from or in connection with the enforcement or exercise of any of rights under this Pledge Agreement or related to the Interests, including without limitation, any fiduciary or similar duty.

**6.16.** *Not a Joint Venture or Partnership.*   This Pledge Agreement and the other Loan Documents are intended to create only a debtor-creditor relationship between Pledgor and Secured Party, and Pledgor acknowledges and agrees that nothing contained herein or therein shall be construed in any way as creating a joint venture, partnership, joint tenancy or tenancy in common between Pledgor and Secured Party. Secured Party shall not, by virtue of this Pledge Agreement or the exercise of any of its rights related to the Interests or this Pledge Ageement, have any liability for the debts, obligations, or liabilities of the Company, have any obligation to make contributions to the Company, or owe any fiduciary or other duty to Pledgor, Company or any other members or creditors of the Company.

**6.17.** *Waiver of Subrogation Rights.*   Pledgor waives, relinquishes and irrevocably agrees not to assert in any fashion any and all rights of contribution, subrogation, indemnification or reimbursement Pledgor may have against any of the Borrowers related to, or as a result of, any of the actions of Secured Party hereunder, the Loan Documents or applicable law, including, without limitation, Secured Party's sale of any of the Collateral or receipt of any funds on account of the Loans.

### SECTION 7
### MISCELLANEOUS PROVISIONS

**7.1.** *Binding Effect.* The provisions of this Pledge Agreement are binding on and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the parties. This section is, however, not a modification of any restriction on transfer set forth in this Pledge Agreement.

**7.2.** *Notice.* All notices or other information required or permitted to be given by Secured Party to Pledgor in connection with this Pledge Agreement or an applicable Uniform Commercial Code provision must be in written form and may be sent, in Secured Party's sole discretion, by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, (d) confirmed telecopy or other facsimile transmission, or (e) email, addressed, as applicable, as follows:

Pledgor.

KW Restaurants Holdings, LLC

1278 Glenneyre Street
Suite 128
Laguna Beach, CA 92651

With a copy to:
Darrell J. Graham
Roeser Tanner & Graham LLC
Two North Riverside Plaza, Ste 1850
Chicago, IL 60606

All notices or other information sent by Pledgor to Secured Party in connection with this Pledge Agreement must be in writing and must be sent by prepaid overnight courier, addressed as follows:

If to Lender:

Attn: George Souri
LQD Financial Corp.
370 North Carpenter St.
Chicago, IL 60607

With a copy to:

William J. Factor
FactorLaw
105 W. Madison Street, Suite 1500
Chicago, IL 60602

The address of a party to which notices or other communications must be mailed may be changed from time-to-time by giving written notice to the other party.

**7.3.** *Litigation Expense.* If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this Pledge Agreement, or for the purpose of collecting any obligation secured by this Pledge Agreement, including any proceeding in the United States Bankruptcy Court, the Secured Party is entitled to recover reasonable attorney's fees in the proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law. In addition, the Secured Party is entitled to recover reasonable attorney's fees and legal expenses incurred by the Secured Party in connection with retaking, holding, preparing for sale, and selling the Collateral.

**7.4.** *No Waiver.* No waiver of any provision of this Pledge Agreement or any obligation secured by this Pledge Agreement may be deemed, or will constitute, a waiver of any other provision, whether or not similar, nor will any waiver constitute a

continuing waiver. No waiver will be binding unless executed in writing by the party making the waiver.

      **7.5.** *Section Headings.* Section headings are for convenience only and are not material parts of this Pledge Agreement.

      **7.6.** *Advice of Counsel.* The wording of this Pledge Agreement was reviewed by legal counsel for each of the parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution and enters into this Pledge Agreement freely and of their own volition and without any duress or coercion. The wording of this Pledge Agreement shall not be construed in favor of or against any party.

