IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| CRAVE BRANDS, LLC, *et al.*, | ) | Case No. 21-04729 |
| | ) | |
| Debtors. | ) | Hon. Timothy A. Barnes |
| | ) | |
| | ) | (Jointly Administered) |

**DEBTORS' RESPONSE IN OPPOSITION TO LQD'S**
**MOTION TO DISMISS §§305 AND 1112(B) AND FOR STAY RELIEF**

Debtors Crave Brands, LLC ("**Crave**") and Meathead Restaurants LLC ("Meathead" and, together with Crave, "Debtors") submit this response in opposition to the *Motion to Dismiss Under §§305 and 1112(B) and/or for Stay Relief* (ECF No. 19)(the "Motion") filed on behalf of LQD Financial Corp. ("LQD").

### I.    PRELIMINARY STATEMENT

The Debtors borrowed about $6.5 million from LQD over two years ago. Since that time, the Debtors have made every single *weekly* 17% interest payment to LQD when due. And the Debtors managed this during the worst pandemic in a century that, according to Bloomberg's, caused 110,000 restaurants to fail. The Debtors' gross revenues are back to where they were before COVID. Gross margins, restaurant profit, company EBITDA, and net income are now higher than before COVID. EBIDTA and net income has improved the two years under current management. The Debtors are paying LQD weekly adequate protection payments, and the Debtors intend to file their Subchapter V plan well before the statutory 90 day period.

Despite the foregoing, LQD filed its Motion less than four days after the Debtors filed their Subchapter V bankruptcy cases. LQD makes only one serious argument in support of the

Motion, namely that the bankruptcy filings were *ultra vires* because LQD purportedly replaced Steve Karfaridis as the Debtors' manager moments before the bankruptcy filing. But as the Debtors demonstrate, LQD's acceptance in partial satisfaction of Karfaridis' KW membership interest violated Section 9-620 of the UCC for the reasons described in Section III(A). All of LQD's other arguments can be disposed of quickly.

## II.     BACKGROUND

To understand LQD's *ultra vires* argument, one must understand Debtors' corporate structure. See Exhibit A. In short, Steve Karfaridis owns the 100% membership interest in KW Restaurant Holdings, LLC ("KW"). KW owns approximately 60% of the membership interests in Crave. Crave owns 100% of the member interests in Meathead. Mr. Karfaridis is the sole manager of KW, Crave, and Meathead.

On December 18, 2020, LQD and the five obligors on LQD's loan[1] signed an Amended and Restated Forbearance and Reaffirmation Agreement (the "Forbearance Agreement"). The Debtors were not in payment default to LQD at the time the parties signed the Forbearance Agreement. Nevertheless, Section 5(d) of the Forbearance Agreement says:

> "Borrowers consent to Lender's acceptance of the Collateral in full or partial satisfaction of the Indebtedness, as determined by Lender pursuant to a writing Lender delivers to Borrowers, **with the amount of the Indebtedness satisfied to be determined Lender at the time of the acceptance.**" (emphasis added)

The Forbearance Agreement fixed the new maturity date of the loan as March 31, 2021. On April 1, 2021, LQD notified the Debtors for the first time that it would not extend the loan.

---

[1] The five obligors are Karfaridis, KW, Crave, Meathead, and Meathead Franchising, LLC, a non-debtor that owns no assets of value.

The Debtors were not in payment default (or in covenant default for that matter) when LQD refused to extend the loan.

On April 9, 2021, LQD's counsel sent a letter (the "April 9 Letter") to the Debtors' counsel a few minutes before the bankruptcy filing. The April 9 Letter said that LQD had accepted Karfaridis' KW membership interest in satisfaction of $100,000 of the $6,650,000 indebtedness. As a result, the April 9 Letter continued, LQD was the sole member of KW and LQD had removed Karfaridis as manager and replaced him with a third party. The third party then purported to remove Karfaridis as manager of Crave.

However, LQD's purported acceptance of the KW membership interest in partial satisfaction of the indebtedness violated §9-620 of the Uniform Commercial Code ("UCC"). As a result, Karfaridis is still the sole manager of KW, Crave and Meathead, and the bankruptcy petitions were properly authorized.

### III. THERE ARE NO GROUNDS TO DISMISS THESE CASES

**A. LQD's Last Minute Partial Strict Foreclosure Was Invalid**

Although Revised Article 9 permits partial strict foreclosure, the statute imposes several conditions on the exercise of his remedy. Specifically, under UCC §9-620(a), a debtor must "consent" to a secured lender's proposed acceptance of collateral in partial satisfaction of the secured debt. Such consent occurs "*only if* the debtor agrees to the terms of the acceptance in a record authenticated after default."