      **7.7.** *Merger/Modification.* This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters. This Pledge Agreement shall not be modified or amended or extended except in written form signed by each of the parties hereto. In entering into this Pledge Agreement and agreeing to be bound by the terms hereof, Pledgor is not relying upon any statements outside of this Pledge Agreement.

      **7.8.** *Counterparts.* This Pledge Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one agreement. Except as set forth herein, any party hereto may execute and deliver a counterpart of this Pledge Agreement by delivering by facsimile or email a signature page of this Pledge Agreement signed by such party and such signature shall be treated in all respects as having the same effect as an original signature.

      **7.9.** GOVERNING LAW/VENUE. THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES THAT WOULD, IF APPLIED, LEAD TO THE APPLICATION OF THE LAW OF ANOTHER STATE. PLEDGOR HEREBY IRREVOCABLY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY UNITED STATES MAIL, FIRST CLASS POSTAGE, OR ANY OTHER MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW. EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING BETWEEN THE PARTIES SHALL BE COOK COUNTY, ILLINOIS OR, IN SECURED PARTY'S SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW AND SECURED PARTY MAY BRING AN ACTION IN ANOTHER VENUE TO THE EXTENT DOING SO IS NECESSARY, IN SECURED PARTY'S SOLE DISCRETION, TO ENFORCE SECURED PARTY'S RIGHTS AGAINST PLEDGOR OR ANY OF THE COLLATERAL.

{00179075 3}

**7.10.**  WAIVER OF JURY TRIAL.   PLEDGOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. PLEDGOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION. CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.


KW Restaurant Holdings LLC

By:
Steve Karfaridis, Its Manager and
Sole Member


LQD Finance Corp.

By: *George Souri*
George Souri, not individually, but solely
as President of LQD Financial Corp.


Consented to by:

Crave Brands, LLC

By: KW Restaurant Holdings LLC, Its
Manager and Majority Member

By:
Steve Karfaridis, Its Manager and
Sole Member


{00179075 3}

Exhibit A

| Member Name / Address/Email | Membership Units | Fully Diluted Interest |
|---|---|---|
| KW Restaurant Holdings, LLC 1278 Glenneyre Street, Suite 128 Laguna Beach, CA 92651 Email: greekologie@yahoo.com | 6,104,242 | 61.04% |

# Exhibit 4



The following abbreviations, when used in the description on the face of this certificate, shall be construed as though they were written out in full according to applicable rules or regulations.

| TEN COM | — as tenants in common | UNIF GIFT MIN ACT | | Custodian |
| TEN ENT | — as tenants by the entireties | | (Cust) | (Minor) |
| JT TEN | — as joint tenants with right of survivorship and not as tenants in common | | under Uniform Gifts to Minors | |
| | | | Act | |
| | | | | (State) |

Additional abbreviations may also be used though not in the above list.

*For value received* _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

46-c

LQD Financial Corp
370 N. Carpenter
Chicago, IL 60661

_____ *Shares*

*represented by the within Certificate, and do hereby irrevocably constitute and appoint*

David Graff

_____ *Attorney*

*to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* 4/9/2021

*In presence of*

Eric Weisheit
Eric Weisheit

by Steve Karfaridis

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND CANNOT BE SOLD OR TRANSFERRED UNLESS (I) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES LAWS IS THEN IN EFFECT WITH RESPECT TO THE SECURITIES REPRESENTED HEREBY, OR (II) AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES LAWS IS AVAILABLE WITH RESPECT TO THE PROPOSED SALE OR TRANSFER AND THAT NO SUCH REGISTRATION IS REQUIRED.