A debtor must affirmatively "agree to the terms" of a partial strict foreclosure to prevent creditor overreaching. As a leading treatise says:

> The drafters require greater protection of the debtor if the creditor takes collateral in partial satisfaction because of the chances of overreaching. For example, the creditor might propose to take the collateral in

satisfaction of only $10 of debt while planning to sue on the remaining debt.

4 J. White, R. Sommers and R. Hillman, *Uniform Commercial Code*, §34:20 (6th Ed. 2020)(hereinafter "White & Summers"); s*ee also* T. Zinnecker, *The Default Provisions of Revised Article 9 of the Uniform Commercial Code: Part II*, 54 Bus. Law. 1737, 1769 (August 1999)("The prohibition against implied consent to a partial strict foreclosure presumably stems from a heightened concern that through mere silence a debtor should not lose its property and also remain liable *for an amount of debt calculated by the creditors in its sole discretion*.")(emphasis added).

Likewise a debtor cannot waive its right to "agree to the terms" of a partial strict foreclosure. UCC §9-602(10). White & Summers, at §34:20 ("[UCC] Section 9-602(10) explicitly prohibits waiver of the 'rules' stated in UCC §9-620").

Revised Article 9 does not explicitly state what must be included within the "terms of acceptance." However, Official Comment 4 to §9-620 says that "a proposal to accept collateral should specify the amount . . . of the secured obligation to be satisfied, [*etc.*]"). Other commentators agree that partial strict foreclosure consents must disclose the amount of indebtedness that will be satisfied. *See, e.g.*, 1 *Nimmer's Commercial Asset-Based Financing*, §6.5 (2020)("with a partial-strict foreclosure, the secured creditor must set forth the amount it is willing *to* credit toward the obligation."); F. Miller & W. Henning, 47 *Uniform Commercial Code Law Letter* 1, No. 3 (May 2013)("A secured party proposing a partial strict foreclosure should specify the amount by which the outstanding indebtedness will be reduced when the secured becomes the owner of the collateral"). Indeed, a rule that does not require the creditor to

disclose the amount of the credited indebtedness would encourage the sort of creditor overreaching that the statute is specifically designed to prevent. White & Summers, at §34:20.

Moreover, courts have consistently required that a written consent to a partial strict foreclosure must include the amount of debt being satisfied. *See, e.g., Kapor v. RJC Investment, Inc.*, 434 P.3d 869, 877-8 (Mont. 2019); *John Hancock Insurance Company v. Goss*, 2015 WL 5569150 (N.D. Cal. September 21, 2015)(the court held that the premium financing lender's "argument contravenes the statute's purpose of protecting both creditors and debtors from strict foreclosure without a clear understanding of the legal consequences.").

LQD does not contend that Karfaridis agreed to allow LQD to accept ownership of Karfaridis' KW membership interest for satisfaction of only $100,000 of the indebtedness. Instead, LQD points to Section 5(b) of the Forbearance Agreement, and construes it to say Karfaridis agreed in December 2020 to a partial strict foreclosure at some hypothetical point in the future in exchange for an amount to be determined by LQD at that hypothetical future time.

LQD's argument is inconsistent with UCC §9-620(c)(1)'s requirement that a debtor must affirmatively "agree to the terms" of a partial strict foreclosure. LQD's argument that one party can fix the most consequential term of an agreement in its sole discretion is repugnant to even the most rudimentary notions of offer and acceptance. *See, e.g., Association Benefit Services Inc. v. Carmark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007)("No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance."); *Maywood Sportservice, Inc. v. Maywood Trotting Assoc., Inc.*, 302 N.E.2d 79, 84 (Ill. App. 1973)(*citing Kraftco Corp v. Kolbus*, 274 N.E.2d 153, 155 (Ill. App. 1971))("where obligations of one party to a contract are

totally dependent upon its own actions, the contract is void."). As one noted authority on contract law explains, "[o]ne of the most common types of promises that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroy the promise and makes it illusory." *Williston on Contracts*, §4:27 (4th Ed. 2020)

By purporting to grant LQD the absolute discretion to determine the amount of debt that would be satisfied in a partial strict foreclosure, Section 5(d) of the Forbearance Agreement constitutes a "wavier" and/or "variance" of the requirements of UCC §9-620(c)(1). This purported waiver and/or variance is an impermissible attempt to overreach and is expressly null and void under UCC §9-602(a)(10).