# Exhibit 5

{00014788}

## WRITTEN CONSENT OF LQD FINANCIAL CORP. as the
## MAJORITY MEMBER OF KW RESTAURANT HOLDINGS LLC

The undersigned, being the sole member of KW Restaurant Holdings, LLC, a Delaware limited liability company (the "Company"), hereby consents to and adopts the following resolutions in lieu of a special meeting:

WHEREAS, LQD Financial Corp. ("LQD") is the owner and holder of 100.00% of the membership interests of the Company;

WHEREAS, pursuant the Company's operating agreement, a majority of the members may take any action required or permitted to be taken at any meeting of the members without prior notice and without a vote and such action shall have the same force and effect as if taken by the members at a meeting; and

WHEREAS, KW believes it is in the best interests of the Company to appoint a new manager of the Company and remove the current manager of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the undersigned hereby, as the holder of the majority of the membership interests of the Company and pursuant to the Company's operating agreement, authorizes and approves the removal of Steve Karfaridis as the manager of the Company and the appointment of Robert Handler as the manager of the Company;

FURTHER RESOLVED, that notice of this action be given to each of the other members as soon as possible;

FURTHER RESOLVED, that Robert Handler, as manager of the Company, is hereby authorized and empowered to do all things, including to execute and deliver all documents necessary and appropriate, to fulfill the role of manager of the Company.

FURTHER RESOLVED, that Robert Handler be, and he hereby is, authorized and directed, in the name and on behalf of the Company, to take any and all actions and to execute and deliver any and all other documents that he so acting deems necessary or desirable to carry out the purpose and intent of the foregoing resolutions, the taking of such actions and the execution and delivery of such documents to be sufficient and conclusive evidence that the same are within the authority conferred by these resolutions.

IN WITNESS WHEREOF, the undersigned has executed this Written Consent as of April 9, 2021.

LQD Financial Corp.

*George Souri*

By: George Souri (Apr 9, 2021 15:15 CDT)
Name: George Souri
Its: President

{00193914}

# Exhibit 6

{00014788}

## WRITTEN CONSENT OF KW RESTAURANT as the
## MAJORITY MEMBER OF CRAVE BRANDS LLC

The undersigned, being the majority member of Crave Brands LLC, a Delaware limited liability company (the "Company"), hereby consents to and adopts the following resolutions in lieu of a special meeting:

WHEREAS, KW Restaurant Holdings LLC ("KW") is the owner and holder of 61.04% of the membership interests of the Company;

WHEREAS, pursuant to Section 4.4 of the Company's operating agreement, a majority of the members may take any action required or permitted to be taken at any meeting of the members without prior notice and without a vote and such action shall have the same force and effect as if taken by the members at a meeting; and

WHEREAS, KW believes it is in the best interests of the Company to appoint a new manager of the Company and remove the current manager of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the undersigned hereby, as the holder of the majority of the membership interests of the Company pursuant to section 4.4 of the Company's operating agreement, authorizes and approves the removal of Steve Karfaridis as the manager of the Company and the appointment of Robert Handler as the manager of the Company;

FURTHER RESOLVED, that notice of this action be given to each of the other members as soon as possible;

FURTHER RESOLVED, that Robert Handler, as manager of the Company, is hereby authorized and empowered to do all things, including to execute and deliver all documents necessary and appropriate, to fulfill the role of manager of the Company.

FURTHER RESOLVED, that Robert Handler be, and he hereby is, authorized and directed, in the name and on behalf of the Company, to take any and all actions and to execute and deliver any and all other documents that he so acting deems necessary or desirable to carry out the purpose and intent of the foregoing resolutions, the taking of such actions and the execution and delivery of such documents to be sufficient and conclusive evidence that the same are within the authority conferred by these resolutions.

IN WITNESS WHEREOF, the undersigned has executed this Written Consent as of April 9, 2021.