Since the alleged partial strict foreclosure of the KW membership interest violated the UCC and is therefore void, LQD had no authority to replace Karfaridis or revoke his authority to sign the Debtors' voluntary bankruptcy petitions. *Cf. In re Cadiz Properties, Inc.*, 278 B.R. 744, 749 (N.D. Tex. 2002)(the alleged strict foreclosure was ineffective and, thus, the debtor's existing board of directors retained full power and authority to authorize the debtor corporation's bankruptcy filing).[2]

**B.  LQD's Attempted Partial Strict Foreclosure On Karfaridis' KW Membership Interest In Void Because of Bad Faith**

Separately, LQD's attempted partial strict foreclosure on Karfaridis'' KW membership interest is invalid as being in bad faith. Pursuant to UCC §1-304, "every contract or duty within the scope of the Uniform Commercial Code imposes an obligation of good faith in performance

---

[2] *See* UCC §9-622, Official Comment 2 ("If a purported acceptance is ineffective under Section 9-620 . . . then neither [subsection (a)] nor subsection (b) [of this Section] applies."); *see also* 10 Hawkland UCC Series §9-622:2 (2020)(noting that noncompliance under UCC §9-620 is not covered by UCC §9-622 and that in the case of non-compliance with UCC §9-620, "the purported strict foreclosure is simply invalid.").

or enforcement." It is well-accepted that "the remedy of acceptance [of collateral] in full or partial satisfaction of the obligation . . . must be done in 'good faith.'" D. Rapson, *Default and Enforcement of Security Interests under Revised Article 9*, 74 Chicago-Kent L. Rev. 893, 924 (1999). As explained in Official Comment 11 to UCC §9-620:

> Section 1-304 imposes an obligation of good faith on a security party's enforcement under this Article. This obligation may not be disclaimed by agreement. See Section 1-302. Thus, a proposal and acceptance made under this section in bad faith would not be effective. For example, a secured party's proposal to accept marketable securities worth $1,000 in full satisfaction of indebtedness in the amount of $100, made in the hopes that the debtor might inadvertently fail to object, would be made in bad faith.

UCC §9-620, Official Comment No. 11.

LQD purportedly accepted Karfaridis'' KW membership interest in satisfaction of only $100,000 of the indebtedness. As Exhibit 7 to the Motion shows, on April 7, less than two days before the April 9 letter, LQD offered to release Karfaridis from at least $3,325,000 (and potentially, the entire amount) of the debt in exchange for what would have amounted to 93% of his interest in the Debtors. LQD cannot explain why the credit dropped by more than $3.3 million in less than forty-eight (48) hours. LQD's actions fall squarely within the type of overreaching conduct proscribed by the above Official Comment.

C. **Delaware Limited Liability Company's Act Law Prohibits LQD from Stripping Karfaridis from the Right to Vote His Interests**

LQD also argues "the pledge agreements for KW and Crave prohibited Karfaridis from exercising voting rights upon occurrence of a default." Motion, p. 2. However, this provision of the pledge agreement is unenforceable. Since KW is an Delaware limited liability company, it is governed by the Delaware Limited Liability Company Act (the "Act"), 6 Del. Code §§18-101 *et seq*. Under the Act, a member of a Delaware limited liability company who pledges his

membership interest to a third-party lender continues to retain the right to vote the membership interest unless the company's limited liability company agreement expressly provides otherwise.

> *Unless otherwise provided in a limited liability company agreement*, the pledge of, or granting of a security interest, lien or other encumbrance in or against, any or all of the limited liability company interest of a member shall not cause the member to cease to be a member or to have the power to exercise any rights or powers of a member.

6 Del. Code §18-1702(b)(3) (emphasis added)

Nothing in KW's Operating Agreement disenfranchises Karfaridis if he pledges his membership interest. Applying similar statutory provisions from other jurisdictions, at least two other bankruptcy courts denied motions to dismiss filed by creditors that argued the debtors' members had agreed not to exercise their voting rights after an event of default. *See In re Lake County Grapevine Nursery Operations*, 441 B.R. 653, 654 (Bankr. N.D. Cal. 2010); *In re Crossover Financial I, LLC*, 477 B.R. 196, 204-5 (Bankr. D. Colo. 2014).