KW Restaurant Holdings, LLC, a Delaware limited liability company

By: _____
Name: Robert Handler
Its: Manager

{00293912}

# Exhibit 7

{00014788}

| | |
|---|---|
| **From:** | William Factor |
| **To:** | Newman, Lauren; Darrell Graham (dgraham@rtglaw.com); Matthew Hafter (mhafter@thompsoncoburn.com) |
| **Cc:** | Robert P. Handler (rhandler@com-rec.com) |
| **Subject:** | Sending: Exercise of Remedies Letter (00193925).docx |
| **Date:** | Friday, April 9, 2021 3:28:24 PM |
| **Attachments:** | Exercise of Remedies Letter (00193925).docx |



William J Factor
Direct Dial: 312-878-6146
Email: wfactor@wfactorlaw.com

April 9, 2021

Darrell Graham                          Lauren Newman
Roeser Tanner & Graham LLC              Thompson Coburn LLP
Two North Riverside Plaza. Ste 1850     55 East Monroe Street
Chicago, IL 60606                       Chicago, IL 60603

Matt Hafter
Thompson Coburn LLP
55 East Monroe Street
Chicago, IL 60603

    Re:    Crave Brands

Dear Darrell, Matt, and Lauren:

    Reference is hereby made to the various loan agreements, forbearance agreements, pledge agreements and related documents (the "Loan Documents") executed by and between Crave Brands, LLC ("Crave"), KW Restaurant Holdings, LLC ("KW"), Meathead Franchising, LLC ("Franchising"), Meathead Restaurants, LLC ("Restaurants") and Steve Karfaridis ("Steve," Crave, KW, Franchising, and Restaurants, are the "Borrowers"), including that certain Amended and Restated Forbearance and Reaffirmation Agreement dated December 18, 2020 (the "Forbearance Agreement").

    As you know, actionable defaults have occurred under the Loan Documents (the "Events of Default").

    As a result of the Events of Default, Lender has exercised certain of its rights under the Loan Documents and applicable law.

    Accordingly, please be advised that Lender has foreclosed upon the 100% membership interest (the "Interest") it holds in KW Restaurant Holdings LLC ("KW") through a partial retention of the collateral securing the indebtedness owed to Lender. Lender will credit $100,000 to the outstanding amount owed. As a result, Lender is now the sole member of KW.

April 9, 2021
Page 2

As the sole member of KW, Lender has removed Stave Karfaridis as the manager of KW. Mr. Karfaridis no longer has any authority to act on behalf of KW. Robert Handler now is the manager of KW.

Additionally, as the manager of KW, Robert Handler has executed a written consent removing Steve Karfaridis as the manager of Crave Brands LLC. Steve Karfaridis lacks authority to act on behalf of Crave Brands. Robert Handler now is the manager of Crave Brands. All instructions regarding Crave Brands should be taken from Robert Handler.

As a result of the foregoing, we assume you understand that instructions from Mr. Handler, as the manager of KW and Crave, will be forthcoming to your respective firms.

Lender reserves all of its rights and remedies under the Loan Documents and applicable law and does not waive or release any rights or remedies as a result of these actions.

**THE LAW OFFICE OF
WILLIAM J. FACTOR, LTD.**

Very truly yours,

William J Factor

WJF:
cc:    LQD Financial Corp.
       Robert Handler

{00193925}

Exhibit 8

| | |
|---|---|
| **From:** | Robert Handler |
| **To:** | Lauren Newman |
| **Cc:** | William Factor; Warfield, David A. |
| **Subject:** | Crave Brands, LLC |
| **Date:** | Friday, April 9, 2021 7:01:13 PM |
| **Attachments:** | image001.png |

Hi Lauren,

As you were recently informed by Bill Factor, I am the manager of Crave Brands, LLC  and
KW Restaurant Holdings, LLC.   Please be advised that I did not authorize you or your firm to
file the Chapter 11 petition for Crave.  You are further advised that Thompson Coburn has a
conflict of interest by your continuing representation of both Steve Karafaridis on the one
hand, and KW and Crave on the other, and that neither Crave nor KW waives that conflict

Regards,

Bob


Bob Handler
Commercial Recovery Associates, LLC
205 W. Wacker Drive, Suite 918
Chicago, IL 60606
P: (312) 845-5001, x221
C: (312) 543-3427

signature_1964049469