Furthermore, the relevant language in the KW Operating Agreement was added in December 2020 when the parties signed the Forbearance Agreement. The Forbearance Agreement recites that the loan was in covenant default. Therefore, under LQD's reading of the documents, Karfaridis surrendered his voting rights in KW when he signed the Forbearance Agreement. Courts correctly view clauses of this sort as back-handed attempts to divest companies of their right to file bankruptcy. *Cf. In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 264 (Bankr. D. Del. 2016)(noting that "[t]oday's resourceful lawyers" are continuing the tradition of attempting to devise ever more creative and surreptitious ways to "circumvent the bankruptcy laws 'through a circuity of arrangement.'").

**D.    Debtors' Bankruptcy Filings Are a "Good Faith" Attempt To Reorganize Businesses Devasted by a Once-in-a-Century, Global Pandemic**

Debtors sustained enormous financial setbacks as a result of the COVID-19 pandemic. Congress increased Subchapter V's debt limits in direct response to the pandemic. The Debtors are merely seeking to use Subchapter V in a good faith attempt to address their financial challenges.

Paying no heed to the pandemic, LQD argues the Court should dismiss Debtors' cases because they are "bad faith" filings. LQD invokes the so-called *Takena* factors applied by this Court (with some reservations) in *In re Lake Michigan Beach Pottawattamie Resort LLC*, 547 B.R. 899, 905 (Bankr. N.D. Ill. 2016)(*citing In re Tekena USA, LLC*, 419 B.R. 341, 346 (Bankr. N.D. Ill. 2009)).

These filings are not in remotely in the neighborhood of bad faith filings like *Tekena*. The Debtors have twelve operating restaurants. They have over 100 employees and more than 60 trade creditors. The Debtors are operating businesses that filed bankruptcy to prevent a single creditor from taking self-interested actions that would impair value for all the Debtors' stakeholders. If it is bad faith to file a bankruptcy case to stop a single creditor from exercising legal rights, then Texaco could not have filed bankruptcy to stop Pennzoil from executing on its judgment. Indeed, if these cases are filed in bad faith, as LQD alleges, then a majority of all Chapter 11 cases should also be dismissed. Cf. *Lake Michigan Beach Pottawattamie Resort*, 547 B.R. at 906 (wherein this Court, after noting that the debtor's bankruptcy schedules listed two other creditors, rejected the secured lender's contention that the case represented a two-party dispute).

LQD peppers this part of its argument with *ad hominem* attacks on Debtors' management. Steve Karfaridis is a forty-year veteran of the restaurant industry with deep management experience in the fast-casual niche. Michael Webb is an experienced businessman who has served

on several boards of directors for businesses in the retail, restaurant, and hospitality industries. Karfaridis and Webb's salaries are $90,000 each, hardly excessive. And both of them deferred all of their salaries during most of the pandemic.

LQD also argues that Debtors' filings were in bad faith because the Debtors did not include their Paycheck Protection Program ("PPP") loan in calculating their compliance with Subchapter V's debt eligibility limits. However, the only published decision on the issue fully supports the Debtors' position. *See In re Parking Management, Inc.* 620 B.R. 544, 560 (Bankr. D. Md. 2020)("debtor's obligation under the PPP was unliquidated as of the date of filing."). Moreover, the Office of U.S. Trustee in this case independently evaluated the PPP Loan issue and concluded it would not challenge the filings.

In short, Debtors do not doubt that their bankruptcy filings frustrated LQD's plans to take over ownership of their businesses. Nevertheless, the Debtors' bankruptcy cases represent a wholly appropriate and legitimate use of the Bankruptcy Code by two small business debtors seeking to restructure their financial affairs.

E.   **The Cases Should Not Be Dismissed Under Section 305**

LQD also argues that the Court should dismiss these cases under Section 305's abstention provisions. In a bankruptcy case involving an ongoing and active business with multiple creditors, abstention is rarely, if ever, appropriate unless there is an already pending state court receivership or some formal out-of-court restructuring arrangement. *See, e.g.*, *In re FMB Bancshares, Inc.*, 517 B.R. 361, 372 (Bankr. M.D Ga. 2014). There is obviously no such state court receivership or formal out-of-court restructuring in these case.

## IV.  LQD HAS FAILED TO ESTABLISH GROUNDS FOR OBTAINING RELIEF FROM THE AUTOMATIC STAY

### A. This Court Should Not Enforce the Pre-Petition Stay Waivers In The Forbearance Agreement

In addition to the other measures it included to restrict the Debtors' ability to file for bankruptcy protection, LQD also inserted "automatic stay waivers" in the Forbearance Agreement. Invoking these provisions as part of the instant Motion, LQD now claims it is contractually entitled to relief from the automatic stay.

LQD fails to cite to any authority within this district or even within this Circuit. Instead, LQD cites mostly (if not exclusively) single-asset real estate bankruptcy cases in which courts gave the pre-petition stay waivers varying degrees of recognition and enforcement. Although Debtors' counsel is not aware of any precedent directly on point either from the Seventh Circuit or in this district, this Court aptly observed in the past: "[i]n the same way that individuals may not contract away their bankruptcy rights, corporations should be similarly constrained. *See, e.g.*, 11 U.S.C. §362(e)." *Lake Michigan Beach Pottawattamie Resort LLC*, 547 B.R. at 912.

As one court observed in an attempt to explain why it is had previously honored a pre-petition stay waiver in a single asset real estate bankruptcy case but was unwilling to do so in the case immediately before it:

> [The debtor in this case] has a significant business enterprise that operates twelve Burger King fast-food chains. The Debtor employs nearly 200 employees in servicing customers at these locations and generates substantial income . . . This [case] involves the types of activity for which for which Chapter 11 was designed.

*In re Deb-Lyn, Inc.*, 2004 WL 452560, 3 (N.D. Fla. February 20, 2004).

Accordingly, Debtors maintain this Court should likewise refuse to enforce the pre-petition stay waivers invoked by LQD in this case.

**B. LQD Has Otherwise Failed to Demonstrate Its Entitlement to Relief from Stay**

LQD is already receiving adequate protection in the form of weekly interest payments of $21,982 and daily reporting. There is not a scintilla of evidence that LQD's collateral position is eroding during the pendency of these cases. Accordingly, LQD is not entitled to relief under 11 U.S.C. § 362(d)(1).

Similarly, in respect to its request for relief under 11 U.S.C. § 362(d)(2), LQD has failed to carry its burden of demonstrating Debtors lack equity in the collateral. 11 U.S.C. §362(g)(1). Likewise, as will be evident in the proposed Chapter 11 Plan, LQD's collateral is definitely necessary for an effective reorganization.

## V.     CONCLUSION

For all the foregoing reasons and such additional reasons as may be further developed and presented in any proceedings in this matter, Debtors Crave Brands, LLC and Meathead Restaurants LLC submit that the *Motion to Dismiss Under §§305 and 1112(B) and/or for Stay Relief* (ECF No. 19) filed on behalf of LQD Financial Corp. should be denied with prejudice.

        Respectfully submitted,

        CRAVE BRANDS, LLC and
        MEATHEAD RESTAURANTS, LLC


        By: /s/ David A. Warfield
            One of their attorneys

Lauren Newman, Esq. (IL Bar No. 6188355)
Thompson Coburn LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
Telephone: (312) 580-2328
Fax: (312) 580-2201
lnewman@thompsoncoburn.com

David A. Warfield
Thompson Coburn LLP
One U.S. Bank Plaza, Suite 2700
St. Louis, Missouri 63101
Telephone: (314) 552-6079
Fax: (314) 552-7000
dwarfield@thompsoncoburn.com

Proposed Counsel for Debtors

## CERTIFICATE OF SERVICE

      I, David A. Warfield, an attorney, hereby certifies that on May 4, 2021, pursuant to Section II. B.4 of the Administrative Procedures for the Case Management/Electronic Case Filing System and Fed. R. Civ. P. 5(a), I caused a copy of the foregoing Debtors' Response In Opposition To LQD's Motion To Dismiss §§305 and 1112(B) and For Stay Relief to be served electronically on all persons identified as registrants on the Service List below.

                                            /s/  David A. Warfield

## SERVICE LIST

Matthew Brash  mbrash@newpointadvisors.us, I003@ccfcbis.com

William J Factor on behalf of Creditor LQD Financial Corp.  wfactor@wfactorlaw.com, wfactorlaw@gmail.com;bharlow@wfactorlaw.com;wfactor@ecf.inforuptcy.com;wfactormyecfmail@gmail.com;factorwr43923@notify.bestcase.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

David A. Newby on behalf of Creditor MEPT Stony Creek LLC
dnewby@momkus.com, lholub@momkus.com

**Exhibit A**

**(Corporate Structure)**

